## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| EMILY ZAPANTIS-DALAMAKIS,<br><br>                    Plaintiff,<br><br>    vs.<br><br>CITY OF NEW YORK and the NEW YORK CITY<br>DEPARTMENT OF EDUCATION,<br><br>                    Defendants. | CASE NO. 24-4631<br><br><br>**COMPLAINT**<br>JURY TRIAL DEMANDED |

*"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*

— James Madison, 1784

Plaintiff EMILY ZAPANTIS-DALAMAKIS, through undersigned Counsel, affirms that the following is true, or, if on information and belief, that she believes it to be true:

### PRELIMINARY STATEMENT

1.     Plaintiff, EMILY ZAPANTIS-DALAMAKIS ("Mrs. Zapantis"), stands before this honorable Court seeking justice and compensation for the violation of her fundamental religious rights, which were violated by her employer, the New York City Department of Education ("DOE") working together with the City of New York

1

(the "City").

2.      On or about August 24, 2021, then Mayor Bill de Blasio, with his then Commissioner of Health David Chokshi, issued an "emergency" regulation mandating Covid-19 vaccination for all DOE employees (the "Mandate").

3.      Initially, the City and the DOE openly asserted that they would not consider any religious or medical accommodations, despite their statutory responsibilities to do so.

4.      Labor disputes, lawsuits and several temporary restraining orders forced the City to amend the Mandate to allow reasonable medical and religious accommodation and the DOE to adopt an accommodation policy ("Stricken Standards").

5.      However, the policy was designed and applied to deny as many applicants as possible.

6.      Essentially, the Stricken Standards conditioned access to accommodation on membership in certain preferred religious organizations.

7.      For example, the Stricken Standards facially favored Christian Scientists, and stated that people whose religious beliefs were not shared by so-called "established" and "recognized" religious leaders would be denied.

8.      In practice, DOE engaged in even more discrimination than the written policy required.

9.      For example, the Stricken Standards required the DOE to conduct the initial review of each application and to accommodate any employee who met the

2

policy's definition of a valid religious exemption without regard to undue hardship.

10.    But in violation of its own policies and governing law, DOE sent every single applicant (including Plaintiff) the same autogenerated form email, asserting that the Mandate did not allow DOE employees to work in person and that DOE could not offer another worksite without undue hardship (which they defined as "i.e., more than a minimal burden") on DOE and its operations.

11.    Mrs. Zapantis received this email, even though as an Assistant Principal she was an administrator and could have been easily accommodated or remotely.

12.    This same email was even sent to employees who were already approved for remote work and were already engaged in remote work at the time, revealing that no individualized, good faith assessment was made about possible reasonable accommodations.

13.    The email also stated the wrong "*de minimus*" standard, even though the New York City Human Rights Law ("CHRL"), New York State Human Rights Law ("SHRL") and Title VII of the Civil Rights Act of 1964 ("Title VII") each require an employer to prove that accommodation would pose a significant hardship after individualized review and based on concrete data and evidence before denying accommodation.

14.    Moreover, the email misstated the facts. The Mandate had by that time been specifically amended to acknowledge that nothing therein prevented reasonable accommodation required by law, which could include in-person instruction.

15.    Mrs. Zapantis could have safely been allowed to work unvaccinated in

person, as she'd been doing throughout the pandemic without issue.

16.    Furthermore, when implementing the policy, decision-makers and agents of the City and DOE repeatedly made defamatory and hostile statements about religious objections to Covid-19, showing clear animus, and engaging in what can only be considered heresy inquisitions.

17.    For example, Arbitrator Barry Peek and the DOE attorneys argued in Plaintiff's appeal hearing that Plaintiff could not qualify for accommodation, even though she had sincerely held religious beliefs, because a Greek Orthodox Church leader in North America is vaccinated.

18.    Plaintiff explained that the Greek Orthodox Church is autocephalous and she does not follow the North American religious leader, but rather other Bishops, Holy Elders and Saints in the Church that have provided guidance showing her she cannot take the Covid-19 vaccines.

19.    DOE and the arbitrator ignored Plaintiff's interpretation of her faith, and denied her relief on the basis that her beliefs were not eligible for protection under the Stricken Standards.

20.    Meanwhile, other Assistant Principals were accommodated because their beliefs were favored under the discriminatory policy.

21.    By November 2021, the Second Circuit had already issued a merits decision holding that the Stricken Standards were blatantly unconstitutional and likely violated employees' rights under the Free Exercise Clause of the First Amendment to the United States Constitution. *Kane* v. *De Blasio*, 19 F.4th 152, 168

4

(2d Cir. 2021) (per curiam).

22.     During those proceedings, Defendants themselves also admitted the Stricken Standards were "constitutionally suspect" and the City promised to give "fresh review" under a new "Citywide Panel" process, and reinstate wrongfully denied employees with back pay.

23.     However, the Citywide Panel process proved to be just as much of an exercise in futility.

24.     The Panel applied many of the same discriminatory criteria as DOE had previously applied and denied all applicants except for one.

25.     This one reversal was issued for one of the ten plaintiffs in the *Kane* lawsuit while the matter was "subjudice" and was pretextual.

26.     Plaintiff's application was denied by the Citywide Panel without any explanation, even though other Assistant Principals had been accommodated under the Stricken Standards, and even though the DOE acknowledged Plaintiff's religious objections were sincere.

27.     In the Spring of 2022, DOE began terminating employees denied by the Citywide Panel, including Plaintiff.

28.     Though the Mandate was rescinded in February 2023, DOE continues to retaliate against these employees by attaching problem codes to their files and failing to allow them to come back.

29.     This lawsuit seeks to restore justice and dignity to a woman who has given her life to serving Defendants, and the children in the New York City public

school system, and to safeguard religious freedom and the sanctity of personal convictions in a just society.

30.    Plaintiff files on behalf of herself and all others similarly impacted by DOE"s unlawful policies.

## PARTIES

31.    Plaintiff Emily Zapantis is a citizen of the United States and currently resides in Greece. Prior to being denied reasonable religious accommodation, suspended without pay and eventually terminated, Plaintiff worked for the DOE for over twenty-two years. She was a tenured Assistant Principal when she was fired.

32.    Defendant City of New York is a municipality organized and existing under the laws of New York State.

33.    The City of New York helped DOE to propose their original unconstitutional Stricken Standards accommodation policy and took voluntary responsibility for conducting "fresh reviews" of those denied thereunder, which were supposed to result in reinstatement without break in service, and repayment of back pay and benefits.

34.    Defendant New York City Department of Education is responsible for the management of the New York City School District and the administration of New York City's public schools. At all times relevant, DOE met the definition of Plaintiff's public employer under statutory and constitutional standards and employed no fewer than fifteen people.

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear related claims arising under New York State law.

36.     Venue is proper in this district under 28 U.S.C § 1391(b) because it is the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred and continues to occur, and the District where Plaintiff worked and lives.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES/PROCEDURES

37.     All conditions precedent to filing claims under Title VII have been performed or have occurred.

38.     Plaintiff filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"); and the EEOC issued a right-to-sue notice on April 1, 2024.

39.     This case is brought within 90 days of receipt of the EEOC notice.

40.     Plaintiff fully exhausted her administrative remedies and is entitled to file in the district court. The Complaint is filed within the statutory deadlines for each claim.

41.     Following commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

42.     Any and all other prerequisites to the filing of this suit have been met.

## FACTS

43.    Mrs. Zapantis was employed by the DOE as an employee in good standing for twenty-two years before she was suspended without pay on or about October 4, 2021.

44.    According to scientists, at some point between the fall of 2019 and spring of 2020, Covid-19 began circulating in New York City.

45.    In March 2020, then Governor Andrew Cuomo declared a state of emergency due to the Covid-19 pandemic.

46.    On June 23, 2021, Governor Cuomo announced that the pandemic emergency was officially over in New York State.

47.    Other than for a few months in the Spring of 2020, Mrs. Zapantis worked in person throughout the pandemic emergency.

48.    By August 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they did; (2) herd immunity could not be achieved with available vaccines; (3) vaccine protection wanes significantly after a matter of weeks.

49.    By August 2021, governments around the world were publicly acknowledging that vaccination would not stop the spread of the virus, and that everyone, vaccinated and unvaccinated alike, would likely catch Covid-19.

50.    Nonetheless, on August 3, 2021, Mayor de Blasio declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get vaccinated with one of the experimental COVID-19 vaccines. At a press

conference, he described the goals of the program as follows:

> The key to New York City – when you hear those words, I want you to imagine the notion that because someone's vaccinated, they can do all the amazing things that are available in this city. This is a miraculous place literally full of wonders. And, if you're vaccinated, all that's going to open up to you. You'll have the key. You can open the door. **But, if you're un-vaccinated, unfortunately, you will not be able to participate in many things. That's the point we're trying to get across. It's time for people to see vaccination as literally necessary to living a good and full and healthy life**. The Key to NYC Pass will be a first-in-the-nation approach. It will require vaccination for workers and customers in indoor dining, in indoor fitness facilities, indoor entertainment facilities. This is going to be a requirement. The only way to patronize these establishments indoors will be if you're vaccinated, at least one dose. The same for folks in terms of work, they'll need at least one dose. This is crucial because we know that this will encourage a lot more vaccination.[1]

51.    Two days after this announcement, Wolf Blitzer interviewed Centers for Disease Control and Prevention ("CDC") Director Rochelle Walensky ("Dr. Walensky"), who clarified on national television that the data on vaccine effectiveness against the now dominant delta variant are conclusive: though the vaccines can prevent severe illness, they cannot stop infection or transmission. "But what they can't do anymore is prevent transmission. So if you are going home to somebody who has not been vaccinated, to somebody who can't get vaccinated, somebody who might be immunosuppressed or a little bit frail, somebody who has co-morbidities that put them at high risk, I would suggest you wear a mask in public indoor settings." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."[2]

---

[1] Office of the Mayor, NYC. (2021, August 3). *Transcript: Mayor de Blasio Holds Media Availability* [Press release]. https://www1.nyc.gov/office-of-the-mayor/news/539-21/transcript-mayor-de-blasio-holds-media-availability
[2] Blitzer, W. (2021, August 5). *Transcript: Interview with CDC Director Dr. Walensky.* The Situation Room, CNN.

52.    Rather than cause him to cease or pause the mandates, the emerging consensus that the vaccines cannot stop transmission only prompted Mayor de Blasio to become more aggressive in his vaccine crusade.

53.    In the weeks that followed Dr. Walensky's announcement, Mayor de Blasio and Commissioner Chokshi announced to the press that a new and more aggressive Mandate was being issued for DOE employees.

54.    Previously, there was a mandate in place that allowed DOE employees to test weekly if they did not want to get vaccinated, just as every other district allowed, and just as all other municipal employees were allowed to do.

55.    But according to the new Mandate, beginning September 27, 2021, the testing option would be removed for DOE employees, who would now have to get vaccinated to keep their jobs, with no exemptions offered and no possibility of less restrictive measures being implemented to accommodate them.

56.    No new emergency was guiding the Mayor's efforts. The state of emergency had been lifted months before by the Governor, and there were no urgent increases in hospitalizations or deaths guiding the implementation of these policies in New York City or elsewhere in the State.

57.    Without any explanation or valid reason, both the City and DOE announced that they would not consider any religious or medical accommodation requests.

58.    The DOE Mandate was the first "no exemption option" employee

---

http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

vaccination mandate in the country.

59.    New York City labor unions unanimously decried the Mandate as reckless and unlawful and announced that they would be taking legal action. Leaders from all major impacted unions, the Municipal Labor Committee ("MLC"), and leaders from each of the member unions of the MLC all put out statements that the Vaccine Mandate for teachers violates basic constitutional rights.

60.    Mass protests, lawsuits, and labor disputes ensued.

***Arbitration and Lawsuits Forced Defendants to Adopt Religious Accommodation Policies.***

61.    On or about September 9, 2021, the MLC and sixteen unions filed a lawsuit ("MLC Litigation") in State Court, challenging the Mandate and the Defendants' refusal to consider reasonable accommodations pursuant to their statutory duties.

62.    On September 14, 2021, the Supreme Court, New York County, issued a temporary restraining order ("TRO") enjoining the City from enforcing the Mandate "solely because the Department of Health and Mental Hygiene Order's mandate did not reference the possibility of any medical or religious exemption." *The New York City Mun. Labor Committee v. The City of New York,* No. 158368/2021, 2021 WL 4502854, at *2 (N.Y. Sup. Ct. Sep. 22, 2021).

63.    The next day, on September 15, 2021, the DOE Mandate was rescinded and reissued, with an amendment clarifying that "[n]othing in this order shall be construed to prohibit any reasonable accommodation otherwise required by law."[3]

---

[3] The Mandate was also further amended later in September 2021, but not substantively for purposes of this Petition

64.     The Supreme Court accordingly vacated the TRO, stating that it was "obviate[d]" by the Commissioner's amendment. *Mun. Labor Committee,* 2021 WL 4502854, at *3.

65.     In a parallel litigation, the United Federation of Teachers ("UFT"), Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse on September 1, 2021, contending, among other things, that the DOE's failure to provide religious and medical accommodations was unlawful and that the DOE further failed to afford due process regarding job and benefits protection. The challenge moved to arbitration.

66.     On September 10, 2021, a decision was rendered by Arbitrator Martin Scheinman requiring that the DOE provide UFT members with medical and religious exemptions, as defined in the arbitration award ("Arbitration Award"). A true and accurate copy of the UFT Arbitration Award is attached hereto as Exhibit A ("Stricken Standards").

67.     Martin Scheinman's neutrality is contested.

68.     He was one of the Mayor's donors and had previously held fundraisers for him.

69.     Subsequently, the Counsel of School Supervisors and Administrators ("CSA") submitted the matter to Arbitrator Scheinman, who predictably issued a materially identical award covering CSA employees on September 15, 2021.

70.     Defendants claimed to the state court that the adoption of the Stricken Standards, coupled with the amendment to the Mandate, meant that they intended

---

other than to push back the effective date as a result of further lawsuits.

to comply with statutory religious accommodation requirements.

71.    However, what was not before the State court was a copy of the actual religious accommodation policy, which does not comply with the most basic statutory or constitutional religious accommodation standards.

### *The Stricken Standards were Openly Discriminatory*

72.    The Stricken Standards are facially discriminatory.

73.    For example, they state, among other objectionable provisions, that: "religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the objection is personal, political or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists). Stricken Standards at 9.

74.    Multiple problems stand out in this definition of "acceptable" religious beliefs.

75.    First, the policy preferences Christian Scientists and requires the government to decide which religions are "recognized" as "established religious organizations."

76.    Under the Stricken Standards, if an applicant belongs to a religion that is not deemed "established" and "recognized" by the government employer, whatever that means, the person must be denied.

77.    A clearer violation of the Establishment Clause is hard to imagine; it is well-settled law that government cannot "establish" which religions are

"recognized" and thus valid. New York incorporates the federal constitutional standards defining protected religion and prohibiting government from establishing any "recognized" (versus unrecognized) religions.

78.     The policy also provides that religious objection based on personally held or "philosophical" religious beliefs will be denied.

79.     Under the federal, state, and local standards, personally held or unorthodox religious beliefs are just as protected as those that are provided by official church dogma.

80.     Personally held, and philosophical beliefs are defined by EEOC guidance as expressly protected, but under the Stricken Standards, they are excluded from protection even if they are sincere.

81.     Another problem is that the requirement that the objection "must be documented in writing by a religious official (e.g. clergy)." This certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have personal religious beliefs.

82.     It is long-established law in New York that governments cannot require a person to show a clergy letter or belong to an "established religion" to have their religious beliefs protected. *See, e.g., Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 92 (E.D.N.Y. 1987).

83.     But it gets worse. Under the Stricken Standards, even if a person does happen to belong to an "established" and "recognized" religion, according to the government employer, and that religious organization provides a clergy letter, the

applicant must still be denied if anyone the government deems a "leader" of their faith has publicly expressed support for vaccination.

84.    "Leader" is not defined, but in practice, the DOE repeatedly interpreted this concept to categorically deny accommodation to huge categories of religions.

85.    For example, DOE found an article in the Jerusalem Post stating that the Sephardic Chief Rabbi of Israel was vaccinated. DOE representatives repeatedly cited this article to assert that all Jews should therefore be denied, even when the applicants explained that their own Rabbi did not share the Israeli Rabbi's opinion, or that Judaism is a diverse religion, and a random Rabbi in Israel could not be deemed the "leader" of all Jews.

86.    Similarly, DOE repeatedly argued that all Christians, even non-denominational ones, should be denied because the Catholic Pope was vaccinated.

87.    DOE even argued that a Buddhist should be denied because his views are not shared by the Catholic Pope.

88.    The DOE's discriminatory statements were common and well-documented throughout the accommodation process, and infected every decision made.

89.    A group of educators brought a proposed class action lawsuit, titled *Kane v. de Blasio et al*, in the Southern District of New York in August 2021.

90.    In November 2021, the Second Circuit Court of Appeals held, first in a motion panel and then a merits panel, that the DOE's religious accommodation policies were facially unconstitutional, and the plaintiffs were likely to succeed on

the merits of their claim and deserved injunctive relief.

91.    As the Second Circuit pointed out, the religious exemption criteria in the Stricken Standards are blatantly unlawful.

92.    It violates the most basic governing standards of state and federal law to discriminate against those with personally held religious beliefs, or deny accommodation based on someone else's religious beliefs, even the leader of one's own faith.

93.    Notwithstanding the obvious illegality of the Stricken Standards, the DOE adopted and enforced the policy to decide religious accommodation requests to the Mandate.

94.    Upon information and belief, the criteria for religious exemption were composed primarily from language and procedures proposed by the City and DOE attorneys, including Eric Eichenholtz ("Mr. Eichenholtz"), who was, at all times relevant to this Complaint, working under the direction and guidance of the City of New York and the DOE.

95.    Despite his leadership in drafting the first unlawful policy, Mr. Eichenholtz was later placed in charge of the Citywide Panel reviews.

96.    After the Citywide Panel reviews were challenged as discriminatory as well, he was promoted to Managing Attorney for the New York City Law Department.

97.    Even if they had not had any hand in helping to create the unlawful policy, DOE knew or should have known that the Stricken Standards are blatantly

unconstitutional, and that the Government cannot make *or enforce* unconstitutional policies.

98.    Nothing in the arbitration award, or in the governing collective bargaining agreement waived Plaintiff's right to challenge the religious discrimination inflicted by DOE or the City on her through plenary proceedings in court against the Defendants.

**Plaintiff's application and denial**

99.    Plaintiff timely submitted an application for religious accommodation through the Self-Service Online Leave Application System ("SOLAS").

100.    Her application included  a five-page letter setting forth her sincerely held religious objections to the Covid-19 vaccines, which providing links to source material and writings by the Church's Holy Elders and Saints and scripture that guide her religious objections.

101.    DOE immediately responded with a generic, autogenerated email, stating:

> We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate. Your application has failed to meet the criteria for a religious based accommodation.
>
> Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations.
>
> This application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of your union and the Board of Education regarding the vaccine mandate. Under the terms of the Arbitration Award, you

may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice by logging into SOLAS https://dhrnycaps.nycenet.edu/SOLAS and using the option "I would like to APPEAL". As part of the appeal, you may submit additional documentation and also provide a reason for the appeal.

Sincerely,HR Connect Medical, Leaves, and Records Administration

102. The autogenerated denial is deficient in multiple ways.

103. First, at no time did the DOE engage in any cooperative dialogue or individualized review before sending the denial out.

104. Plaintiff was not contacted by any person at DOE to discuss her application before it was denied.

105. And DOE did not even individually review her application or any of the others before sending out the autogenerated emails to each employee, even those who could have been easily accommodated.

106. Second, the notice cited the wrong legal standard for asserting undue hardship. The email stated that accommodation could not be made under the *de minimis* standard, but, under Title VII as well as the SHRL and CHRL, the employer bears the burden of at least showing that it would be a "substantial" and/or "significant" burden or expense under the governing statutory criteria.

107. DOE did not even assess the required statutory criteria before denying relief to Plaintiff, leave aside prove that there was undue hardship before denying her application.

108. Nor did the DOE assess the required statutory factors to determine whether Plaintiff or her colleagues would pose a direct threat that could not be

accommodated before denying relief.

109. The safety analysis cannot be speculative or generalized. Rather, "The employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information, to ascertain: the nature, duration and severity of the risk; the probability that potential injury will actually occur; and whether reasonable accommodation, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11(g)(2).

110. Neither the City nor the DOE made any good faith attempt to individually analyze these or the other required statutory factors before conclusively denying all applicants based on undue hardship.

111. Nor did DOE or the City analyze the list of economic statutory factors that must be assessed before determining that accommodation could not be made.

112. Mr. Eichenholtz admitted, in depositions, that neither the City nor DOE assessed any of the statutory economic or safety factors before denying relief.

113. For example, DOE had set up buildings specifically for remote work for those who would be accommodated under the Stricken Standards.

114. At all times relevant to this Complaint, those building stood largely empty and well below capacity.

115. Third, the denial incorrectly states that the Mandate does not allow for accommodation, and that the DOE is prohibited from allowing any unvaccinated employee to work in any DOE building or other site with contact with students,

employees, or families.

116.    But the Mandate expressly provides that nothing therein should be construed to prevent reasonable accommodation as required by law.

117.    This means that so long as an employee is not a direct threat, they should be allowed to continue working in person.

118.    Plaintiff timely appealed and had a zoom hearing with Arbitrator Barry Peek and a representative of the DOE.

119.    DOE representative acknowledged that Plaintiff's religious objections were sincere.

120.    However, the DOE representatives and Arbitrator Peek each asserted that she cannot qualify because she is Greek Orthodox, and a leader in the North American branch of the Greek Orthodox Church allegedly supports vaccination.

121.    Plaintiff explained that the Greek Orthodox church is autocephalous, and that she is not bound by that leader's beliefs.

122.    She pointed out that many Bishops and churches that she does follow had shared religious objections to the vaccines.

123.    She also explained that she follows the teachings of the Holy Spirit, the Holy Elders and the Saints, and believes that their guidance is to abstain.

124.    DOE argued, essentially, that this was heretical and that the Arbitrator must take the Archbishop's guidance as the only valid religious belief for a Greek Orthodox applicant.

125.    Mrs. Zapantis was denied again, with no further explanation than an

"x" next to the word denied.

126. On or about October 4, 2021, Mrs. Zapantis was placed on involuntary leave without pay.

127. Arbitrarily, 164 other DOE employees, many of them teachers, were accommodated by DOE after the initial denial was appealed, which eviscerates the claim that no one could have been accommodated without undue hardship.

128. In any event, no one mentioned undue hardship in Plaintiff's appeal.

129. And, under the Stricken Standards, undue hardship was not a valid reason for denial. Rather, if anyone met the criteria, the policy stated they "shall" be accommodated.

130. In November 2021, first a motions panel and then a merits panel at the Second Circuit determined that the religious accommodation policy the DOE had adopted and implemented was discriminatory and unconstitutional.

131. During this process, the City offered, in mid-November, 2021, to offer a "fresh review" by a newly created "Citywide Panel" and reinstate everyone who qualified under lawful standards with backpay.

132. The Citywide Panel reviews were spearheaded by Defendants' attorneys, and specifically, by Mr. Eichenholtz, who upon information and belief had advised the City in crafting the first unlawful policy.

133. As a form of temporary injunctive relief, the Second Circuit ordered the City to conduct this review for all named *Kane* plaintiffs and reinstate them with back pay if they qualified under lawful standards.

134.    Though the order did not apply to non-named plaintiffs in the *Kane* lawsuit, the City promised to make the Citywide Panel review available more broadly,

135.    The City also admitted that the religious accommodation policy was likely unconstitutional as applied to all applicants.

136.    Plaintiff was offered a fresh review by the Citywide Panel.

137.    The Citywide Panel engaged in much of the same religious discrimination as DOE had inflicted during the initial reviews.

138.    Panelists were instructed to deny applicants who included concerns about the use of aborted fetal cell lines in production and development of the vaccines.

139.    This is one of Plaintiff's primary religious objections.

140.    Panelists also routinely denied anyone with beliefs that came from guidance from prayer or the Holy Spirit, improperly disregarding the applicants' own interpretation of their faith, and redefining these beliefs as "personal" in nature rather than "religious."

141.    Mrs. Zapantis was guided by the Holy Spirit in her religious objection to avoid vaccines.

142.    Panelists also applied blanket undue hardship denials to teachers and Assistant Principals, even though teachers and Assistant Principals were accommodated teachers under the Stricken Standards without undue hardship.

143.    In or around March 2022, Mrs. Zapantis was issued an autogenerated

email from the Citywide Panel, denying her application without explanation.

144.    On or about March 17, 2022, Mrs. Zapantis was terminated from DOE.

145.    Mrs. Zapantis timely initiated and filed an EEOC complaint alerting Defendants of her religious discrimination claims and seeking remediation of the ongoing religious discrimination.

146.    DOE failed to adjust timely notices of claim submitted by Plaintiff and her colleagues.

147.    In September 2022, DOE sent Plaintiff and all other employees fired for refusing to violate their religious beliefs a letter offering reinstatement if they would get vaccinated.

148.    Plaintiff could not violate her beliefs in this way.

149.    In February 2023, the mandate was rescinded, and DOE told the Second Circuit that this "mooted" the pending appeal in *Kane v. de Blasio*, because all DOE employees could return to work.

150.    This was a material misrepresentation.

151.    Plaintiff and most of her colleagues still are barred from returning to this date.

152.    Plaintiff was not allowed to come back.

153.    Instead, DOE hired two different people to do her job.

154.    Furthermore, DOE placed a problem code on Plaintiff's file which will not allow her to pass a security check to get rehired.

155.    This problem code has also impeded her ability to get work outside of

DOE.

156.    Unable to survive in New York City without income, Mrs. Zapantis had to move out of the country to Greece to try to survive.

157.    In addition to loss of income and benefits, including raises and valuable retirement credits, Mrs. Zapantis incurred substantial financial loss because of Defendants' discriminatory actions.

158.    She also suffered severe humiliation, emotional pain, suffering and trauma, among other harms.

159.    At no time did DOE or the Citywide Panel engage in cooperative dialogue with Mrs. Zapantis.

160.    On April 1, 2024, Mrs. Zapantis received a right to sue letter from the EEOC.

161.    This suit was timely commenced within ninety days thereafter.

***Defendants Cannot Prove Undue Hardship***

162.    To the extent that DOE or Defendants assert it would have been an undue hardship to accommodate Plaintiff, this is inaccurate.

163.    Defendants used the wrong undue hardship standards and did not bother to assess any of the statutory criteria.

164.    Plaintiff did not pose a threat to anyone based on her vaccination status and could have been easily accommodated.

165.    The vaccines could not stop transmission, and this was known at the time of the denial and even more clear when Mrs. Zapantis was terminated.

166.    The DOE's own data supported this fact. At the time, the DOE published regular updates on the number of staff infected with Covid-19 on any given day. Excluding the unvaccinated beginning on October 4, 2021 did not slow the infection rates. On the contrary, after the unvaccinated staff were excluded, infection rates rose astronomically among the fully vaccinated staff, with daily numbers jumping from 40 infections at a time to over 5,000 infections a day among the fully vaccinated staff.

167.    Worse, infected staff were instructed to go back into classrooms to teach in person, even though they were actively able to transmit the virus to their students, while Plaintiff and her colleagues were excluded even though they were not infectious.

168.    Even if the Covid-19 vaccines could mitigate transmission in some way, the DOE could not meet its burden of proof to show that an unvaccinated employee constituted a "direct threat" which could not be mitigated other than through termination.

169.    It makes no sense to say that one million students could come to school unvaccinated, riding the enclosed bus with unvaccinated school-district employed bus drivers (who were exempt from the Mandate due to staffing concerns) and commingling with one another but that they would suddenly be in severe danger just because their teacher was also unvaccinated.

170.    If congregating with unvaccinated people was such a severe hazard, the rule should have applied universally to everyone in the population.

171.    One person could not make any difference to herd immunity when the bulk of the population was unvaccinated.

172.    Indeed, a 2021 Harvard Study showed that there was "no discernable relationship between percentage of the population fully vaccinated and new Covid-19 cases." Subramanian S. V. and Akhil Kumar. "Increases in Covid-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States." *European Journal of Epidemiology*, 1-4. 30 Sep. 2021, doi: 10.1007/s10654-021-00808-07.

173.    Moreover, Mrs. Zapantis already had Covid in 2020 and had robust natural immunity.

174.    When Plaintiff was denied accommodation, multiple studies had already shown that Natural immunity was far more durable and protective against transmission than vaccination.

175.    The DOE was on notice that the great weight of the evidence showed that unvaccinated employees did not constitute a direct threat and could be easily accommodated.

176.    Attached, and incorporated herein by reference as if fully set forth herein, are sworn declarations submitted in related litigation from public health experts at Stanford (Exhibit C), Johns Hopkins (Exhibit D) and Yale (Exhibit E).

177.    As the expert declarations explain, being unvaccinated does not and did not pose any direct threat, and there were numerous additional measures that could have been taken to the extent that there was any confusion on this point,

including but not limited to weekly testing, symptom checks, or other protective measures.

178.    Every other school district in the state, including many neighboring school districts on Long Island, which had nearly identical populations of students and staff, allowed teachers to test weekly in lieu of vaccination throughout the pandemic.

179.    Moreover, despite the push to move most instruction to in person, the New York City DOE continued to provide a sizeable remote program.

180.    Moreover, Plaintiff was not even a classroom teacher.

181.    As an administrator, her job could have been adjusted so that she could work remotely if necessary.

182.    Plaintiff could have been accommodated like other Assistant Principals were.

**The Mandate and religious policies were not generally applicable**

183.    Neither the Mandate nor DOE's religious exemption denials were generally applicable.

184.    First, the multiple mechanisms for exemption defeat general applicability.

185.    Most importantly, the Mandate expressly allowed for religious accommodation, and DOE adopted policies to provide a mechanism for such accommodation decisions.

186.    Multiple employees were accommodated under this mechanism.

187.    One unvaccinated employee was even allowed to have a full exemption under this mechanism.

188.    Moreover, not only does Federal law provide an exception, but state law and even local municipal law each provide a mechanism for religious accommodation as well.

189.    Pursuant to the SHRL and CHRL, employers are required to reasonably accommodate an employee's religious practices unless the employer can prove that they are unable to do so.

190.    Under these statutes, such decisions must be individualized, and cannot be generalized.

191.    When deposed, Defendants' attorneys admitted that the decision-making process for who was rejected or accepted was entirely discretionary.

192.    Many other mechanisms for exemption existed as well.

193.    For example, the Mayor exercised discretion to issue orders exempting various employees from the City's vaccine mandates.

194.    Second, exceptions were made for secular reasons even though those exempted undermined the stated interests in the same way.

195.    The Mandate's stated purpose was to stop the spread of Covid-19.

196.    The various versions of the DOE Mandate were just a few of about 160 different "Emergency Executive Orders" issued by the Mayor's office, which collectively imposed vaccine mandates on nearly every category of employee in New York City for this same reason.

197.    The Commissioner's office announced, when the Mandates were rescinded, that all of them collectively functioned together to achieve the same goal.

198.    But the Mayor had total discretion to add or subtract from that list for secular reasons as he deemed appropriate.

199.    Most controversially, in March 2022, Mayor Eric Adams issued an emergency executive order ("EEO 62") exempting athletes, entertainers (including adult entertainers), and their entourages from having to comply with the vaccine mandates covering nearly every other New York City employee.

200.    In announcing these carve-outs, Mayor Adams acknowledged that the exemptions were made due to anticipated economic benefits to the City (and incidentally to the Mayor's top donors), not based on any physical health difference between athletes, makeup artists, strippers or any other category of employee, including teachers.[4]

201.    As EEO 62 reveals, the City's vaccine mandate decisions, including decisions about exemptions, were not driven by safety analysis, and the Mayor had enormous discretion to decide who to cover and when, for reasons unrelated to health or safety concerns.

202.    The Mandate was also not generally applicable, because bus drivers and certain others who worked with the students, were allowed to remain unvaccinated, even though they were far more likely to transmit Covid-19 to students if infected while driving them in airless, enclosed busses than an Assistant

---

[4] Office of the Mayor Eric Adams, NYC, Emergency Executive Order 62 (2022, March 24), https://www.nyc.gov/office-of-the-mayor/news/062-003/emergency-executive-order-62

Principal was from her administrative offices.

**The mandate and religious exemption policies were not neutral**

203.    The Mandate and religious accommodation policies were also not neutral, particularly considering the history and events leading up to the determinations.

204.    Hostile statements from the Mayor, DOE officials and agents, and other decision-makers, and even on the face of the religious exemption policies themselves, show animus and defeat neutrality.

205.    In a press briefing, held on September 23, 2021, the same day that Mrs. Hogan applied for religious accommodation, then Mayor de Blasio was asked how the City intended to handle religious accommodations from DOE employees, and what criteria would be used.

206.    He responded by dismissing the validity of religious objections to the vaccines as largely invalid and stating that the applicants would be subjected to discriminatory review policies:

> **Mayor:** Yeah, it's a great question. Thank you. Yes. And very powerfully, Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. There are, I believe, its two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But overwhelmingly, the faiths all around the world have been supportive of vaccination. So, we are saying, very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection.[5]

---

[5] Office of the Mayor, NYC (2021, September 223). *Transcript: Mayor de Blasio Holds Media Availability* [Press release]. https://www.nyc.gov/office-of-the-mayor/news/644-21/transcript-mayor-de-blasio-holds-media-availability

207.    Defendants knew, or should have known, that discrimination against personally held religious beliefs is unconstitutional, as is preferencing certain faiths, or making judgments about the theological validity of religious objections.

208.    The Mayor's statements also reveal that the City was directing DOE policy on religious accommodations to his Mandate and is jointly culpable for the initial denials as well as the later action by the Citywide Panel.

209.    At the very least, it shows the City was aiding and abetting the religious discrimination.

210.    The City further participated in proximately causing the initial denials by issuing a letter, written by Commissioner of Health David Chokshi, in which the Commissioner derided religious objections to abortion as invalid because he believes the connection is too indirect to merit religious concern.

211.    Commissioner Chokshi's judgment about this theological matter are wholly inappropriate and discriminatory. It does not matter what Commissioner Chokshi thinks, it matters what the adherent believes.

212.    But the DOE relied on this letter to adopt a reflexive policy of denying all applications in which employees' religious objections were based on or included an objection to the use of aborted fetal cells in testing or development.

213.    Mr. Chokshi's letter was frequently cited by DOE agents in various arbitration appeals as proof of why a person should be denied accommodation, even if sincere.

214.    Mr. Eichenholtz also confirmed in later depositions that Defendants

31

took the position that applicants' concerns were wrong and invalid, and thus were reflexively denied, when based on concerns about abortion.

215.    In limited discovery in a related case, the City also produced an email revealing that the panelists on the Citywide Panel were *instructed* to categorically deny religious objections rooted in opposition to abortion.

216.    The email, from a Panelist in training, to Mr. Eichenholtz, who is the architect of the Citywide Panel, and served as the City's Chief Labor and Employment litigation attorney at the time, stated: "I'm mostly seeing folks expressing their view that all Covid vaccines contain or were tested using fetal stem cells…My understanding from our conversation is that those would not constitute sincerely held religious beliefs…"

217.    Mr. Eichenholtz did not correct this Panelist in his follow up email.

218.    Though Mr. Eichenholtz initially denied the blanket instruction, when pressed in depositions, he admitted that the Panel was instructed to routinely deny such objections based on his opinion that the belief was wrong.

219.    For example, Mr. Eichenholtz stated: "It's not a religious belief. They cannot an employee cannot claim a vaccine contains something they don't claim. If the clergy says it. If---regardless. If someone says the sky is green, that is – you know, and we know the sky is blue, then the sky is blue."

220.    To this day, Mr. Eichenholtz also admits that beliefs that are based on personal prayer were categorically denied as well, as Defendants do not deem beliefs to be religious in nature if they are personally held, or able to be derived independent

of an official church dogma or command.

221.   It is well-settled law that such statements constitute animus, and that the government is prohibited from passing judgment on the validity of religious beliefs or requiring that the beliefs align with written or other Church orthodoxy.

222.   All these statements alone would constitute direct evidence of discrimination.

223.   But, here, the problem is even more apparent, since the DOE adopted a facially discriminatory written policy that completely lines up with the Mayor's and City's ongoing hostile directions.

224.   In cases such as this one, where the government adopts a facially discriminatory written policy, the government cannot rebut the presumption of discrimination by proving that there was some other, non-discriminatory reason for denial. *See, e.g., TWA v. Thurston,* 469 U.S. 111, 121 (1985) (holding that in cases of direct discrimination, summary judgment must be afforded to plaintiffs unless the government can prove an affirmative defense).

225.   But far from rebutting discrimination, the Defendants actions and reasoning only provide further evidence of continued widespread discrimination against religious minorities, and that the denials were pretextual.

226.   Plaintiff's denials were not decided in a vacuum.

227.   While religious accommodation requests are typically granted by DOE, religious accommodation requests to the Covid-19 vaccine mandate were nearly all denied showing a special animus towards these religious beliefs.

228.    Out of thousands of original applicants, everyone was denied initially.

229.    Of these, only approximately 165 were accepted on appeal.

230.    After lawsuits were filed and the Second Circuit affirmed that Defendants were likely violating employees' religious rights, the City engaged in pretextual reviews under supposedly fresh standards.

231.    But they arrived at the same result as the discriminatory process had for all but one token DOE employee.

232.    Whether analyzed under the direct threat, mixed motive, or indirect evidence standard, Defendants' widespread discrimination is not justified and cannot withstand judicial review.

## FIRST CAUSE OF ACTION

### (Failure to Accommodate in Violation of Title VII)

233.    Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

234.    Title VII was enacted with the purpose of prohibiting employment discrimination based on religion, among other protected characteristics. 42 U.S.C § 2000e et seq. 71.

235.    Under Title VII, it is an unlawful employment practice for an employer: (1) to fail or to refuse to hire or discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for

employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C §2000e-2(a).

236.   Title VII imposes an affirmative obligation on employers to make reasonable accommodations for their employees' religious beliefs and practices. 42 U.S.C §2000e(j); 20 C.F.R. §1605.2(b).

237.   The term "religion" includes all aspects of religious observance and practice, as well as belief. 42 U.S.C §2000e(j). Religious beliefs as stated in 42 U.S.C §2000e(j) also include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R. 1605.1.

238.   It is well-settled law, acknowledged by the Supreme Court of the United States all the way down to the district courts and administrative agencies as well as state court systems, that an individual seeking to demonstrate a sincerely held religious belief under New York State or federal statutory or constitutional standards need not prove that his belief is part of the recognized dogma of a religious sect. *See, e.g., Widmar v. Vincent*, 454 U.S. 263 (1981) ("The beliefs need not be consistent with the dogma of any organized religion, whether to not the plaintiffs belong to any recognized religious organization.")

239.   "The fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee." 29 C.F.R. 1605.1.

240.    An employee's belief or practice can be "religious" under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief or practice, or if few – or no – other people adhere to it. *Welsh v. U.S.*, 398 U.S. 333, 343 (finding that petitioner's beliefs were religious in nature although the church to which he belonged did not teach those beliefs); *Thomas v. Rev. Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981) (disagreement among sect workers as to whether their religion made it sinful to work in an armaments factory irrelevant to whether belief was religious in nature because "[t]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.").

241.    The Supreme Court of the United States cautions: "it must be remembered that, in resolving these exemption problems, one deals with the beliefs of different individuals who will articulate them in a multitude of ways. In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight." *U.S. v. Seeger*, 85 S.Ct. 850, 863 (1965); *See also EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 393 (E.D.N.Y. 2016) ("Delineating the meaning of 'religion' for purposes of Title VII often requires resort to First Amendment cases, where nontraditional religious practices are a frequent source of litigation.").

242.    It is impermissible "to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).

243.    Under Title VII, the burden is on the employer to demonstrate "that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employers' business." 42 U.S.C. §2000e(j).

244.    Undue hardship is shown "when a burden is substantial in the overall context of an employer's business". *Groff v DeJoy*, 143 S Ct 2279, 2294 (2023). "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 2295 (internal citations omitted).

245.    Plaintiff has a bona fide religious belief that conflicts with the Mandate.

246.    Plaintiff cannot receive the COVID-19 vaccine because to do so would violate her sincerely held religious beliefs.

247.    Plaintiff notified the Defendants that her sincerely held religious beliefs conflicted with the Mandate and requested reasonable accommodation.

248.    Plaintiff was denied religious accommodation, and placed on leave without pay, and eventually terminated for failing to violate her faith by getting vaccinated against Covid-19.

249.    Defendants did not engage in an interactive process to determine the feasibility of accommodating Plaintiff.

250.    Plaintiff made multiple attempts to articulate and explain her sincerely held religious beliefs to Defendants.

251.    Defendants did not question the sincerity of Plaintiffs beliefs.

252.    Defendants made no good faith effort to accommodate Plaintiff's need for religious accommodation and did not engage in an individualized assessment of possible accommodations pursuant to the required statutory standards.

253.    Defendants did not assess the significance, duration, or likelihood of any danger, and did not assess objective medical sources. Instead, Defendants relied on assumption and speculation and issued a blanket determination that they each could not accommodate Plaintiff.

254.    Defendants did not assess possible accommodations on an individualized basis that could have mitigated any actual risks.

255.    The DOE accommodated other unvaccinated employees than Plaintiff, including many people who had substantially similar job duties as Plaintiff.

256.    It would not cause an undue hardship to accommodate Plaintiff, either by granting her an exemption with no conditions, allowing her to work remotely, allowing her to test weekly, or wear a mask, allowing her to do daily symptom checks, or any number of other potential accommodations, which the Defendants failed to even assess.

257.    As a direct and proximate result of Defendants' failure to accommodate her, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, including physical symptoms, for which she is entitled to an award of

monetary damages in an amount to be determined at trial.

258.   Plaintiff is entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

259.   Plaintiff is also entitled to punitive damages in an amount to be determined at trial. Under Title VII, Plaintiffs can "recover punitive damages . . . [by] demonstrat[ing] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

260.   Defendants were put on notice many times over that their religious accommodation policies were unconstitutional and discriminatory and yet they displayed reckless disregard for Plaintiff's rights by failing to give her application fresh review even after the Second Circuit chastised them for their policies.

## SECOND CAUSE OF ACTION

### (Discrimination in Violation of Title VII)

261.   Plaintiff reincorporates all paragraphs of this Complaint as if fully written herein.

262.   Plaintiff asserts that DOE's adoption of a facially discriminatory religious accommodation policy, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with

unorthodox religious beliefs, constitutes direct evidence of discrimination.

263.    Moreover, hostile comments by high-level City actors' and DOE agents about the invalidity of sincere religious objections grounded in concerns about abortion or personal prayer, or derived from religions other than Christian Science, constitute direct evidence of discrimination.

264.    Plaintiff's denial of accommodation must be presumed to be pretextual and discriminatory under this framework, and Defendants cannot survive summary judgment without asserting an affirmative defense.

265.    As the Second Circuit already noted, Defendants cannot meet this burden: "The City concedes that the Arbitration Award…'may' have been 'constitutionally suspect,' [] and its defense of that process is half-hearted at best. Indeed, it offers no real defense of the Accommodation Standards at all." *Kane v. de Blasio,* 19 F.4th 152, 167 (2d Cir. 2021). "We confirm the City's 'susp[icion]' …" *Id.*

266.    The Second Circuit held that the written policy is not neutral, because on its face, it singles out unorthodox beliefs and faiths for disparate and unequal treatment: "We conclude, first, that the procedures specified in the Arbitration Award and applied to Plaintiffs are not neutral. The Supreme Court has explained that 'the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.' *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* ---U.S.---, 138 S. Ct. 1719, 1731 (2018)." *Id.* at 168.

267. Next, the Court also acknowledged additional direct evidence of discrimination in the application of DOE's facially unlawful standards, for example, through DOE's pattern of recharacterizing people's beliefs as personal rather than religious. "Denying an individual a religious accommodation based on someone else's publicly expressed religious views – even the leader of her faith – runs afoul of the Supreme Court's teaching that [i]t is not within the judicial ken to question the centrality of particular beliefs or practices of faith, *or the validity of particular litigants' interpretation of those creeds." Id.* at 168-169 (emphasis in original).

268. This discrimination impacted all applicants for religious accommodation, including Plaintiff, who was point blank told that she was being denied relief because her religious "leader" allegedly did not share her beliefs.

269. As and for another count of direct evidence of discrimination, the City and DOE further discriminated against Plaintiff by subjecting those who did not qualify under the Stricken Standards to a more onerous undue hardship standard.

270. Under the Stricken Standards, those who met the discriminatory definition "shall be accommodated" and no provision was made for an undue hardship defense. Pursuant to that policy, at least 163 people were accommodated.

271. However, the DOE adopted a policy whereby everyone who applied and was not later accepted by an arbitrator under the Stricken Standards would be issued a blanket denial on the basis of assumed undue hardship, and the Citywide Panel continued this policy by categorically denying every teacher and Assistant Principal based on the same unsubstantiated assumption of undue hardship.

272.   By adopting a substantially different undue hardship standard for those who were deemed to meet the discriminatory criteria of the Stricken Standards, both DOE and the City showed direct discrimination against unorthodox religious beliefs.

273.   The Supreme Court has held that an employer's adoption of a policy that makes express classifications based on a protected characteristic) constitutes direct evidence of discrimination, which is sufficient as a matter of law to state a claim. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985).

274.   In so holding, the Supreme Court explained that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Id.* at 121 (referencing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).

275.   Use of such classifications demonstrates a discriminatory purpose as a matter of law, without regard to the decision-makers' animus or subjective intent. *See Miller v. Johnson*, 515 U.S. 900, 904–05 (1995); *see also Hassan v. City of New York*, 804 F.3d. 277, 295 (3d Cir. 2015) ("Put another way, direct evidence of intent is 'supplied by the policy itself.'").

276.   The Plaintiff's case here is even stronger than *TWA*, because unlike the age discrimination statutes, there is no affirmative defense to a policy that discriminates between orthodox and unorthodox religious beliefs. The government may not target religious minorities for disparate treatment, no matter how well-intentioned the subject regulation may be. *Trump v. Hawaii*, 138 S. Ct. 2392, 2423

(2018).

277.    In the alternative Plaintiff sets forth a prima facie case under the mixed motive framework.

278.    Plaintiff holds a sincere religious belief against Covid-19 vaccines, not derived from Church orthodoxy but from her prayer and reliance on Greek Orthodox Bishops, Saints and Holy Elders who share or support her concern about the use of aborted fetal cell lines in the development of the vaccines and other religious reasons to avoid vaccination.

279.    Plaintiff was, at the time, otherwise qualified for employment, being a tenured and well-respected educator for twenty two years.

280.    Plaintiff was suspended and then terminated because she was denied religious accommodation.

281.    Plaintiff should also prevail under a disparate impact theory of discrimination.

282.    Disparate impact discrimination is also barred by Title VII, and "occurs when an employer uses facially neutral policies or practices that a have a disproportionately adverse effect on protected groups." *Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009).

283.    "Disparate-impact claims do not require a showing of discriminatory intent." *United States v. Brennan*, 650 F.3d 65, 90 (2d Cir. 2011). Rather, "a plaintiff establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color,

religion, sex, or national origin.'" *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)).

284.    An employer can rebut a prima facie case "by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" *Id*.

285.    The plaintiff, in turn, can rebut that showing by "showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Id*. (citing §§ 2000e–2(k)(1)(A)(ii) and (C)).

286.    "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir.2003).

287.    A recognized minority of religious people, including Plaintiff, cannot take a Covid-19 vaccine for religious reasons, particularly concerns about abortion.

288.    Defendants expressed hostility to these religious beliefs as theologically flawed, and failed to consider available accommodations that could have mitigated the impact of the Mandate on the small percentage (about 2%) of employees who hold these sincere religious beliefs.

289.    For example, Defendants could have considered actual safety risks, allowed for remote work, weekly testing, daily symptom checks, masking or a large number of other accommodations deemed sufficient in every other school district in the state.

290.    Instead, Defendants refused to consider any accommodations in good faith, other than for 164 employees deemed to fit within openly discriminatory criteria set forth in the Stricken Standards.

291.    All other employees were reflexively denied, by the DOE and the Citywide Panel, without any analysis of the Stricken Standards, causing a disparate impact on those whose beliefs were not derived from the orthodoxy of the "leaders" of an "established" and "recognized" religious organization that DOE and the City preferred.

292.    As a direct and proximate result of Defendants' discrimination, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages in an amount to be determined at trial.

293.    Plaintiff is entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

**WHEREFORE,** Plaintiff prays that this Court order a jury trial and grant judgment to her containing the following relief:

A.     A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs are *void ab initio* and constitute unlawful discriminatory practices pursuant to Title VII of the Civil Rights Act of 1964; and

B.     An order that Defendants' reinstate Plaintiff to her former position with full seniority, no break in service, status, retirement credits, salary increments, bonuses and benefits as if the denials of accommodation had never occurred; and

C.     An award to Plaintiff of nominal and compensatory damages for Plaintiff's lost wages, back pay, front pay, overtime, salary increases, benefits and retirement credits, in an amount to be determined at trial; and

D.     An award to Plaintiff of costs in this action and any appeals, including reasonable attorney's fees and expert fees under Title VII of the Civil Rights Act of 1964 and other governing laws; and

E.     An award of pre- and post-judgment interest on all amounts awarded to the Plaintiff at the highest rates and from the earliest dates allowed by law on all causes of action; and

F.     Such other and further relief as this Court may deem just and proper.

Dated: Geneva, New York
     July 1, 2024

                             Respectfully Submitted,
                             Gibson Law Firm, PLLC


                             By: /s/ Sujata S. Gibson
                                 Sujata S. Gibson
                                 120 E Buffalo Street, Suite 201
                                 Ithaca, NY 14850

(607) 327-4125
sujata@gibsonfirm.law

**Attorneys for the Plaintiff**