# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF NEW YORK

EMILY ZAPANTIS-DALAMAKIS, TRAVIS CARTER, MARIANA ARGYROS, MICHELLE BAPTISTE, VENESSA BURRELL-BARTLEY, STEPHON BYNOE, CONNI CALIA, ADRIANA CARBONE, JESSICA DALY, SUZANNE DEEGAN, STEPHANIE DICAPUA, LEAH ERLENBACH, MEGAN FICCHI, KELLY FINLAW, MICHELE GARRETT, ARIJANA LUKACEVIC, ANAMARIE MEDINA, AYELLET MOAS, MICHAEL MONZILLO, DONNY NAPOLITANO, MAWULI OLIVIERRE, PETER OTTO, LEONARD PIZZA, SAUNDRA RAYMOND, ROBERT RETTINO, NICOLE RIVICCI, CHRISTIAN SCHMIDT, DAMARIS SCOTT, BONNIE SKALA KILADITIS, JUDITH STAMOS, ZABDIEL VALERA, and all others similarly situated,

             Plaintiffs,

vs.

CITY OF NEW YORK and the NEW YORK CITY DEPARTMENT OF EDUCATION,

             Defendants.

CASE NO. 24-4631

**SECOND AMENDED PROPOSED CLASS ACTION COMPLAINT**
JURY TRIAL DEMANDED

---

*"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*

— James Madison, 1784

The above-named Plaintiffs, through their counsel, stand before this honorable court seeking justice and compensation for unlawful religious discrimination carried out by their employer, the New York City Department of Education ("DOE") in concert with the City of New York (the "City"). Plaintiffs assert claims under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 4200 U.S.C. § 2000e, *et seq*; 42 U.S.C.§1983, for the deprivation of rights under the First Amendment and Fourteenth Amendment of the United States Constitution; the New York City Human Rights Law ("CHRL"), NYC Administrative Code Title 8, and the New York State Human Rights Law ("SHRL"), NY Executive Law § 296, *et seq.*

## INTRODUCTION AND SUMMARY OF THE CASE

1.      This case arose because the City, working in concert with its DOE, engaged in widespread religious discrimination in an attempt to evade statutory obligations to accommodate religious practices of DOE employees that conflicted with the City's Covid-19 vaccine mandate.

2.      The discrimination occurred through three distinct phases:

    a.  **Initial "Phase 1" DOE denial**: DOE denied 100% of applications through an autogenerated system on the basis that it was allegedly "more than a minimal burden" to provide any accommodations. No human being reviewed a single application, and no cooperative dialogue was offered before the autogenerated denials were sent out. Denials were even sent to employees that already had remote jobs.

    b.  **Stricken Standards "Phase 2" Appeals:** arbitrators considered whether to reverse the DOE denials using a written policy that required them to facially discriminate against applicants depending on what religion they belonged to and whether their "religious leader" supported vaccines. If the applicant met the

discriminatory criteria, they were reinstated regardless of undue hardship. If not, they were rejected. During the appeals, DOE and City actors repeatedly and aggressively argued that their official policy was to categorically deny Catholics, Jews, Buddhists, Muslims and most Christians as well as anyone with beliefs derived from prayer or an objection to abortion.

c. **Citywide Panel "Phase 3" Remedial Review:** after the DOE's religious accommodation policies were found unconstitutional by the Second Circuit, the City offered to remediate the acknowledged constitutional harm by reviewing those denied by the arbitrators de novo. They denied 499 out of 500 applicants with unexplained autogenerated emails stating that applicants "did not meet criteria" and noting that it would be an undue hardship to accommodate them given the need for safe in person learning.

3. This lawsuit is brought by 31 Plaintiffs denied through all three phases of the DOE's religious accommodation process. They bring this case as a proposed class action lawsuit on behalf of themselves and all others similarly situated, asserting statutory claims and constitutional claims.

4. This lawsuit is distinct from the Second Circuit's decision in *New Yorkers for Religious Liberty, Inc. v. City of N.Y.* ("NYFRL") in that it asserts statutory as well as constitutional claims. Title VII and the SHRL and CHRL all place the burden on the employer (not the plaintiff) to *prove* that an employee's accommodation request would pose a significant threat of substantial harm that could not be mitigated with reasonable measures without significant hardship or expense.

5. Plaintiffs in this case also are entitled to constitutional relief. In NYFRL, the Second

Circuit affirmed that Phase 1 and 2 of the DOE's religious accommodation process was unconstitutional, but held that to make a free exercise claim for denials under Phase 3, plaintiffs would have to plead facts that gave rise to an inference that the "undue hardship" reasoning provided by the panel was either pretextual or not based on lawful standards. The NYFRL court held that two of the plaintiffs met that burden and the rest did not on the conclusory facts in that complaint. The facts in *this* complaint establish that the Citywide Panel's undue hardship determinations were pretextual and did not meet these or other statutory standards for any plaintiffs. For example, after the NYFRL complaint was filed in early 2022, the City offered Attorney Eric Eichenholtz as a 30(b)(6) witness to provide further information about how the Citywide Panel operated. He affirmed under oath that the Citywide Panel applied the unlawful de minimis hardship standard rather than the "significant expense or difficulty" standard required by law, failed to consider any of the required statutory factors for economic harm, safety or alternative accommodations, and conducted no individualized assessment of direct threat analysis. He also testified that the City did not actually make any independent undue hardship assessment but simply relied on the DOE's tainted, blanket and unsupported assertion that it could be an undue hardship to accommodate anyone under the  unlawful "de minimis" burden test.

6.      Plaintiffs in this case include not only classroom teachers but also administrators, psychologists, secretaries, and remote workers who posed no direct threat and could have been accommodated without any hardship whatsoever, as set forth in detail later in this complaint. Multiple Plaintiffs already worked remotely, had co-teachers in place, or worked exclusively in administrative offices without student contact.

7.      Moreover, substantial evidence has arisen since the operative complaint in NYFRL that requires a re-examination of all the constitutional claims. For example, the Second Circuit's

holding on animus depends on the holding that there were insufficient nonconclusory facts that could lead to an inference that the Mayor or the City participated in implementing the DOE's clearly unconstitutional Phase 1 and 2 reviews or that the DOE was involved in the undue hardship determinations at the Phase 3 Citywide Panel review phase.

8.     This complaint asserts specific facts that show that both were true. For example, this complaint cites the fact that the Mayor admitted publicly to the press that the City was involved in the DOE's original determinations under the Stricken Standards, and directed them to categorically deny Catholics, Jews and others besides Christian Scientists. Moreover, in blatant violation of the Establishment Clause, the City sent articles to DOE representatives and directed them to categorically deny most religions, and Commissioner Chokshi wrote a letter to the arbitrators and the Citywide Panel instructing them to deny religious objections that involved concerns about abortion, despite his acknowledgment that all three vaccines used fetal cell lines derived from aborted fetuses in their production or development. These and other examples of animus require strict scrutiny of the City's "remedial" review of the original acknowledged unconstitutional denials as well as the DOE's original two determinations.

9.     After denying accommodation and terminating employees for failing to violate their sincerely held religious beliefs, Defendants attached "problem codes" to plaintiff's employment files, marking them as unhireable, and creating a barrier to getting rehired or employed elsewhere that still haunts most plaintiffs today.

10.     Plaintiffs have been gravely harmed. They've lost their livelihoods, their homes, their savings, gone hungry and suffered severe trauma from having been subjected to punitive policies that forced them to choose between their jobs and faith in such a discriminatory and arbitrary manner.

11.     Despite the fact that the Mandate was repealed in early 2023, and despite severe staffing shortages, DOE continues to retaliate against Plaintiffs and still refuses to allow most Plaintiffs to return to work.

12.     Plaintiffs seek declaratory relief, reinstatement with back pay, front pay and benefits, nominal and compensatory damages, and attorneys' fees. They also seek an apology and a promise that this will never happen to anyone employed by the City again.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) to hear related claims arising under New York State law because they are so related to the federal claims that they form part of the same controversy.

14.     Venue is proper in this district under 28 U.S.C § 1391(b) because it is the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred.

## NAMED PARTIES

15.     Plaintiff MARIANA ARGYROS is a resident of Queens County, New York. Prior to being denied religious accommodation, Ms. Argyros was a tenured teacher working in Queens with over 17 years of service at DOE.

16.     Plaintiff MICHELLE BAPTISTE is a resident of Kings County, New York. Prior to being denied religious accommodation, Ms. Baptiste was a tenured teacher working in Brooklyn with over 30 years of service at DOE.

17.     Plaintiff VENESSA BURRELL-BARTLEY is a resident of Queens County, New York. Prior to being denied religious accommodation, Mrs. Burrell-Bartley was a tenured teacher working in Queens with four years of service at DOE.

18.     Plaintiff STEPHON BYNOE is a resident of Kings County. Prior to being denied religious accommodation, Mr. Bynoe was a tenured Special Educator and General Education Teacher who worked in an administrative building with 22 years of service at DOE.

19.     Plaintiff CONNI CALIA is a resident of Queens County, New York. Prior to being denied religious accommodation, she was a school psychologist, working in Brooklyn with over 20 years of service at DOE.

20.     Plaintiff ADRIANA CARBONE is a resident of Bronx County, New York. Prior to being denied religious accommodation, Ms. Carbone was a Community Associate working at the administrative offices in Manhattan with over nine years of service at DOE.

21.     Plaintiff TRAVIS CARTER is a resident of Richmond County, New York. Prior to being denied religious accommodation, Mr. Carter was a tenured teacher working in Staten Island with over 21 years of service at DOE.

22.     Plaintiff JESSICA DALY is a resident of Richmond County, New York. Prior to being denied religious accommodation, she was a paraprofessional working in Staten Island with over ten years of service at DOE.

23.     Plaintiff EMILY ZAPANTIS-DALAMAKIS currently resides in Greece. Prior to being denied reasonable religious accommodation, she was a tenured Assistant Principal working in Queens with over twenty years of service at DOE.

24.     Plaintiff SUZANNE DEEGAN is a resident of Monmouth County, New Jersey. Prior to being denied religious accommodation, Mrs. Deegan was a tenured teacher working in Staten Island with over 20 years of service at DOE.

25.     Plaintiff STEPHANIE DICAPUA is a resident of Richmond County, New York. Prior to being denied religious accommodation, Ms. DiCapua was a tenured teacher working in

Richmond County with nearly five years of service at DOE; Ms. Dicapua joins this lawsuit only for the Title VII claims.

26.     Plaintiff LEAH ERLENBACH is a resident of Kings County, New York. Prior to being denied religious accommodation, Ms. Erlenbach was a paraprofessional working in Brooklyn with 5 years of service at DOE.

27.     Plaintiff MEGAN FICCHI is a resident of Richmond County, New York. Prior to being denied religious accommodation, Mrs. Ficchi was an Assistant Principal working in Richmond County with over ten years of service at DOE.

28.     Plaintiff KELLY FINLAW is a resident of New York County. Prior to being denied religious accommodation, Ms. Finlaw was a tenured teacher working in Manhattan with over fourteen years of service at DOE.

29.     Plaintiff MICHELE GARRETT is a resident of Suffolk County, New York. Prior to being denied religious accommodation, she was a tenured teacher working in Queens with over twenty years of service at DOE.

30.     Plaintiff ARIJANA LUKACEVIC is a resident of Queens County, New York. Prior to being denied religious accommodation, she was a paraprofessional working in Queens with two years of service at DOE.

31.     Plaintiff ANAMARIE MEDINA is a resident of Westchester County. Prior to being denied religious accommodation, Ms. Medina was a tenured teacher working in the Bronx with 27 years of service at DOE.

32.     Plaintiff AYELLET MOAS is a resident of Broward County, Florida. Prior to being denied religious accommodation, Ms. Moas was a tenured special education teacher working in Manhattan with over thirteen years of service at DOE.

33.     Plaintiff MICHAEL MONZILLO is a resident of Nassau County, New York. Prior to being denied religious accommodation, he was a biology teacher, working in Queens with over eight years of service at DOE.

34.     Plaintiff DONNY NAPOLITANO is a resident of Saint John's County in Florida. Prior to being denied religious accommodation, he was a tenured secondary math teacher working in Brooklyn with over eight years of service at DOE.

35.     Plaintiff MAWULI OLIVIERRE is a resident of Kings County, New York. Prior to being denied religious accommodation, he was a tenured teacher working in Brooklyn with over 23 years of service at DOE.

36.     Plaintiff PETER OTTO is a resident of Suffolk County, New York. Prior to being denied religious accommodation, Mr. Otto was a tenured teacher working as a school programmer in charge of remote learning in Queens with just under fifteen years of service at DOE.

37.     Plaintiff LEONARD PIZZA is a resident of Suffolk County, New York. Prior to being denied religious accommodation, he was a tenured teacher working in Queens with eighteen years of service at DOE.

38.     Plaintiff SAUNDRA RAYMOND is a resident of Westchester County, New York. Prior to being denied religious accommodation, she was a tenured teacher working in the Bronx with over twenty-four years of service at DOE.

39.     Plaintiff ROBERT RETTINO is a resident of Putnam County, New York. Prior to being denied religious accommodation, he was a tenured teacher working in the Bronx with over sixteen years of service at DOE.

40.     Plaintiff NICOLE RIVICCI is a resident of Richmond County, New York. Prior to being denied religious accommodation, she was a tenured teacher working in Brooklyn with six

years of service at DOE.

41.     Plaintiff CHRISTIAN SCHMIDT is a resident of Kings County, New York. Prior to being denied religious accommodation, he was a tenured teacher, working in Manhattan with over sixteen years of service at DOE.

42.     Plaintiff DAMARIS SCOTT is a resident of Bronx County, New York. Prior to being denied religious accommodation, she was a secretary, working in the Bronx with over twenty-four years of service at DOE.

43.     Plaintiff BONNIE SKALA KILADITIS is a resident of Queens County, New York. Prior to being denied religious accommodation, she was a tenured teacher working in Queens with over twenty-four years of service at DOE.

44.     Plaintiff JUDITH STAMOS is a resident of Suffolk County, New York. Prior to being denied religious accommodation, she was an occupational therapist working in Queens with over ten years of service at DOE.

45.     Plaintiff ZABDIEL VALERA is a resident of Essex County, New Jersey. Prior to being denied religious accommodation, he was a tenured teacher, working in Manhattan with over fifteen years of service at DOE.

46.     Defendant CITY OF NEW YORK is a municipal corporation of the State of New York and can sue and be sued. The City operates and employs people through its municipal agencies. Since 2002, the City has exercised Mayoral control over DOE pursuant to a grant of authority to the City from the State Legislature.

47.     Defendant DOE is a school board organized under, and existing pursuant to, the New York Education Law. Defendant DOE maintains its headquarters at 52 Chambers Street, New York, New York and operates in all five boroughs of the City of New York. The Mayor of the City

of New York exercises mayoral control over the DOE.

## CLASS ACTION ALLEGATIONS

48.     Plaintiffs propose that this matter be certified as a class action pursuant to Rule 23 in their representative capacity on behalf of themselves and the class of all others similarly situated, as defined in this Amended Complaint.

49.     Plaintiffs propose that the class consist of all persons who applied for but were denied religious accommodation from the Covid-19 vaccine mandate applicable to DOE employees and contractors (the "Class") and were informed they would get a Citywide Panel review but were not accommodated through that process.

50.     This action meets the following prerequisites of Rule 23(a):

a.  Numerosity: upon information and belief, the Class consists of approximately five hundred people. Due to the large number of class members, joinder of all members is impracticable, and indeed, virtually impossible.

b.  Ascertainability: the Class is ascertainable. DOE and the City sent notifications to applicants for religious accommodation between November 2021 and January 2022 confirming that they would get the fresh review.

c.  Commonality: the central issues in this case are common to the whole Class, including but not limited to –

   i.   Whether the facts give rise to an inference of discrimination that could have impacted the Defendants' religious accommodation decisions and policies; and
   ii.  Whether the DOE's original accommodation policies were unlawful or discriminatory on their face or as applied; and
   iii. Whether the facts give rise to an inference that the Citywide Panel reviews were also affected by discrimination and animus; and
   iv.  Whether the denials based on undue hardship were pretextual; and
   v.   Whether the denials based on undue hardship were applied evenly between those accepted under the DOE's original, admittedly

unconstitutional religious accommodation policies and those unlawfully denied under that policy but given fresh consideration by the Citywide Panel; and

vi. Whether Defendants could have accommodated Plaintiffs and other members of the Class without undue hardship; and

vii. Whether the policies at issue are subject to strict scrutiny; and

viii. Whether Defendants' policies can survive strict scrutiny or rational basis review.

d. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs were all in good standing at their jobs at DOE, and each applied for religious accommodation, was denied, timely appealed, was denied again, and suffered harm as a result including the harm of being placed on leave without pay and deprived of their salary and tenure in or around the fall of 2021. Plaintiffs were each subsequently informed that they would get fresh consideration by the Citywide Panel but were not accommodated as a result of that fresh review. The claims of the Plaintiffs and the Class arise from the same events and actions by Defendants and are based on the same legal theories.

e. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. They do not have any interests that conflict with the interests of the Class. They have engaged competent counsel who are experienced in complex litigation, including class actions, and have won relief for groups of Plaintiffs impacted by these very same policies.

f. <u>Superiority</u>: a class action is superior to alternatives, if any, for the timely, fair, and efficient adjudication of the issues alleged herein. A class action will permit numerous similarly situated individuals to prosecute their common claims in a single forum simultaneously without duplication of evidence, expense and resources. This action will result in uniformity of decisions and avoid risks of

inconsistency and incompatible standards of conduct in the judicial system. It will also more efficiently allow adjudication of the pattern and practice claims.

g. <u>Maintainability</u>: this action is properly maintainable as a class action for the above-mentioned reasons and under Rule 23(b). Individual litigation is too costly. This is expensive litigation against deep-pocket government employers who have shown an unwillingness to afford relief class wide even after admitting that its policies were discriminatory. The City and DOE routinely appeal when they lose and tie up case in years of expensive appeals. These hard-working employees, who have been shut out of work and retaliated against for three years now, do not have the means to hire attorneys to individually litigate their claims for years on end, and there are not enough attorneys who work in this area to represent them all individually even if they did. Individual actions would also unnecessarily burden the courts and waste judicial resources.

h. <u>Predominance</u>: questions of law or fact common to Class Members predominate over any question that may affect only individual members. A class action is superior to other methods for fairly and efficiently adjudicating the controversy.

## STATEMENT OF FACTS COMMON TO ALL CLAIMS

### I. BACKGROUND ON THE MANDATE AND INITIAL REFUSAL TO ACCOMMODATE

### A. The Pandemic

51. At some point between the fall of 2019 and spring of 2020, the Covid-19 virus began circulating in New York City and around the world.

52.     In March 2020, New York State declared a state-disaster emergency due to the Covid-19 pandemic. Schools were closed for the remainder of the Spring 2020 semester across the state, including all DOE schools.

53.     In the 2020-2021 school year, DOE schools reopened for in-person learning, with the option of remote instruction if families preferred that option.

54.     This fact was not addressed in NYFRL, where the Court was under the impression that the DOE was just resuming in person learning in the fall of 2021 when the Mandate was issued.

55.     In fact, most DOE teachers and staff were required to return to in-person instruction the year before in the fall of 2020 and many students resumed in person learning in the fall of 2020 as well.

56.     In or around December 2020, vaccines became available against Covid-19.

57.     But there was no vaccine mandate during the 2020-2021 school year, and DOE allowed Plaintiffs to continue to work unvaccinated for the entire school year and following summer, even if they were working in person around students in the classroom.

**B. Scientific Consensus Prior to Mandate**

58.     On June 23, 2021, a year and a half in to the pandemic, Governor Cuomo announced that the pandemic emergency was officially over in New York State.

59.     The virus had mutated by that time to become more mild, there were far fewer deaths and hospitalizations, and the crisis had stabilized dramatically.

60.     By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts:

a. vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they did; and

b. herd immunity could not be achieved through vaccination; and

c. any vaccine protection waned significantly after a matter of weeks.

61. By August 2021, governments around the world publicly acknowledged that vaccination would not stop the spread of the virus, and that everyone, vaccinated and unvaccinated alike, would likely catch Covid-19 regardless of vaccine measures.

62. On August 5, 2021, prior to the issuance of any DOE Mandate, Wolf Blitzer interviewed CDC Director Rochelle Walensky, who acknowledged on national television that the vaccines could not stop transmission of Covid-19.

63. For example, Dr. Walensky said: "But what [the vaccines] can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky further stated, "that's exactly right."[1]

### C. Issuance of Mandate and Initial Refusal to Accommodate

64. On or about August 24, 2021, Mayor Bill de Blasio and Commissioner Chokshi issued the first version of a new "emergency" regulation mandating Covid-19 vaccination for most DOE employees and removing the previous alternative option of testing in lieu of vaccination.

65. Initially, the City and DOE announced they would consider no religious or medical accommodations from the Mandate.

66. Plaintiffs assert that an inference of animus against those with religious objections to the vaccine can be deduced from the aggressive no accommodation stance given that: (1) the scientific consensus at the time showed that vaccines could not meaningfully stop the spread of

---

[1] Blitzer, W. (2021, August 5). *Transcript: Interview with CDC Director Dr. Walensky.* The Situation Room, CNN. http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

Covid; (2) the CDC had already announced, prior to the issuance of the Mandate, that vaccinated people could also spread Covid-19; (3) the DOE had allowed teachers to work in person for the past year unvaccinated without issue with students; and (4) no other school district in the state or neighboring states refused the accommodation of weekly testing in lieu of vaccination.

67.     On or about September 9, 2021, the MLC and sixteen unions filed a lawsuit ("MLC Litigation") in State Court, challenging the Mandate and the Defendants' refusal to consider reasonable accommodations pursuant to their statutory duties.

68.     On September 14, 2021, the Supreme Court, New York County, issued a temporary restraining order ("TRO") enjoining the City from enforcing the Mandate "solely because the Department of Health and Mental Hygiene Order's mandate did not reference the possibility of any medical or religious exemption." *The New York City Mun. Labor Committee v. The City of New York,* No. 158368/2021, 2021 WL 4502854, at *2 (N.Y. Sup. Ct. Sep. 22, 2021).

69.     The next day, on September 15, 2021, the first version of the DOE Mandate was rescinded and reissued, with an amendment clarifying that "[n]othing in this order shall be construed to prohibit any reasonable accommodation otherwise required by law."[3]

70.     The City assured the court that it intended to allow for reasonable religious and medical accommodation from the Mandate.

71.     The New York State Supreme Court accordingly vacated the TRO, stating that it was "obviate[d]" by the Commissioner's amendment allowing for religious and medical accommodation. *Mun. Labor Committee,* 2021 WL 4502854, at *3.

## II.     DEFENDANTS ADOPT AND ENFORCE THE STRICKEN STANDARDS.

---

[3] The Mandate was also further amended later in September 2021, but not substantively for purposes of this Petition other than to push back the effective date as a result of further lawsuits.

72.     In a parallel proceeding against both the City and DOE, the United Federation of Teachers ("UFT"), Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse on September 1, 2021, contending, among other things, that Defendants' failure to provide religious and medical accommodations was unlawful and that the Defendants further failed to afford due process regarding job and benefits protection.

73.     On September 10, 2021, an impact arbitration decision was rendered by Arbitrator Martin Scheinman requiring that the DOE provide eligible employees with reasonable religious accommodation. [Exhibit 1 – not offered for the truth of the document, but to show what the policy said]. Shortly thereafter, materially identical awards were issued to cover Counsel of School Supervisors and Administrators ("CSA") members and District Council ("DC37") employees subject to the DOE Mandate.

74.     The arbitration awards are collectively referred to hereafter as the "Stricken Standards" since they were later struck down as unconstitutional by the Second Circuit Court of Appeals. *Kane v. de Blasio,* 19 F.4th 152, 167 (2d Cir. 2021).

75.     In the Stricken Standards, the arbitrator began by ordering both the City and the DOE to provide religious accommodation from the Mandate, allowing them to either choose their own accommodation process or an expedited process issued in the Stricken Standards. The decision begins: "As an alternative to any statutory reasonable accommodation process, the City, the Board of Education of the City School District for the City of New York (the 'DOE'), and the United Federation of Teachers, Local 2, AFT, AFL-CIO (the 'UFT'), (collectively the 'Parties') shall be subject to the following Expedited Review Process..."

76.     This information was not before the Court in NYFRL or in Kane, in which litigations the parties had not realized that the arbitration had been against the City and DOE, and

both entities had been ordered to implement and oversee a religious accommodation process for DOE employees.

77. The arbitrator, Martin Scheinman, served as a major donor and fundraiser for Mayor de Blasio and his neutrality is and was contested at the time that DOE adopted the Stricken Standards.

78. He acknowledged that in drafting the Stricken Standards, he incorporated submissions from the parties.

79. The language setting forth the criteria for which religious beliefs could (and could not) qualify was largely proposed by the City and the DOE.

80. These criteria in the Stricken Standards were clearly designed to deny most applicants by unconstitutionally narrowing the definition of what beliefs could qualify for religious accommodation. The City's participation in drafting and proposing this language leads to another inference of animus.

81. On its face, the "Expedited Review Process" set forth in the Stricken Standards sets forth unconstitutional denominational preferences and categorically excludes most religions from protection and access to accommodation.

82. For example, the Stricken Standards provide the following criteria for determining who could access accommodation: "religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists)." [Stricken Standards at 9]. This language was almost entirely drafted and proposed by Defendants' attorneys.

83. Multiple problems stand out in this definition of what constitutes "acceptable" religious beliefs:

84. First, the criteria favors Christian Scientists, predefining Christian Science as the only enumerated example of a "recognized" and "established religious organization." This gives Christian Scientists an unfair advantage.

85. Second, the policy requires the government to decide which other religions than Christian Science are "recognized" as "established religious organizations" which requires them to entangle themselves with religious questions in violation of the Establishment Clause. If an applicant belongs to a religion that is not deemed "established" and "recognized" by the government employer, whatever that means, the person must be denied. It is well-settled law that government cannot "establish" which religions are "recognized" and thus valid.

86. Third, the policy also provides that religious objection based on personally held or "philosophical" religious beliefs must be denied. This violates federal, state, and local statutory standards, as well as constitutional standards, all of which require that personally held or unorthodox religious beliefs are just as protected as those that are endorsed by official church dogma.

87. In fact, even moral or philosophical beliefs are defined by the EEOC and governing law as expressly protected religious beliefs, but under the Stricken Standards, they were excluded from protection even if the beliefs were sincerely held.

88. Fourth, the Stricken Standards require that the religious objection "must be documented in writing by a religious official (e.g. clergy)." The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have different religious beliefs about the Covid-19 vaccines than their pastor or church leader. Defendants were on notice that the clergy requirement was illegal. It is long-established law in New York that governments cannot require a person to show a clergy letter or belong to an

"established religion" to have their religious beliefs protected. *See, e.g., Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 92 (E.D.N.Y. 1987).

89.     Fifth, the Stricken Standards require that, even if the DOE were to determine a person does belong to an "established" and "recognized" religion, and that religious organization provided a clergy letter, the applicant must still be denied if the "leader" of their faith has publicly expressed support for vaccination. "Leader" is not defined in the Stricken Standards, but in practice, the City and the DOE repeatedly interpreted this concept broadly to categorically deny accommodation to whole categories of religious employees based on sometimes random ideas about who the leader of a faith might be.

90.     Though the government is prohibited by the Fourteenth Amendment to the United States Constitution from making or enforcing any policy which abridges the privileges and immunities of citizens of the United States, or which denies any person within its jurisdiction equal protection, the City and the DOE adopted and enforced the Stricken Standards as the official policy for determining religious accommodations from the vaccine mandate. The Mayor further endorsed the process as valid in a press conference.

91.     These actions lead to a further reasonable inference of animus against both Defendants.

### A. Phase 1 - DOE denies 100% of applicants without review based on "undue hardship."

92.     Under the Stricken Standards, employees had only a few days to submit their applications, and initial determinations were to be made by DOE staff in the Division of Human Capital, Office of Equal Opportunity and Office of Employee Relations.

93.     These DOE departments were to apply the criteria from the Stricken Standards to determine who should be accommodated and provide a reason for any determination.

94. Within hours or days of submitting their application, every single applicant who applied under the Stricken Standards received the same autogenerated email from DOE stating:

Dear [NAME],

We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate. Your application has failed to meet the criteria for a religious based accommodation.

Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations.

This application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of your union and the Board of Education regarding the vaccine mandate. Under the terms of the Arbitration Award, you may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice by logging into SOLAS https://dhrnycaps.nycenet.edu/SOLAS and using the option "I would like to APPEAL". As part of the appeal, you may submit additional documentation and also provide a reason for the appeal.

Sincerely, HR Connect Medical, Leaves, and Records Administration

Please do not reply to this message via e-mail. This email address is automated.

95. Notwithstanding that the Stricken Standards already was designed to categorically deny most applicants, Defendants thus applied the Stricken Standards to exclude even more employees from protection than the discriminatory policy allowed.

96. As bad as the Stricken Standards were, the one thing that the policy did for employees was to guarantee that the DOE had to grant religious accommodation by allowing an employee to remain on payroll and work outside of the classroom if an applicant qualified under its criteria, without an excuse to deny based on "undue hardship."

97. In the Stricken Standards, there was no provision for undue hardship, which the unions had argued would be applied as a pretext given the Defendants' prior refusal to apply the

accommodation standards in good faith.

98.     Rather, under the Stricken Standards, at both the initial DOE review and in the appeals, any applicant who qualified "within the specific criteria identified above shall be permitted the opportunity to remain on payroll.." and further provided: "Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE while the exemption and/or accommodation is in place…the DOE shall make best efforts to make these assignments within the same borough as the employee's current school, to the extent a sufficient number of assignments exist in the borough. Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment."

99.     The DOE's decision to deny 100% of the applicants, even those who qualified and even those who already worked in administrative offices or could easily do so violated the Stricken Standards, which stated: "The process set forth, herein, shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school."

100.    In addition to violating the arbitrator's award, the autogenerated denials violated statutory standards in multiple ways.

101.    First, the DOE did not engage in any good-faith individualized attempts to accommodate employees before issuing blanket "undue hardship" denials to 100% of applicants.

102.    No human being at the DOE individually reviewed  the applications before sending out the autogenerated emails denying accommodation.

103.    Applicants were not contacted by any person at DOE to discuss their applications

before they were denied.

104.   No cooperative dialogue was offered or took place before the denials were issued.

105.   The same or substantially the same email was sent to all applicants.

106.    The DOE also sent out the same email to employees who were already approved to work remotely and those who did not have student-facing jobs.

107.   Plaintiffs assert these facts lead to a further reasonable inference of discrimination and pretext.

108.   Second, the denial incorrectly states that the Mandate did not allow DOE employees to work in person.

109.   It was not true that the Mandate did not allow DOE employees to work in person around students – on the contrary, as Attorney Eichenholtz admitted in sworn depositions, the Mandate had been expressly amended to allow for any reasonable religious accommodation, which would include in person accommodation.

110.   By law, employers bear the burden of proving that an employee is a direct threat and of proving that no reasonable accommodation could be made without undue hardship that would mitigate this threat.

111.   Nothing in the Mandate provided justification for a blanket ban on in-person accommodation without individualized analysis of the statutory factors for each employee, as Eric Eichenholtz, the City's Rule 30(b)(6) witness, affirmed under oath.

112.   Third, the DOE's denials admitted - on their face - that Defendants applied the wrong legal standard for assessing whether accommodation would pose an undue hardship.

113.   The denials stated that Defendants used the *de minimis* standard, but under the SHRL and CHRL, the employer bears the burden of proving that accommodation would create a

"significant" burden or expense, and under Title VII, the employer must prove substantial hardship, not *de minimis* hardship.

114. Moreover, pursuant to federal, state and local law, employers also must prove that they made the undue hardship determination after assessing all possible accommodations against specific statutory defined criteria, and the best available evidence, on a good-faith individualized basis before denying an applicant.

115. Under all three statutes, an employer must also engage in a good faith cooperative dialogue about any potential accommodations and the employers concerns about economic or safety issues they may present, which allows the employee to then address those concerns and/or propose a different accommodation.

116. DOE did not engage in cooperative dialogue with any employee before issuing the denials.

117. DOE did not make any good faith attempt to individually analyze any of the required statutory factors for any applicant before conclusively denying them all based on alleged undue hardship.

118. DOE did not prove or individually assess whether any employee was a direct threat due to their vaccination status before sending out the autogenerated blanket denials.

119. DOE did not prove or individually assess whether it would be an undue hardship to provide reasonable accommodation for any employee deemed a direct threat before sending out the autogenerated blanket denials.

120. Some employees were already working remotely, or could have easily worked remotely, when they received the blanket undue hardship denials, and no one ever articulated why it would be an undue hardship to accommodate them.

121.    Most of those who received the email denial had already been accommodated to work remotely in the past and could have easily been accommodated to do so again.

122.    And all employees could have been easily accommodated in person or remotely, as they had been for the entirety of the pandemic, without undue hardship or safety concerns, as further set forth in the undue hardship section below.

123.    Upon information and belief, the summary blanket denials were issued to demoralize, discourage and harass employees with religious objections to the vaccines.

124.    Whatever the motive, employees got the message, loud and clear, that DOE was not acting in good faith.

125.    The applicants had poured their hearts out into their religious accommodation letters, which is a vulnerable thing to do.

126.    They were given only a few days to commit their most sacred innermost thoughts to paper, and to gather a clergy letter if they could.

127.    Receiving an autogenerated response, almost immediately, with a boilerplate denial, felt like a mockery of their faith and showed many employees that further efforts were futile.

128.    The DOE's decision to violate statutory standards and their own Stricken Standards policy by proactively denying 100% of the applicants through an autogenerated email pretextually asserting "undue hardship" leads to a reasonable inference of animus, bad faith and/or that the undue hardship denials were pretextual and not issued in accordance with statutory standards.

B.  *Phase II – the Defendants Each Participate in Unconstitutional Arbitration Appeals*

129.    Pursuant to the autogenerated email denials, and the Stricken Standards policy,

applicants had 24 hours to appeal their initial DOE denials.

130.    Many employees were unable to appeal, since the electronic "SOLAS" system they were required to submit applications through crashed and froze repeatedly during their brief window to appeal. Many others felt it was futile to appeal, after receiving DOE's insulting autogenerated generic denials in response to their good-faith and heartfelt accommodation requests.

131.    Notwithstanding these hurdles, each named Plaintiff in this lawsuit timely submitted their request for appeal.

132.    Pursuant to the Stricken Standards, the appeals were sent to an arbitrator, who was supposed to judge the appeals based on the criteria set forth in the Stricken Standards.

133.    Arbitrators could deny the application outright or request a zoom hearing first.

134.    Arbitrators were given unfettered discretion whether to allow a hearing.

135.    There was no apparent reason why some employees were granted a hearing, and others denied.

136.    Some of the Plaintiffs were denied without the opportunity for a zoom hearing. They were provided with no explanation whatsoever for the denial of the hearing, or the reasons for the denial of their appeals, just given a paper that had an "x" next to the word "Denied."

137.    Other identically situated applicants were allowed a zoom hearing.

138.    After the appellate process, at least 169 DOE employees were granted accommodation, and some of these were classroom teachers. The vast majority were denied, again, with no explanation other than an "x" next to the word denied in the vast majority of cases.

### *Direct Evidence of Discrimination in the Arbitration Hearings*

139.    Neither DOE nor the arbitrators kept any records explaining the arbitration

decisions and DOE admitted in other lawsuits and position statements to the EEOC that it cannot explain the reasons why some were granted, and others denied.

140.     But dozens of employee accounts in this and other cases show direct evidence of systematic discrimination by DOE representatives and by the arbitrators during this process. As set forth more fully in this complaint, at the zoom hearings, the arbitrators and DOE representatives engaged in what can only be described as heresy inquisitions, in which they discriminated even more zealously than the already discriminatory policy required.

141.     For example, DOE representatives openly and repeatedly asserted that DOE's official position was that all Jews, Catholics, Muslims, Buddhists and most Christian denominations had to be categorically denied.

142.     DOE took the official position that all Jews must be denied because of a Jerusalem Post article stating that a Rabbi in Israel was vaccinated.

143.     DOE representatives repeatedly referenced this article in zoom hearings to assert that all Jews must be categorically denied accommodation.

144.     Jewish applicants from this and other lawsuits repeatedly documented that though they explained that their own Rabbi did not share the Israeli Rabbi's opinion, that Judaism is a diverse religion, and that a random Rabbi in Israel could not be deemed the "leader" of all Jews, they were still told that Jews could not qualify under the Stricken Standards because of the Jerusalem Post article.

145.     Similarly, DOE also took the repeated position that all Catholics had to be denied, because Pope Francis is vaccinated.

146.     There is substantial debate within the Catholic faith, like many other faiths, about whether it is religiously permissible to take a Covid-19 vaccine.

147.     For example, a whole council of Catholic Bishops set forth a document asserting that it is likely *not* permissible for Catholics to take any of the Covid-19 vaccines due to the use of aborted fetal cell lines in production and development of the vaccines.

148.     Moreover, while Pope Francis is vaccinated and expressed his public opinion that vaccination might be permissible despite the connection to abortion, he also instructed Catholics that they must each consult their religious conscience to make the choice for themselves.

149.     Nonetheless, DOE argued repeatedly in the zoom hearings that all Catholics should be denied because the Catholic Pope was vaccinated.

150.     DOE maintained this position even if the applicant provided a letter from their own Priest or religious leader stating that they had a valid religious objection.

151.     DOE representatives went so far as to argue in at least one documented case that a Buddhist applicant should be denied because his views were not shared by the Catholic Pope even though the DOE representative acknowledged that DOE found his religious beliefs sincere and even after he pointed out that he was not Catholic. Nonetheless, DOE argued that since he was raised as a Christian and said that he was still guided by Christ as well as Buddha, he must be denied because the Pope was vaccinated.

152.     DOE representatives also often argued that any non-denominational Christians other than Christian Scientists should be categorically denied due to the Pope's beliefs.

153.     In multiple cases where Christians submitted letters from their own religious leaders, explaining that they also religiously opposed vaccination, DOE argued that the Pope's beliefs controlled all Christians other than Christian Scientists, and the applicant had to be denied, even if sincere and even if they were following the teachings of their religious leader.

154.     Alternatively, DOE representatives often argued that less hierarchical, or non-

denominational Christian churches were not "Established" enough to allow members to be accommodated under the Stricken Standards.

155. Similarly, the DOE representatives routinely argued for categorical denial of Seventh Day Adventists, often referencing a letter purporting to be from a Seventh Day Adventist leader to assert that all Seventh Day Adventists must be denied.

156. DOE also argued that all Buddhists had to be denied because the Dalai Lama was vaccinated.

157. The Dalai Lama is a spiritual leader of the Gelug ("Yellow Hat") sect, which is one of at least four sects of Tibetan Buddhism.

158. There are many other sects of Buddhism - perhaps thousands of other sects, outside of Gelug Buddhism.

159. Moreover, according to spiritual texts, Buddha told his followers not to take any leader when he was dying, but rather, that each must rely on the dharma to examine the truth for themselves.

160. But DOE still repeatedly argued that all Buddhists should be categorically denied because the Dalai Lama was vaccinated.

161. DOE also argued repeatedly that all Muslims must be denied due to the alleged discovery of an alleged "leader" of that diverse faith who was vaccinated.

162. DOE also categorically denied several specific religious objections, even in cases where they deemed them sincerely held.

163. Especially, DOE representatives argued that any religious objection based on concerns about the use of aborted fetal cell lines was presumptively invalid.

164. In support of this argument, DOE primarily relied on a letter from Health

Commissioner David Chokshi, in which the Commissioner argued that concerns about aborted fetal cells did not merit religious protection.

165.    In the letter, the Commissioner admitted that aborted fetal cell lines were used prior to licensing in some phase of the development of each Covid-19 vaccine, but he recommended that arbitrators and decision-makers deny these concerns because he believed many faith leaders felt it was okay to take the vaccines notwithstanding this connection due to the potential public health benefit.

166.    It is well documented that aborted fetal cell lines were used in the production and/or development of the available Covid-19 vaccines.

167.    DOE's attorneys have admitted they have no basis to contest this fact.

168.    Mr. Chokshi's opinion that these concerns do not merit religious protection is impermissible governmental entanglement in religious questions and constitutes discrimination.

169.    Nonetheless, the DOE repeatedly used Commissioner Chokshi's letter in zoom hearings, arguing that concerns about the use of aborted fetal cell lines did not merit religious protection and were a reason to categorically deny anyone who brought it up, regardless of whether they were deemed sincere or not.

170.    The DOE's discriminatory statements and ignorant assumptions about faith were common and well-documented throughout the accommodation process, as evidenced by the following examples from the individual plaintiffs in this case.

171.    Many Plaintiffs experienced firsthand how DOE representatives repeatedly made categorical statements denying accommodation based on an applicant's religious affiliation rather than their individual sincerely held beliefs, as evidenced by the following examples:

        a.   When Ms. Zapantis, a Greek Orthodox applicant, explained that the Greek

Orthodox church is autocephalous, that many Bishops and Greek Orthodox churches she follows share her religious objection to vaccines, and that she follows the teachings of the Holy Spirit, the Holy Elders and the Saints, DOE representatives argued that this was essentially heretical, and that the arbitrator must take the Archbishop's guidance as the only valid religious belief for a Greek Orthodox applicant and deny Ms. Zapantis' beliefs on that basis.

    b. In Mr. Valera's hearing, though DOE acknowledged he had sincerely held religious beliefs, they argued he must be denied because the leadership of the Seventh Day Adventist religion was vaccinated, presenting a letter from the President/leadership committee of the Church as evidence against Mr. Valera's own religious interpretation of what his faith required.

    c. Despite Mr. Stephon Bynoe's role as Pastor of his Ministry and his having written religious accommodation letters for two of his congregation that were granted accommodation, his own request was denied without a hearing.

172. DOE representatives demonstrated particular hostility toward religious beliefs related to abortion and the use of fetal cell lines in vaccine development.

    a. In Mrs. Burrell-Bartley's hearing, DOE representatives chiefly argued that she was not entitled to accommodation because her church was "wrong" to object to the link between vaccines and abortion, arguing that Commissioner Chokshi's letter and opinion that such concerns were silly required she be dismissed.

    b. When Ms. Daly explained that she did not worship the Pope or any man, but rather followed God's guidance, the DOE representative still pulled out

Commissioner Chokshi's letter and argued that based on this letter, and its reference to the Pope, her religious objections to abortion should be denied accommodation.

c. Similarly, when Ms. Finlaw presented her religious objections during her hearing, the DOE representative argued that beliefs derived from guidance from God and scripture, and concerns about abortion are inherently "philosophical" not religious, despite her pastor's letter affirming her religious beliefs.

173.  DOE representatives routinely dismissed personally held religious beliefs or those derived from prayer, showing hostility toward non-hierarchical religious practices. As a few examples:

a. For Mr. Napolitano, who stated that his beliefs derived from prayer and his interpretation of scripture, the DOE representative acknowledged the sincerity of his religious beliefs but repeatedly argued that his beliefs were "wrong," and thus should not be granted accommodation.

b. During Ms. Stamos' hearing, she was subjected to what her then-attorney characterized as unconstitutional questioning, with the arbitrator "aggressively grilling her about irrelevant aspects of her faith and whether she belonged to a religious organization that shared these same beliefs." Ms. Stamos reported feeling she was in a "heresy inquisition" and left "shaken and traumatized."

174.  These and similar lines of argument in the hundreds of other zoom hearings demonstrated a clear pattern of "direct evidence" of religious discrimination, with DOE representatives and arbitrators making impermissible judgments about the validity of applicants'

religious beliefs rather than focusing on sincerity and consistently imposing a hierarchy of religions that privileged certain faiths and religious interpretations over others.

### *Arbitrators Exercised Substantial Discretion*

175.    Arbitrators often joined in in the discriminatory positions and comments, accusing applicants of being wrong about what their faith required, or essentially, of being heretics for not allegedly following Pope Francis or the Dalai Lama or the Israeli Rabbi or whoever they decided to deem the leader of the faith.

176.    Arbitrators also routinely referenced the letter from Commissioner Chokshi as a basis for categorically denying sincerely held religious beliefs in cases where an applicant mentioned abortion.

177.    DOE and City representatives encouraged such harassment from the arbitrators, joining in and doing nothing to remediate the comments when made.

178.    However, the arbitrators were given enormous discretion to decide who was accommodated and not, which led to some instances where those who DOE argued should be categorically denied were accommodated.

179.    For example, one applicant, Amaryllis Ruiz-Toro, who was an assistant principal whose job required substantial student classroom work in person, was accommodated even though DOE argued that she should be categorically denied.

180.    Ms. Ruiz-Toro belonged to a small non-denominational church, which shared her religious objection to the vaccines. Her pastor wrote a letter in support and all parties found her sincere. However, the DOE argued that she still could not be accommodated under the Stricken Standards because her non-denominational Christian church was too small to be considered "established" as required under the Stricken Standards.

181.    The arbitrator assigned disagreed with the DOE. He admitted that many of his colleagues were denying people who belonged to minority churches but asserted that he, as a Southerner, appreciated that there were independent and non-denominational churches. So, Ms. Ruiz-Toro was accommodated and remained accommodated and on payroll throughout the Mandate.

***The City aided, abetted and colluded in the direct discrimination during this phase.***

182.    As set forth more fully throughout this section, each phase of this discriminatory conduct occurred with the City's knowledge and most of the discriminatory conduct was endorsed and encouraged by the City.  The Mayor's office and the City actively participated in establishing the discriminatory criteria, were responsible for providing religious accommodation under the arbitration order and participated in implementing the Stricken Standards. The City is thus jointly liable for the DOE's discriminatory religious accommodation policies and practices.

183.    Most of the facts in this section were not before the court in *NYFRL* or *Kane.* In *Kane,* when assessing whether those plaintiffs were likely to succeed in establishing a facial challenge to the mandate itself based on discriminatory comments made by the Mayor, the Court held that there were insufficient factual allegations in that early complaint to show that the City "had a meaningful role in establishing or implementing the Mandate's accommodation process, which was implemented by DOE staff, and later, the Arbitrator." *Kane,* 19 F.4th at 165. Now, substantially more facts are known that change this analysis.

184.    As a threshold matter, in 2002, the New York State Legislature granted the City "Mayoral Control" over New York City's public schools. At all times relevant to this Complaint, pursuant to this authority, as extended and amended over the years, the Mayor's office exercised control over DOE and its operations.

185. Moreover, the arbitration was against the City as well as the DOE. The arbitration award did not only order the DOE to accommodate employees but also ordered that the City accommodate employees, using the Stricken Standards, or any other "statutory reasonable accommodation process."

186. Pursuant to the fact that the City was jointly ordered to implement the Stricken Standards, at all times relevant to this Complaint, the Mayor and/or City employees under his control worked closely with DOE to oversee and direct the religious accommodation policies and their discriminatory implementation.

187. The City also actively participated in suppressing religious accommodation unlawfully as described more fully in this section.

188. The Mayor's office and Mayor's legal counsel initially directed DOE not to offer any religious or medical accommodation from the Mandate.

189. When faced with a court order to provide religious accommodation, the Mayor's office and/or Mayor's legal counsel then participated in drafting the proposed language for what criteria to use in judging a valid religious accommodation requests, which were later adopted in the Stricken Standards.

190. Upon information and belief, Attorney Eichenholtz, who was, at all times relevant to this Complaint, working under the direction and guidance of the City of New York, was one of the attorneys who drafted the proposed criteria adopted in the Stricken Standards and advised the City on how to implement it.

191. At the time, Attorney Eichenholtz was the director of the labor and employment litigation group and was in charge of all litigation against the City arising from the Stricken Standards.

192.    After advising the City in proposing and adopting the religious accommodation criteria struck down by the Second Circuit as unconstitutional in *Kane,* Attorney Eichenholtz was promoted to Managing Attorney for the entire New York City Law Department.

193.    The City, who was ordered to jointly implement the accommodation process, was also intimately involved in directing the DOE in the implementation of these policies and aiding and abetting the exclusion of as many applicants as possible from accommodation based on unconstitutional criteria.

194.    In a press briefing held on September 23, 2021, the day before the DOE arbitration appeal hearings began, Mayor de Blasio was questioned about how the City was going to decide who to accommodate and how. What follows is the relevant excerpt from the transcript:

**Question:** … So, my first question actually addressed when you were talking about deploying, you know, moving substitute teachers if you need to for potential shortages on Monday. But in terms of the religious and medical exemptions, do you have an exact number? The percentage of teachers who have asked for the exemptions?

**Mayor:** I don't have it in front of me, but I'll make sure the DOE gets you that update. What we saw was the rules were, you know, through the arbitration process, very, very clear about what constituted the types of criteria for those exemptions. And what the consequences are if someone doesn't have an exemption and chooses not to work. So, I think what's different in these last few days compared to weeks ago is the ground rules were 100 percent set through an arbitration process that involved the city and the union. I have been struck at how few people have applied for those exemptions. We'll get you the final numbers. And the process of determining who gets them and who doesn't is playing out over these next few days. But again, we saw, you know, even yesterday, I think as we were talking through the vaccination numbers. You see they're jumping up intensely among educators and staff. I think the truth is a hell of a lot of people are getting ready for Monday. They hadn't gotten vaccinated yet. They're planning to do it the next few days. Go ahead.

**Question:** Could you maybe go into some of that criteria so I know like with religious exemptions, for example, there have been leaders such as the Pope that have said it's okay you know, to get – for Catholics to get the vaccine. So, are there any religious exemptions that you know of?

**Mayor:** Yeah, it's a great question. Thank you. Yes. And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But

overwhelmingly the faiths all around the world have been supportive of vaccination. So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection. Go ahead.

195.    There is no reasonable interpretation that could render these full comments to be merely a personal opinion. The Mayor clarifies that the City was involved in establishing the Stricken Standards policy – for example, when he states: "the ground rules were 100 percent set through an arbitration process that involved the city and the union." And then the Mayor goes on to admit an intention to categorically discriminate against most religions and only grant religious accommodation to members of certain faiths that have "a very, very specific longstanding objection" according to the Mayor. He does not say "DOE" will do this. He says "So, **we** are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection."

196.    There is additional evidence that the City was intimately involved in and aided and abetted the DOE's implementation of the Stricken Standards in a maximally discriminatory way.

197.    The Mayor's office and/or Mayor's legal counsel provided DOE with a letter from the Jerusalem Post and advised DOE to deny Jewish applicants based upon that article.

198.    The Mayor's office and/or Mayor's legal counsel also advised DOE to exclude Buddhists, because the Dalai Lama was vaccinated.

199.    The Mayor's office and/or Mayor's legal counsel also advised DOE to exclude Muslims, because the City believed a Muslim leader was vaccinated.

200.    The Mayor's office and/or Mayor's legal counsel also advised DOE to exclude Catholics, because Pope Francis was vaccinated.

201.    The Mayor also took an official City position on religious questions, announcing

to the press that "Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated" when explaining that the City would not allow people with personally held religious beliefs that differed from the leaders of their faith to get accommodation.

202.    The Commissioner of Health went so far as to write a letter instructing the arbitrators and DOE to deny religious accommodation to those who had a religious objection to the use of aborted fetal cell lines used to develop the vaccines.

203.    The Chokshi letter admitted that fetal cell lines were used in testing and/or developing all three vaccines.

204.    The Chokshi letter argues, however, that religious objections to vaccination based on abortion should nonetheless be rejected because Chokshi believes that they lack merit after reviewing comments by other religious leaders and because he feels the abortions took place too long ago to matter much.

205.    The Mayor and/or Mayor's legal counsel also directed DOE to deny all personally held religious beliefs.

206.    The evidence of animus from City decision-makers like Commissioner Chokshi and Mayor de Blasio towards most religious objection to vaccination constitute direct evidence of discrimination and also gives rise to an inference of animus not only in assessing the appropriate scrutiny to apply to the religious accommodation process, but also the Mandate's themselves, at least as applied to religious objectors.

### III.    STRICKEN STANDARDS DECLARED UNCONSTITUTIONAL

207.    A group of educators brought a proposed class action lawsuit against the City and DOE, titled *Kane v. de Blasio et al*, in the Southern District of New York on or about September

21, 2021, arguing, among other things, that the DOE's religious accommodation policies were unconstitutional.

208.    This verified complaint, which was served on the DOE and the City, notified both Defendants that the Stricken Standards were discriminatory and violated the rights of <u>all</u> DOE employees seeking religious accommodation.

209.    Both Defendants acknowledged receipt of the notice by entering the *Kane v. de Blasio* case.

210.    The Complaint was timely served on the Department of Education and the City of New York.

211.    Neither Defendant adjusted Plaintiffs' claims.

212.    In November 2021, the Second Circuit Court of Appeals held, first in a motion panel and then a merits panel, that the DOE's religious accommodation policies were unconstitutional, and the plaintiffs were likely to succeed on the merits of their claim and deserved injunctive relief.

213.    The Second Circuit first assessed whether the Mandate itself was subject to strict scrutiny. On the facts before it at the time, the Court held that it was not, because the complaint lacked allegations to establish that the Mandate was not neutral or generally applicable on its face.

214.    But the Court still held that Plaintiffs were likely to succeed on their as applied claims, because the religious accommodation policies that were applied to them in implementing the Mandate were neither neutral, nor generally applicable, and could not pass strict scrutiny. *Kane,* 19 F.4th at 167-170.

215.    The Court first assessed neutrality and found that the religious accommodation

policies were not neutral, stating:

> We conclude, first, that the procedures specified in the Arbitration Award and applied to Plaintiffs are not neutral. The Supreme Court has explained that "the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, –– – U.S. ––––, 138 S. Ct. 1719, 1731, 201 L.Ed.2d 35 (2018). We have grave doubts about whether the Accommodation Standards are consistent with this bedrock First Amendment principle. They provide that "[e]xemption requests shall be considered for recognized and established religious organizations" and that "requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature." Joint App'x 197.[16] Moreover, Plaintiffs have offered evidence that arbitrators applied the Accommodation Standards to their applications by, for example, telling Plaintiff Keil that his religious beliefs "were merely personal, [because] there are other Orthodox Christians who choose to get vaccinated."[17] *Id.* at 376. Denying an individual a religious accommodation based on someone else's publicly expressed religious views — even the leader of her faith —runs afoul of the Supreme Court's teaching that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, *or the validity of particular litigants' interpretations of those creeds*." *Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (emphasis added); *see also Frazee v. Illinois Dep't of Emp. Sec.*, 489 U.S. 829, 833, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989) (noting that "disagreement among sect members" over whether work was prohibited on the Sabbath had not prevented the Court from finding a free exercise violation based on the claimant's "unquestionably ... sincere belief that his religion prevented" him from working (citing *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)). Accordingly, we conclude that based on the record developed to date, the Accommodation Standards as applied here were not neutral, triggering the application of strict scrutiny. *Kane*, 19 F.4th at 168–69.

216.    Next, the Court assessed general applicability and found that the religious accommodation policies were not generally applicable, as further described in the general applicability section below.

217.    As the Second Circuit pointed out, the religious exemption criteria in the Stricken Standards are blatantly unlawful. The City itself even conceded that the policy was "constitutionally suspect." The Second Circuit clarified that such "suspicions" could be considered confirmed, stating: "The City concedes that the Arbitration Award, as applied to

Plaintiffs, "may" have been "constitutionally suspect," Defendants Br. 37–38, and its defense of that process is half-hearted at best. Indeed, it offers no real defense of the Accommodation Standards at all…We confirm the City's "susp[icion]" that the Arbitration Award procedures likely violated the First Amendment as applied to these Plaintiffs." *Id.* at 167.

218.    The Second Circuit rejected Defendants' attempts to pin the illegality on the arbitrators or to argue that Plaintiffs had to sue the union, not the DOE and the City.

219.    Nothing in the arbitration award, or in the governing collective bargaining agreement waived Plaintiffs' rights to challenge the religious discrimination inflicted by DOE or the City in Court.

220.    Both Defendants knew or should have known that the Stricken Standards are blatantly unconstitutional, and that the Government cannot make or enforce unconstitutional policies, nor can it encourage, aid or abet discrimination.

221.    Notwithstanding the obvious illegality of the Stricken Standards, the DOE adopted and enforced the policy to decide religious accommodation requests to the Mandate and the City participated in and was complicit in these discriminatory denials.

222.    After it became clear in oral arguments that the Second Circuit would rule against them, the City asked the Court to let them try to mitigate the harm done by their application of the Stricken Standards by providing a "fresh review" by a newly created "Citywide Panel", spearheaded by Defendants' attorneys, particularly, Attorney Eichenholtz. The City promised that any employee who qualified under lawful standards would be reinstated with back-pay. The DOE agreed to this plan.

223.    In November 2021, first a motion panel and then a merits panel of the Second Circuit Court of Appeals issued an order requiring the City to give fresh consideration through

the new "Citywide Panel" and reinstate those who qualified with backpay.

224. Though the orders did not apply to non-named plaintiffs in the *Kane* lawsuit, the City promised to make the Citywide Panel review and reinstatement available more broadly on a voluntary basis.

225. In or around November and early December 2021, dozens of plaintiffs and similarly situated colleagues served notices of claim on the NYC DOE, the Chancellor and the Office of General Counsel, each designated to receive such notices under Education Law § 3813. These claims alerted the DOE of widespread discrimination against all applicants subjected to the process. The claims were not adjusted.

226. According to later representations by Defendants counsel in related litigation, the Citywide Panel only reviewed about 500 of the original 7,000 applicants denied religious accommodation.

227. According to Eichenholtz, the Citywide Panel only reviewed employees who submitted appeals to the arbitrators. This fact leads to a reasonable inference of animus, as Defendants were well aware that many employees were unable to submit their appeal due to the system crashing and other similar reasons.

228. All of the named Plaintiffs in this lawsuit were among those who were informed that the Citywide Panel was going to give *de novo* consideration to their religious accommodation application and reinstate them with back pay if they qualified for accommodation under lawful standards.

229. In accordance with the Court's order in *Kane*, fifteen original *Kane* plaintiffs were reviewed in December 2021 by the Citywide Panel. On or about December 10, 2021, they each received a "final determination" – fourteen of them were denied, and one, William Castro, an

administrator whose job included substantial in person student-facing work, was accepted. Each was given the same "reason" for the determination, which was simply "Does Not Meet Criteria" (even for Castro, whose appeal was accepted).

230.	Plaintiffs argued these determinations were pretextual. During litigation, the City's attorneys provided "summaries" of reasons that they asserted were provided by various panelists for the denial. Those summaries (hereinafter the "Kane Summaries") are attached hereto as Exhibit 2, not for the truth of what they say but the fact that these reasons were offered.

231.	Plaintiffs were immediately thereafter ordered to amend the complaint to include allegations about the Citywide Panel, which at that point was essentially a black box. Prior to filing, Plaintiffs had had no opportunity to gather discovery about how the Citywide Panel worked or what it based determinations on.

232.	The lower court then dismissed their constitutional claims, and *Kane* plaintiffs appealed, consolidating the appeal with another case (NYFRL). After three years, the *Kane* plaintiffs received a decision from the Second Circuit, which held that two of the plaintiffs (Natasha Solon and Heather Clark) had properly asserted free exercise claims and the rest had not. The reason provided for affirming the dismissal of the remaining plaintiffs was that the allegations pertaining to the City related to animus were too conclusory and that plaintiffs would alternatively have had to provide non-conclusory allegations to raise an inference the Citywide Panel's classroom teacher undue hardship determinations were either pretextual or unlawful to merit first amendment protection against the City's denials.

233.	Substantial factual development since the *Kane* plaintiffs filed their amended complaint in January 2022 reveals that the Citywide Panel reviews were infected by the same animus that plagued the initial denials of accommodation at DOE and that the City's alternative

undue hardship claims were both pretextual and unlawful.

234.    The NYFRL court did not have these facts available when addressing whether the Citywide Panel's undue hardship policies were pretextual or unlawful, or whether there was evidence of animus against the City and thus that decision is not controlling in this case.

## IV.    THE CITYWIDE PANEL CONTINUED TO APPLY DISCRIMINATORY STANDARDS FOR JUDGING RELIGIOUS BELIEFS

### A.    The Citywide Panel Continued to Discriminate Against Disfavored Faiths

235.    Substantial evidence has emerged in related litigation that the Citywide Panel continued to apply discriminatory criteria to determine whether an applicant had, so called, qualifying religious beliefs.

236.    First, discovery reveals that the Citywide Panel continued to unlawfully reject applicants whose religious belief included objection to the connection between the vaccines and abortion.

237.    Emails exchanged between a Panelist and Mr. Eichenholtz provide evidence that Mr. Eichenholtz instructed the panel that such beliefs do not merit religious protection and should be rejected as invalid.

238.    Mr. Eichenholtz's own deposition testimony, while contradictory, supports this inference that he and the Citywide Panel improperly denied accommodation to applicants with religious objections to the use of aborted fetal cell lines, on the arrogant assumption that these beliefs are "wrong" or that the applicant is mistaken about what her religion requires of her in thinking she cannot take a vaccine tainted by abortion.

239.    Mr. Eichenholtz has also filed numerous sworn pleadings in related cases in which he admits that the Citywide Panel substitutes judgment about whether the applicant is right that taking a vaccine tainted by abortion is against their religion, even in cases in which he

acknowledged that the applicant sincerely believed this was true.

240.     Evidence from related cases also shows that the Citywide Panel continued to rely on Chokshi's letter as a basis to deny religious concerns about abortion. Multiple Citywide Panel notations reference the letter as a reason to deny applicants whose religious beliefs do not allow them to take a vaccine tainted by abortion.

241.     The City has also admitted in related litigation through pleadings and oral argument that the Citywide Panel routinely substituted judgment about whether a sincere applicant was right about what their religion required of them, particularly in cases where abortion was a factor. This was their argument in NYFRL for why they denied Heather Clark. The Second Circuit rejected this approach as unconstitutional. However, the City has also advanced the same argument in dozens of other cases, showing it was a systemic problem and not limited just to Clark's case.

242.     The Citywide Panel also continued to deny beliefs grounded in prayer or consultation with the moral conscience, on the mistaken theory that such beliefs are somehow personal and not "religious."

243.     Beliefs derived from prayer and conscience are religious in nature and are protected as such.

244.     As one of many examples, it is a foundational catechism of Catholicism that the Holy Spirit, and ultimately God, speaks to us and reveals truth through the conscience.

245.     Most Catholics believe they are required to consult their conscience and follow the guidance of the Holy Spirit when it is provided, regardless of what any other person may believe.

246.     Many other religious people have similar beliefs.

247. But other litigation reveals that the Citywide Panel routinely decided that such beliefs are not religious because they allegedly allow a person to pick and choose what they believe they should do.

248. This is ignorant, as many religious people would say that instructions from God or the Holy Spirit *do not* allow a person to pick and choose what they want to do, since religious people believe they are required to follow such guidance even over black letter law handed down by man. But in any event, the rejection of these beliefs is also discriminatory.

249. In a nutshell, the Citywide Panel continued the same discrimination against unorthodox faiths that had been codified in the Stricken Standards, that is, requiring that a person's religious objection come from dogma or instruction from church leaders, rather than from guidance from God or other personally held sources of religious belief.

250. The Citywide Panel also entangled itself to an unconstitutional degree with religious questions, denying applicants because their beliefs were allegedly not logical or articulated in a sufficiently coherent manner.

251. This was another reason given by the City for why they denied Plaintiff Clark (in addition to undue hardship). The Second Circuit rejected this approach as discriminatory. Yet, related litigation reveals this was not an isolated incident – most applicants were denied with the same discriminatory reasoning.

252. Discovery in other litigation and the City's own admissions show the Citywide Panel also denied employees if they'd taken other vaccines, even if the employee explained that they took the previous vaccine before they converted to their current beliefs system, or that their religious objection did not apply to that vaccine (for example, if the other vaccine did not use aborted fetal cell lines in production or development).

253.     Discovery in other litigation and the City's own admissions show the Citywide Panel also refused to credit applicants' own interpretation of their faiths, instead adopting a policy that the City was tasked with the job of determining what their faith required of them.

254.     Moreover, the Law Department, which was one of three agencies given a vote on the Citywide Panel, continued to submit court filings seeking denial of unemployment insurance to employees denied religious accommodation on the ground that their beliefs was not supported by the Pope and thus per se ineligible, for years after the Second Circuit rebuked them for this unconstitutional position.

255.     These are just some of the discriminatory policies applied by the City to uphold all but one of the original denials.

256.     Ultimately, the fact that the Citywide Panel arrived at nearly the same result as the original admittedly discriminatory process leads to an inference that the City's reasons for denial were pretextual.

257.     The goal of the Citywide Panel was to try to get out of liability for the acknowledged original discrimination by upholding nearly all the original discriminatory denials, rather than review them in good faith to remediate the discrimination, as promised.

258.     The City set up an inherent conflict of interest by placing Mr. Eichenholtz in charge of this process.

259.     Mr. Eichenholtz was the head of their defense counsel for labor and employment litigation.

260.     He was required under ethical rules not to say or do anything that went against Defendants' legal interests.

261.     Defendants had a legal interest in mitigating the damage from having denied

thousands of employees under an admittedly discriminatory religious accommodation policy.

262.    Mr. Eichenholtz therefore had an interest in helping the Defendants show that they would have denied the employees anyway, even if the original policy had not been discriminatory on its face.

263.    Upon information and belief, out of an estimated five hundred applications allegedly given "fresh consideration" under lawful standards required by the SHRL, CHRL, Title VII and the First Amendment, the Citywide Panel only reversed the denial of one DOE employee and affirmed the denials of all the rest. This percentage inherently gives rise to an inference or a finding of discrimination.

264.    The history of Defendants' participation in the religious accommodation policies applied under the Stricken Standards also supports the inference that the Citywide Panel's denials were pretextual.

265.    Before the Mandate was implemented, Defendants' religious accommodation policy was to assume that an applicant had sincerely held religious beliefs and focus on whether a request would present an undue hardship.

266.    Denials based on sincerity or adequacy of religious beliefs were rare before the Mandate, both at DOE and at City agencies.

267.    After the Mandate was implemented, Defendants changed the policy and attempted to circumvent accommodation requirements and find ways to deny accommodation to as many employees as possible based on substituted judgment about what a person's faith requires.

268.    After the Mandate, DOE denied most applicants based on unfounded assumptions that they might be insincere or have incorrect religious beliefs.

269. The City affirmed those decisions and carried out the same changed policy, attempting to find reasons to deny applicants, rather than attempting in good faith to find a way to accommodate them.

270. Even if there had been a legitimate interest in limiting the number of exemptions given, the government cannot lawfully winnow the number down by discriminating against certain faiths or beliefs it disfavors.

271. But this is precisely what the City and DOE did, both in the original denials and in the Citywide Panel appeals.

**B. Defendants Failed to Disavow the Stricken Standards**

272. Continued animus at the City level (which taints the Citywide Panel, controlled and operated by the City) can also be evidenced through the City's failure to rescind or repudiate the original Stricken Standards.

273. After imposing the DOE Mandate, the City issued hundreds of additional "emergency" executive orders, extending the vaccine mandates to nearly every employee in New York City.

274. Tellingly, even after the City's own attorneys admitted in the *Kane* case that the Stricken Standards policy was likely unconstitutional (and the Second Circuit confirmed they were definitely unconstitutional), the City failed to repudiate them.

275. Instead, the City *extended the use of the Stricken Standards to more agencies* – striking deals and encouraging nearly every City agency to offer the Stricken Standards as one of two options for employees to apply for accommodation.

276. The City's failure to repudiate the Stricken Standards is yet more evidence of animus, which infects both the mandates and the religious accommodation determinations

thereunder.

277.    Plaintiffs assert that a but for cause of each of their denials was also due to the Citywide Panel's continued use of these discriminatory criteria.

278.    The conclusory denials do not reveal precisely why Plaintiffs were denied.

279.    Unlike the *Kane* Plaintiffs, they never received any follow up summary of why they were denied.

280.    However, a reasonable inference can be drawn that the evidence of systematic application of such discriminatory criteria likely impacted their denials as well.

281.    Plaintiffs respectfully ask that the City be required to provide discovery showing the reasons applied for each of their denials prior to a dismissal on this point.

## V.    THE CITYWIDE PANEL'S UNDUE HARDSHIP DENIALS WERE PRETEXTUAL AND UNLAWFUL.

282.    Plaintiffs provide the following factual allegations to highlight how the Citywide Panel's undue hardship determinations were also unlawful, pretextual, and failed to cure the acknowledged discrimination that they were subjected to under the original accommodation policies at DOE.

### A.  The Panel Creates New Equal Protection Problem with Two-Tiered Undue Hardship Standard

283.    As set forth in the following paragraphs, the evidence shows that Citywide Panel imposed a different undue hardship standard on those given fresh review than had been imposed on those accepted under the discriminatory Stricken Standards policy. Facts that support this assertion include but are not limited to the following:

284.    The City claimed in related litigation that the Citywide Panel applied a blanket undue hardship ban on accommodation for all teachers and most administrators without any

independent review on the assumption that DOE's claim that it would likely be more than a minimal burden to accommodate anyone who worked in a building with children was likely met since the de minimis burden test required so little to meet in the City's opinion.

285. In depositions, Mr. Eichenholtz confirmed that the City did not review any evidence or make any independent undue hardship, and assumed that any reason was likely sufficient to prove undue hardship since he had asked the Panel to only apply the de minimis burden test (despite repeated notifications from counsel and litigants that this was not sufficient under New York's statutory standards).

286. Mr. Eichenholtz further claimed that the Citywide Panel simply checked whether the DOE put a piece of paper stating "undue hardship" in an employee's file, and if they did, the City would add that as an additional reason for denial as a matter of course.

287. However, none of the *Kane* plaintiffs had these "undue hardship" papers in their file, and yet, the Citywide Panel still tacked on the potential for undue hardship reasoning onto their denials, leading to an inference that the backup reason was applied as a matter of course without individual review, as admitted by the City's attorneys.

288. Either way, this additional undue hardship burden was unequal to the one applied under the Stricken standards, as described below.

289. By contrast, under the Stricken Standards, if an arbitrator found the employee's religion met the discriminatory definition for determining they had a qualifying religious belief, the applicant had to be accommodated without regard to the blanket undue hardship defense DOE had claimed for all applicants under the Phase 1 review.

290. Most arbitration hearings focused entirely on whether a person's religion qualified under the Stricken Standards, and undue hardship was hardly, if ever discussed in the Phase 2

reviews by the arbitrators.

291.    With few exceptions, the arbitrators read the Stricken Standards policy to mean that their job was to evaluate the religious beliefs, not undue hardship, and that they were to reverse DOE's initial denials and reinstate applicants to the payroll if their beliefs qualified under the criteria for what qualifies as an acceptable religious objection in the Stricken Standards policy.

292.    The written policy itself supports this allegation, as it states that any applicant with qualifying beliefs under the discriminatory criteria set forth in the policy "shall be allowed to remain on payroll" and the award does not address any avenue for denial based on undue hardship.

293.    Further evidence of the unequal approach to undue hardship comes from the results. Under the discriminatory Stricken Standards policy, at least 169 employees who the DOE had denied based on undue hardship initially had their determinations reversed and were accommodated. Some of them were classroom teachers and other identically situated to those denied by the Citywide Panel based on alleged "undue hardship."

294.    The City has never explained why classroom teachers and administrators who had jobs that included working in person with students could be accommodated under the Stricken Standards and remain accommodated throughout the existence of the Mandate such that they still have their jobs today but could not be similarly accommodated under a Citywide Panel review.

295.    To the extent that the Citywide Panel argues that the allowable number of accommodations were all taken by those preferenced under the old system, leaving no room for more, that underscores Plaintiffs' assertion in this case that the Citywide Panel process could not and did not remediate that original harm of having been denied access to one of the accommodations because Plaintiffs' belonged to the wrong religion.

296.     In sum, the Citywide Panel's more rigorous blanket undue hardship bar for those who qualified under "lawful" standards versus those that qualified under the openly discriminatory standards, constituted a fresh incident of direct evidence of discrimination (since it was not applied to those who were impermissibly favored under the old policy) and gives rise to relief as a matter of law.

**B.  The City Admits the Panel Did Not Follow Statutory Standards on Undue Hardship**

297.     The Citywide Panel's blanket undue hardship denial policy also violated statutory factors because the City failed to consider the statutory factors before denying applicants.

298.     In related litigation, the City offered Attorney Eichenholtz, who created and supervised the Citywide Panel, to be deposed for the purpose of addressing the Citywide Panel's policies. This deposition took place after the complaint was amended in *Kane* and was not considered in the NYFRL decision. The facts revealed in the deposition and related discovery show that the Citywide Panel failed to meet statutory standards as ordered by the Court and promised.

299.     Mr. Eichenholtz was one of the architects of the Citywide Panel and oversaw it and had veto power over determinations.

300.     Under oath, Mr. Eichenholtz admitted that neither the Citywide Panel nor the DOE analyzed any of the enumerated required statutory factors for economic hardship or safety concerns before denying applicants.

### i.  Citywide Panel Conducted No Individualized Safety Analysis for In-Person Accommodation

301.     Mr. Eichenholtz specifically admitted that the Citywide Panel conducted no individualized or categorical safety analysis, and that DOE did not conduct one either

302.     He admitted that neither the Citywide Panel nor the DOE ever assessed any

objective evidence to determine that unvaccinated employees requiring religious accommodation could not safely be accommodated before issuing the undue hardship denials.

303.    He further admitted that the Citywide Panel did not know or assess whether the vaccine could stop transmission of disease or whether unvaccinated employees were more dangerous than vaccinated employees.

304.    Mr. Eichenholtz also stated that he could not recall any panel member assessing whether Covid-19 vaccination could limit the spread of Covid-19.

305.    Mr. Eichenholtz admitted that neither he nor the panel ever relied on any evidence or data to conclude that unvaccinated employees might pose a substantial risk of significant harm if allowed to work in person unvaccinated, which is the statutory requirement for an undue hardship determination based on safety.

306.    He further confirmed that the Citywide Panel did not assess any other required statutory factor on safety, including the duration of any risk, nature and severity of potential harm, likelihood of harm, or imminence of harm.

### ii.    Citywide Panel Conducted No Individualized Economic Burden Analysis

307.    Similarly, Mr. Eichenholtz admitted that to the extent that accommodation would create any safety issue at all, no accommodations were individually considered to mitigate the risk or mitigate the harm done to employees with sincerely held religious beliefs.

308.    Despite notice of multiple viable accommodations, DOE only purports to have considered one – that is, a generalized assumption about whether it would be an undue burden to accommodate employees by allowing them to work in administrative buildings instead of classrooms in person with students.

309.    This was the accommodation given to most of those accommodated under the

Stricken Standards. Under that policy, at least 169 employees, many of them classroom teachers, had been accommodated.

310. However, even for this analysis, Mr. Eichenholtz admits that neither DOE nor the City engaged in any good faith analysis as required by statute. For example:

311. Mr. Eichenholtz admitted under penalty of perjury that DOE never provided information to the Citywide Panel "as to the number of employees it could afford to employ without causing undue hardship."

312. He also swore that the "inability to pay employees" who were not able to work in person "has not come up" nor had DOE submitted any information about increased costs that could present an undue hardship if employees were accommodated.

313. Mr. Eichenholtz said the Citywide Panel did not ask the DOE to explain whether the remote worksites it set up and was using for many accommodated under the Stricken Standards were at capacity (they were not).

314. He also conceded that the Panel had imposed "no evidentiary requirement" from any agency on the issue of undue hardship.

315. When pressed, Mr. Eichenholtz stated that he did not think analysis of any statutory factors was necessary for an appellate body like the Citywide Panel, and he had made sure there was no requirement that the DOE or any other agency "provide that kind of data."

316. Ultimately, Mr. Eichenholtz conceded that the Citywide Panel did not assess undue hardship at all but rather deferred to the agency.

317. So, it was the DOE and not the Citywide Panel that claimed undue hardship – which changes the analysis of animus for purposes of constitutional claims significantly.

318. In NYFRL, the Court was under the impression (as were the plaintiffs) that the

Citywide Panel had provided de novo review as ordered and independently determined undue hardship on their own using the statutory factors and burdens they were ordered to apply. Having found that the plaintiffs in that case had not sufficiently alleged animus against the City, the Court therefore declined to assess the denials under strict scrutiny absent such evidence or evidence of pretext or failure to follow statutory standards in the hardship determinations themselves.

319.     However, given the substantial and already acknowledged evidence of animus that the Court already has recognized against the DOE, Mr. Eichenholtz' admission that it was DOE not the City that was asserting the vague undue hardship defense should result in the application of strict scrutiny in assessing constitutional claims regarding the denials.

### iii.     The City Applied the Wrong Legal Standard

320.     Third, the Citywide Panel applied the wrong legal standard to determine undue hardship. In his deposition and in many sworn pleadings, Mr. Eichenholtz repeatedly admitted under oath that the City and DOE used the unlawful "*de minimis*" standard for undue hardship rather than the significant or substantial standard required by the three controlling statutes.

321.     Using the unlawful *de minimis* standard, the City and DOE made blanket speculative assumptions that any accommodation would naturally be "more than a minimal burden" as it would require some effort, and justified denial of all classroom teachers on that basis.

322.     Panelists from the law department went further, and recommended that *all* applicants, even those that were not classroom teachers, must be denied based on an assumed and unsupported undue hardship basis.

323.     In the NYFRL case, the Second Circuit rejected this further extension of the blanket undue hardship ban to non classroom teachers, vacating and remanding the dismissal of

administrator Heather Clark's free exercise claim even though the City had claimed it would also be an undue hardship to accommodate her.

324. In this case, multiple plaintiffs are in the same position as Clark, and their free exercise claims must go forward as Clark's have as they were not classroom teachers.

325. Prior to the Citywide Panel's denial of any non-Kane plaintiffs, attorneys for the Kane and NYFRL plaintiffs repeatedly alerted the City and DOE that the SHRL and CHRL required a significant hardship analysis, not a de minimis one.

326. The fact that the Citywide Panel continued to use the de minimis standard, even after attorneys for the Kane and NYFRL plaintiffs repeatedly alerted them it was wrong, gives rise to an inference of animus.

### iv. No Cooperative Dialogue on Undue Hardship Before Denial

327. Fourth, the Citywide Panel failed to engage in cooperative dialogue with any applicant about undue hardship before denying their applications.

328. Specifically, prior to their denial, no one from the City or the Panel engaged in any written or oral dialogue concerning the applicant's accommodation needs, potential accommodations, including alternatives to what was requested, or any difficulties those accommodations might create for the employer or covered entity.

329. This leads to an inference that the undue hardship determinations were pretextual and discriminatory, especially because some of those denied under these blanket bans already worked remotely or in buildings without students.

### v. Denial of Numerous Remote Workers Shows the City did not Make Good Faith Decisions.

330. Fifth, numerous Plaintiffs denied based on "undue hardship" by the Citywide Panel already worked remotely or in non-student facing positions, demonstrating that

accommodation would not have created a hardship (leave aside a significant one) and giving rise to a credible inference of pretext, for example:

    a. Ms. Calia a school psychologist, worked primarily on computers writing IEP's and holding IEP meetings (which were held remotely even before the pandemic). She had also been granted medical accommodation to work fully remotely during the 2020-2021 school year with no issue or added expense and there was no reason she could not continue to do her job remotely during the 2021-2022 school year, especially because her job did not take place in classrooms.

    b. Ms. Carbone worked in the Manhattan Borough Office, an administrative office that had no students. Her primary job was to coordinate with nonprofits and handle custodial payroll services. She did not have a student facing job and did not need to enter any school buildings.

    c. Ms. Scott was a secretary working in the Bronx who did not work in a student-facing job. All of her job duties could be done remotely.

    d. Pastor Stephon Bynoe was employed as a UFT Teacher Center Coach/Specialist. He worked in an administrative building and had no student conduct. His job was to teach professional development workshops to teachers. Since March 2020 and continuing through the 2021-2022 school year, all of this work took place virtually.

    e. Mr. Otto worked primarily as a school programmer, a fully digital job that does not require any in-person interaction at all.

331.    These and other examples show that the boilerplate "undue hardship" denials were

not based on an individualized good faith analysis of possible accommodations or hardships therewith but were pretextual and unlawful.

###### vi. Classroom Teachers Could Have Also Been Accommodated Remotely without Undue Hardship.

332. <u>Sixth</u>, if it were truly the case that the safety of in person learning was jeopardized by allowing a few unvaccinated classroom teachers to keep teaching in person, classroom teachers also could have been accommodated remotely through co-teaching arrangements and reassignments just as their colleagues who were granted accommodation under the Stricken Standards were allowed to do.

333. The 169 employees granted accommodation were given a variety of accommodations to be able to remain on payroll throughout the Mandate without working inside the classrooms.

334. For classroom teachers, one accommodation that the DOE provided to teachers under the Stricken Standards was to have a co-teacher physically present in the classroom, while the accommodated teacher taught via Google Classroom.

335. Some classroom teachers accommodated had a co-teacher already, and others did not. For the latter category, DOE hired long term substitutes to be physically present in the classroom while the accommodated teacher joined the class virtually to teach.

336. Classroom teachers accommodated this way under the Stricken Standards taught early education, special education and art, as well as traditional academic subjects.

337. This co-teacher method was also employed for a variety of classroom teachers during the prior 2020-2021 school year for teachers who were accommodated but had students that were still in person.

338. In some instances, the DOE had to hire long-term substitute teachers to man the

classroom for teachers accommodated under the Stricken Standards. Other times, teachers already had a co-teacher in the room with them, so this was unnecessary.

339. DOE hired long-term substitutes to remain in the classroom for some classroom teachers accommodated under the Stricken Standards.

340. Meanwhile, many Plaintiffs already had co-teachers and would not have required this accommodation.

341. Defendants have articulated no lawful reason that the classroom teachers whose beliefs were rejected under the Stricken Standards could not be accommodated the way their identically situated and in some instances less easily accommodated colleagues had been whose beliefs were unconstitutionally preferred under the Stricken Standards.

342. Moreover, DOE also could have provided other non-classroom accommodations, such as reassignment of duties.

343. Many of the DOE employees accommodated under the Stricken Standards had their job descriptions temporarily adjusted during the temporary mandate so that they could work remotely. Often, they were given more administrative work, and asked to work in one of the remote building sites that DOE had set up for this very purpose.

344. At all times during the relevant period, these remote worksites stood largely empty and well below capacity.

345. Moreover, DOE continued to offer a remote learning program to hundreds of students during the entire 2021-2022 school year and beyond.

346. During the period when the Citywide Panel was assessing applications, DOE continued to advertise for and hire remote teachers to teach the students in this remote program.

347. Yet, those who were already working as fully remote teachers in the program, and

those who were ready, willing and qualified to do so were denied on the basis of alleged undue hardship.

### vii. The Mandate allowed for in-person accommodation

348.    <u>Seventh</u>, nothing in the Mandate specified that DOE employees could not be given religious accommodation that would allow them to work in person around students or other staff.

349.    On the contrary, the Mandate specified that nothing in it prevented reasonable accommodation as required by law.

350.    DOE made a number of accommodations that would have violated the Mandate but for the clause that stated that they could make reasonable accommodations. For example, they allowed most of the 169 accommodated under the Stricken Standards to work in person with colleagues, even though the Mandate did not allow unvaccinated employees without religious accommodations to work in person with colleagues or students.

351.    Moreover, in attempting to dissolve the early TRO, the City had represented to the court that they intended to allow reasonable religious accommodations pursuant to statutory guidelines.

352.    Pursuant to statutory requirements, employers must grant religious accommodation unless they can show that there is a significant and non-speculative safety concern that cannot be mitigated without serious undue hardship.

### viii. Defendants' safety analysis was speculative and pretextual

353.    <u>Eighth</u>, Defendants' safety decisions and analysis show that safety concerns were pretextual.

354.    For example, shortly after all unvaccinated employees were excluded, thousands of vaccinated DOE employees were infected with Covid-19.

355. In or around January 2022, before the Citywide Panel undue hardship denials were issued, DOE adopted an open policy of encouraging and cajoling *actively infected* teachers to come back to the classroom within five days of onset of infection due to staffing shortages.

356. It was well-understood at the time that Covid-19 was still transmissible up to ten days after onset in most cases.

357. But, while DOE allowed actively infected and infectious teachers to teach children in person, they excluded Plaintiffs and their religiously opposed colleagues, who were not infected and were willing to test and take other precautions to protect themselves and the students.

358. DOE's own data showed that the Mandate was not diminishing the number of daily Covid-19 infections among the students or fully vaccinated staff. Prior to the Mandate, the average daily infection rate among all staff (vaccinated and unvaccinated) tended to be under 50 a day. After the DOE started excluding unvaccinated employees, the numbers shot up among the fully vaccinated staff. By January 2022, the at that point "fully vaccinated" staff's daily infection rate reached well over 5,000 as Omicron spread among the vaccinated and unvaccinated with equal force.

359. The City's denial of Plaintiffs' religious accommodations rested on a discriminatory and legally baseless policy, informed by an article entitled "Designating Unvaccinated Employees as a Direct Threat to Others," which the head of DCAS distributed to decision-makers in January 2022.

360. The article acknowledged that both vaccinated and unvaccinated employees could contract and transmit the Omicron variant of COVID-19, which undercut any argument that the unvaccinated posed a direct threat, yet advised that employers could get around this by only assessing unvaccinated employees for direct threat because vaccinated employees "generally" do

not seek accommodations from a vaccine mandate so could somehow be disregarded.

361. By adopting this flawed logic, the City wrongly assumed it could ignore the equivalent transmission risks posed by vaccinated employees, asserting that accommodating unvaccinated employees posed an undue hardship without evidence that Plaintiffs uniquely endangered the workplace due to their religious practices.

362. This approach is fundamentally flawed and discriminatory for several reasons. First, the City's refusal to evaluate vaccinated employees for direct threat, despite knowing they could spread COVID-19, undermines its claim that unvaccinated employees posed a substantially greater risk.

363. If workplace safety was the true concern, the City would have applied a consistent standard, assessing all employees' transmission risks regardless of vaccination status or accommodation requests. Instead, the City arbitrarily exempted vaccinated employees from scrutiny, creating a double standard that penalized Plaintiffs for exercising their protected religious beliefs. This selective analysis inflated the perceived "hardship" of accommodating unvaccinated employees, as the City failed to account for the baseline risk posed by all employees, vaccinated or not.

364. Here, the City's failure to assess whether unvaccinated employees posed a substantially higher risk than vaccinated employees rendered its direct threat and undue hardship claims speculative, as it lacked data showing Plaintiffs posed a unique or unmitigable danger compared to their vaccinated colleagues.

365. The City's actions mirror disability discrimination cases under the Americans with Disabilities Act, particularly those involving employees "regarded as" disabled, where employers are routinely found to violate their accommodation responsibilities when they stereotype

individuals as threats based on perceived characteristics without evidence.

366.    For example, in the early days of AIDS, gay men were routinely excluded from the workplace based on concerns that their lifestyle might make them more likely to contract and spread the virus. However, despite the fact that gay men were at the time substantially more likely to contract and spread HIV, courts struck down such speculative safety concerns absent robust data to show that the risk was imminent and likely and could not be mitigated.

367.    Similarly here, the City stigmatized Plaintiffs as dangerous solely due to their religious practice of remaining unvaccinated, while ignoring equivalent risks from vaccinated employees under the false assumption that their compliance with the mandate negated the need for scrutiny. This not only chilled Plaintiffs' religious freedom but also exposed the City's policy as pretextual, driven by administrative convenience or political optics rather than genuine safety concerns.

368.    By refusing to engage in the interactive process to explore reasonable accommodations, such as masking or testing, the City further violated its legal duties, leaving Plaintiffs without recourse to practice their sincerely held beliefs.

369.    DOE also failed to apply the Mandate fairly in other ways. For example, DOE allowed thousands of employees to remain only partially vaccinated in violation of the Mandate. DOE did this even though the Mandate required that employees get their second dose within 45 days and even though it was well-understood that one dose provided no protection against transmission or even personal progression of disease.

370.    The City was aware of this fact and did nothing to require compliance. But the City and DOE were totally inflexible when it came to religious accommodation.

**C.  Scientific Evidence did Not Support the Undue Hardship Claims**

371.     Proving undue hardship is Defendants' burden, and Plaintiffs reserve the right to provide further rebuttal depending on what they offer in this regard, if anything.

372.     But given the decision in NYFRL, Plaintiffs offer some evidence here on this point.

373.     By 2022, when the Citywide Panel began issuing its determinations to non-*Kane* plaintiffs, there was no good faith basis to assert that unvaccinated employees posed a direct threat due to their religious practices according to the strict evidentiary standards set forth in the accommodation statutes.

374.     By 2022, Omicron had swept through vaccinated populations with equal if not greater force and severity as it had among unvaccinated people. As set forth above, Defendants' own internal emails show that they were aware of this fact but ignored it.

375.     From the outset of the mandate, the City and DOE had access to expert scientific testimony that undermined their blanket claim of undue hardship, which they also ignored.

376.     In October 2021, the *Kane* plaintiffs submitted, on behalf of the proposed class, affidavits from Dr. Makary, then a public health expert and professor of medicine and public health at Johns Hopkins, and Dr. Jay Bhattacharya, then a professor of medicine and public health at Stanford University.

377.     Plaintiffs hereby incorporate by reference as the complete expert affidavits of Dr. Jay Bhattacharya, Exhibit 3, and Dr. Martin Makary Exhibit 4, who are now, respectively, the Director of the National Institutes of Health and the Commissioner of the FDA—two of the highest public health scientific positions in the nation. The fact that these preeminent scientists, who provided early testimony that the City ignored, now lead our nation's premier health institutions further validates their expertise and the credibility of their opinions.

378.     Citing the best available evidence, Dr. Makary explained to Defendants why "Those who choose not to get vaccinated may be making a poor health decision at their own individual risk. However, they are unlikely to pose a significant public health threat to those around them in a school setting." Dr. Makary further testified that natural immunity, which nearly all Plaintiffs had, had been "shown to be highly effective in preventing severe Covid disease and in downgrading the severity of illness."

379.     Similarly, Dr. Bhattacharya cited the best available then current evidence to explain why "any policy mandating vaccinations that does not recognize natural immunity is irrational, arbitrary, and counterproductive to community health" and how DOE employees, with or without natural immunity, could be safely accommodated in person.

380.     Dr. Bhattacharya offered multiple practicable accommodations that would have posed no undue hardship, including: daily symptom checking paired with rapid antigen tests for symptomatic workers; weekly PCR testing for asymptomatic employees; recognition of natural immunity for COVID-recovered employees, to name a few.

381.     Dr. Bhattacharya specifically further affirmed that "the DOE could adopt a robust sick policy, requiring that workers who have not been vaccinated and who show symptoms consistent with COVID-19 infection stay at home from work, returning to work only once they have had a negative COVID-19 antigen test result." He noted that such accommodations had been successfully implemented at other institutions, including Stanford University.

382.     As Drs. Bhattacharya and Makary explained to Defendants, the objective scientific consensus overwhelmingly showed that vaccination could not stop transmission of Covid-19.

383.     A 2021 Harvard study showed that there was "no discernable relationship between

percentage of the population fully vaccinated and new Covid-19 cases." This was supported by multiple public health experts from prestigious institutions, including Johns Hopkins, Yale, and Stanford.

384.     By the time the Citywide Panel was making its determinations in 2022, there was simply no credible argument that an unvaccinated employee was a direct threat in the workplace. Plaintiffs offer, as additional evidence of this fact, an affidavit drafted by Dr. Harvey Risch of Yale School of Public Health, which summarized the best available evidence in effect when the Citywide Panel made its decisions. That affidavit is incorporated by reference as if fully set forth here as Exhibit 5, provided supporting expert testimony that confirms that the small percentage of religious employees who could not take the Covid-19 vaccine did not pose a direct threat.

385.     Despite having this expert testimony available to them from the nation's top public health scientists, Mr. Eichenholtz admitted under oath that the Citywide Panel never assessed whether Covid-19 vaccination could limit the spread of Covid-19.

386.     The Panel also failed to consider Dr. Bhattacharya's testimony that "asymptomatic disease spread is rare" and that simple accommodations like symptom checking and testing could effectively mitigate any minimal risks posed by unvaccinated employees.

387.     The Panel's failure to consider this substantial body of scientific evidence from leading experts in the field (who now hold the highest leadership positions at agencies like the NIH and FDA) further demonstrates the pretextual nature of their undue hardship determinations and further demonstrates that the best-available objective science at the time did not support a blanket policy that in-person accommodation was per se a direct threat.

388.     The claim that Plaintiffs posed a direct threat is further undermined by the following facts: (a) Defendants determined that one million students could safely attend school

unvaccinated; (b) the City still permitted unvaccinated bus drivers to transport these students in enclosed spaces; (c) every other school district in New York state allowed weekly testing as an alternative to vaccination; (d) other school districts with similar policies did not see any statistically significant increase in infection rates compared to NYC DOE; (e) DOE did not see any reduction in active daily covid infections among the fully vaccinated staff once unvaccinated staff were excluded (quite the contrary); and (h) unvaccinated employees had been allowed to work in person with students for the 2020-2021 school year without issue, even though that was a far worse phase of the pandemic.

389.    Alternative accommodations could also have been easily implemented, including weekly testing, symptom checks, mask wearing, social distancing, ventilation, and other protective measures that could have mitigated any perceived risk from unvaccinated employees - exactly as Dr. Bhattacharya and Dr. Makary had testified was feasible in their expert opinions provided to the City.

390.    Moreover, had it truly been impossible to accommodate the Plaintiffs in person or through remote work, the Citywide Panel (and DOE) failed to consider a number of other accommodations such as paid leave, unpaid leave without punitive consequences and with a real mechanism for rejoining the workforce without losing tenure once the Mandates were over, use of CAR and Sick days, reassignment and a number of other accommodations short of terminating and continuing to punish and harass unvaccinated employees.

391.    Far from causing an undue hardship, terminating Plaintiffs created actual hardship, as evidenced by the case of Ms. Moas, whose termination forced the school to dismantle the program she taught, disrupting an entire class of special education students with autism and intellectual disabilities. Many other similar stories can be offered.

392.     These facts, combined with the expert testimony available to the City from the beginning of the mandate from scientists who now lead our nation's top public health institutions, demonstrate that the Citywide Panel's undue hardship determinations were pretextual, discriminatory, and unlawful.

## VI.     GENERAL APPLICABILITY AND CONTINUED STATUTORY VIOLATIONS

### A.  The Mandates were Not Generally Applicable

393.     In *Kane*, the Court held that the Mandate was generally applicable, but the religious accommodation policies it was applied to were not. Here, Plaintiffs assert additional facts to show that neither the Mandate nor the various religious accommodation policies were generally applicable.

394.     After the *Kane* case was filed, as more executive orders were issued to extend the mandates to nearly all categories of workers in the City, it became apparent that the Mayor exercised unfettered discretion to make carve-outs, exceptions, or new requirements for secular reasons, or for any reason at all, while denying similar consideration to those with religious concerns.

395.     For example, Mayor Adams issued Emergency Executive Order 62 ("EEO 62") on March 24, 2022, making a carve-out for athletes, entertainers, and their make-up artists and entourages.

396.     On its face, EEO 62 states that the exception was made due to economic reasons, and other reasons not related to stopping the spread of Covid-19.

397.     Some of Mayor Adams' top donors had lobbied for this carve-out.

398.     Mayor Adams announced the controversial carveout at Citi field, the home of the New York Mets.

399.    New York Mets owner Steve Cohen had donated at least 1.5 million dollars to a political action committee supporting Mayor Adams just months before.

400.    Other top donors to the Mayor in the entertainment industry also benefited from the carve-outs.

401.    Due to the carve outs, stars like Kyrie Irving and various entertainers and their make-up artists and entourages could return to work unvaccinated, working in person in enclosed spaces in close proximity to fans and colleagues, but the janitors and minimum wage workers at the fields or theaters, along with most other hard-working people in New York City, like the teachers and educators in this case, were being denied religious accommodation and losing their jobs if they could not take the vaccine.

402.    Significant outcry accompanied the carve outs.

403.    Harry Nespoli, chair of the Municipal Labor Committee ("MLC") said "There can't be one system for the elite and another for the elite and another for the essential workers of our city."

404.    Not surprisingly, this favoritism also worried Jay Varma, a physician, epidemiologist, and senior advisor to Mayor Bill de Blasio for public health and COVID-19, who publicly expressed the concern that the new carve-outs would open the City to "legal action" on the basis that its remaining mandates were "arbitrary and capricious."

405.    The City was well-aware by March 2022 that there was no public health necessity for the Mandates.

406.    The majority of its fully vaccinated staff had by that time caught Covid-19 despite the Mandate.

407.    During the 2021-2022 school year, approximately sixty thousand fully vaccinated

DOE employees caught Covid-19 *after the mandate was imposed* to exclude unvaccinated staff.

408. Many more had already had Covid-19 before the mandate was imposed.

409. But the City refused to drop the rest of the mandates or accommodate employees who could not be vaccinated due to their religious beliefs in good faith.

410. On August 11, 2022, after over a year of verbal acknowledgments that the vaccine could not stop transmission, the CDC officially revised its guidance to stress that it was not appropriate to differentiated between vaccinated and unvaccinated due to the overwhelming scientific consensus that Covid-19 vaccines cannot stop infection and transmission.

411. Instead of accommodating or reinstating employees who'd been denied religious accommodation, DOE sent out a letter later that August 2022, making a fresh offer to DOE employees who'd been terminated or were on leave due to their vaccine status that they could come back and be reinstated to their old positions – but only if they got vaccinated by September 2022.

412. Many Plaintiffs asked for religious accommodation, but they were all denied.

413. Some were able to submit applications through SOLAS, but they received the same vague "undue hardship" denial they'd received before or no response at all, further showing that the undue hardship violations were pretextual given the overwhelming evidence.

414. Others sent in email requests, or mailings, asking that they be able to be reinstated as offered but accommodated so that they did not have to violate their religious beliefs.

415. They were ignored and denied reinstatement.

416. Defendants also knew, when it sent the letter to each of those employees who'd been previously denied religious accommodation, that the applicants required religious accommodation.

417. In September 2022, religious employees denied accommodation who were still on leave were all terminated for failing to violate their faith and get vaccinated.

418. On September 20, 2022, Mayor Adams announced in a press conference that he would repeal the private sector vaccine mandates, and the mandate for students and parents participating in after-school activities but would keep in place the public sector mandates and the DOE mandate for employees.

419. When asked how he could justify keeping the public sector mandates, the Mayor admitted that there was no reason, stating: "I don't think anything dealing with COVID is [sic] makes sense and there's no logical pathway of one can do [sic]."

420. Without any logical explanation why, the City kept the DOE Mandate in place until February 2023, when plaintiffs in related litigation were scheduled to argue their appeals over the unlawful DOE policies before the Second Circuit.

421. On the eve of those arguments, the City announced it would finally repeal the rest of the mandates, and argued to the Court that this should moot the lawsuits.

422. But despite the repeal, DOE refuses to hire back most of the fired unvaccinated workers to this day.

**B. The Religious Accommodation Policies were Not Generally Applicable**

423. Whether or not the Mandates are found generally applicable, a separate question here is whether the religious accommodation policies were generally applicable.

424. In Kane, the Second Circuit held that the Phase 1 and 2 determinations were not generally applicable, stating:

> Nor does it appear that such procedures were generally applicable to all those seeking religious accommodation. In *Smith*, the Supreme Court held that an unemployment compensation system with discretionary, individualized exemptions "lent itself to individualized government assessment of the reasons for the relevant conduct" and

was thus not generally applicable. 494 U.S. at 884, 110 S.Ct. 1595. So too here. Plaintiffs have offered evidence that the arbitrators reviewing their requests for religious accommodations had substantial discretion over whether to grant those requests. Sometimes, arbitrators strictly adhered to the Accommodation Standards. Other times, arbitrators apparently ignored them, such as by granting an exemption to an applicant who identified as a Roman Catholic, even though the Pope has expressed support for vaccination. *Cf. We The Patriots*, 17 F.4th at 288 (denying a motion for a preliminary injunction where medical exemptions were granted exclusively in accordance with a uniform certification process). In our view, and based on the record to date, Plaintiffs have thus shown that they are likely to succeed on their claim that the Arbitration Award procedures as applied to them were not generally applicable." *Kane,* 19 F.4th at 169.

425.    Here, the Citywide Panel exercised the same unfettered discretion to grant or deny requests. In fact, when questioned about this, Eric Eichenholtz affirmed that the discretion was unfettered and that there were no standards that constrained them from granting or denying an accommodation.

426.    This is further evidenced by the spreadsheets showing the reasons for denial or acceptance disclosed in other cases. Often, each agency would have a different recommendation and a different reason for denying or accepting an applicant, showing that they had discretion to decide.

427.    Despite the instruction to deny beliefs related to abortion, Citywide Panelists would thus sometimes recommend that the applicant's denial be reversed, yet others would recommend the opposite on the same facts.

428.    Eric Eichenholtz then had unfettered discretion to change any vote for any reason, without having to explain to anyone why.

429.    This unfettered discretion renders the determinations not generally applicable and therefore subject to strict scrutiny.

## VII.    SUMMARY OF THE RELIGIOUS ACCOMMODATION PROCESS COMMON TO ALL PLAINTIFFS

430.    Each named Plaintiff timely submitted an application and was denied through the

same autogenerated email stating it would be more than a minimal burden to accommodate them.

431.    Each timely appealed and was denied with an "x" next to the word "denied."

432.    DOE suspended them all without pay beginning on or near October 4, 2021.

433.    Between November 2021 and January 2022, each named Plaintiff was notified that their applications were being given fresh consideration by the Citywide Panel.

434.    The Citywide Panel exercised an inexcusable delay after this notification in reviewing the applications.

435.    The first ten *Kane* plaintiffs were quickly decided, within a few weeks, on or about December 10, 2021, as directed in the Second Circuit's order.

436.    All but one of the *Kane* plaintiffs were denied with no more information than "Decisional classification: Does not meet criteria" as an explanation.

437.    This same explanation was offered for why the one *Kane* plaintiff was accommodated, as his "Decisional classification" was also listed as: "Does not meet criteria."

438.    The one *Kane* plaintiff was accommodated while the matter was under scrutiny by the courts so that the City could argue it was acting in good faith.

439.    But in reality, the Citywide Panel was not acting in good faith.

440.    The *Kane* Plaintiffs appealed, and afterwards, the City provided some further "explanations" for the denials through counsel, which they asserted at the time were not prepared in anticipation of litigation but would have been sent to any applicant, including Plaintiffs, had they not rushed to Court.

441.    This turned out to be a misrepresentation. No other applicant other than the *Kane* plaintiffs ever received a similar list of supposed reasons for their denial.

442.    In fact, when arguing that the original *Kane* plaintiffs could not be the sole class

representatives, the City argued that the *Kane* plaintiffs received additional explanations than other employees denied by the Citywide Panel, which were issued because their matter was *subjudice* at the time their applicants were decided.

443.    Essentially, the City admitted that these extra "reasons" were generated in anticipation of litigation.

444.    The reasons provided to the *Kane* plaintiffs are helpful though, as they show continued animus and discrimination.

445.    As one of many examples, each *Kane* applicant who stated that their sincere religious objection was grounded in prayer or guidance from the Holy Spirit was denied with the explanation that, though the Panel did not question their religious sincerity, the City decided that such beliefs were not "religious in nature" since they allegedly allowed an applicant to "pick and choose" what beliefs to follow.

446.    Nothing in any of the applications rejected as "nonreligious" provides any basis for such a conclusion other than animus and improper entanglement by the government in religious questions.

447.    The Citywide Panel exercised inexcusable delay when assessing all the other applications other than those for *Kane* Plaintiffs.

448.    They sat on the applications for everyone else for months.

449.    Meanwhile, as the City was well aware, Plaintiffs and their colleagues remained on leave without pay, struggling and falling deeper into desperation.

450.    Some of them, desperate as they faced eviction and watched their children go hungry, were forced to violate their faith and return to work before they ever got a response.

451.    The majority waited and sustained massive economic harm and other serious

consequences.

452.    In 2022, the Citywide Panel began issuing autogenerated denials to employees who were not part of the *Kane* lawsuit which were sent from a "do not reply" email address.

453.    These denials had little more explanation than the "Does not meet criteria" provided to the *Kane* plaintiffs, though later versions appear to sometimes also or alternatively tack on an additional sentence stating: "DOE has demonstrated that it would be an undue hardship to grant this accommodation to appellant given the need for a safe environment for in-person learning."

454.    Some Plaintiffs never received an answer from the Citywide Panel at all, even though they had been notified their applications were being considered by the Citywide Panel.

455.    Some did not receive an answer until September 2022 – almost a year later.

456.    When the DOE sent out the invitation to get vaccinated and come back to work in September 2022, Plaintiffs and their colleagues asked for religious accommodation from the condition in the new offer.

457.    They were all denied or ignored, despite the CDC's updated guidance.

458.    Plaintiffs also sent more notices of their group claims, which were not adjusted within the statutory period.

***Retaliation***

459.    Defendants not only failed to accommodate DOE employees' sincerely held religious beliefs, they also harassed and retaliated against employees with religious objections to the vaccine.

460.    As a threshold matter, there was no basis to impose some of the draconian requirements that DOE imposed on employees denied religious accommodation due to alleged

"undue hardship."

461. For example, employees were forced to sign a waiver of their right to challenge the determination or face termination "for cause" and lose their good standing, paid time off credits (which belonged to them by law and contract) and health insurance while they waited on leave without pay.

462. These benefits belonged to the Plaintiffs pursuant to the Contract.

463. Tenured teachers cannot face any of these consequences, including loss of salary, without a 3020 hearing, which was not provided.

464. Moreover, the Education Law prohibits imposition of a waiver for any DOE employee under such conditions.

465. The DOE also informed employees that unless they resigned, they were prohibited for working or earning income from *anywhere* even outside of the DOE while on leave without pay. Defendants also could easily have at least allowed Plaintiffs with sincere religious beliefs to work elsewhere while they were kept on leave without pay, and then allowed them to return to their former positions once the temporary "emergency" mandate was lifted.

466. Instead, Defendants imposed a condition that they could not work anywhere while suspended from DOE.

467. Then, DOE attached problem codes to the employee files of those who separated for failing to get vaccinated.

468. The problem codes were associated with Plaintiffs' finger-print records, which are shared with the Federal Bureau of Investigation.

469. These problem codes were also visible to vendors and potential employers outside of the DOE system.

470. The problem codes continue to this day to prevent many Plaintiffs from getting a job at DOE or elsewhere.

471. Even after the DOE repealed the vaccine mandate for DOE employees, DOE continues to use these problem codes and other methods to refuse to rehire the vast majority of Plaintiffs and their peers who were denied religious accommodation.

472. First, DOE continues to impose an arbitrary waiver requirement on some, but not all employees as a condition of return.

473. DOE told UFT that *all* employees would need to sign a waiver of their right to sue to come back, deterring many from trying.

474. In practice DOE imposes this waiver requirement selectively, forcing some to sign as a condition of return but neglecting to even mention it for others.

475. Second, DOE refuses to reinstate Plaintiffs or their peers, instead requiring that these mostly tenured teachers and educators apply as new hires.

476. Third, DOE continues to use the problem code to thwart efforts for those denied religious accommodation to return even as a new hire.

477. For example, there is a staffing crisis at DOE.

478. Many Plaintiffs with spotless employment records report that they have interviews and are offered a job, but then this job offer is rescinded after problems with their "security clearance" are reported.

479. Some employees have been told point blank that the security clearance issue is that they have a problem code attached to their file.

480. Others have seen the problem code.

481. These problem codes are typically imposed on employees who are not hirable due

to heinous offenses, like child abuse.

482.    DOE has long been aware of this issue, as it has been repeatedly brought up in EEOC complaints and related litigation but refuses to address it.

483.    There is currently a Congressional Investigation into the problem code issue, and members of the United States Congress have demanded answers from the City and DOE. Neither Defendant has bothered to answer these inquiries even though they are required to do so.

484.    There have also been hearings by the City Council, and many employees from DOE and the City have testified about the ongoing retaliation and discrimination they face.

485.    Fourth, DOE has attempted to block all efforts at receiving unemployment compensation.

486.    For example, when employees would apply, DOE would routinely object and state that they were fired for misconduct or were ineligible for a "good cause" determination because the Pope or others did not agree with the employee's religious choice.

487.    DOE routinely made these discriminatory arguments even after the Second Circuit chastised them for conditioning access to accommodation on the beliefs of a religious leader like the Pope.

### NAMED PLAINTIFFS' INDIVIDUAL FACTS

488.    Each Plaintiff sets forth additional facts below, which help demonstrate the widespread discriminatory policies and practices, and also support their as-applied individual claims.

**EMILY ZAPANTIS-DALAMAKIS**

489.    In September 2021, Plaintiff EMILY ZAPANTIS-DALAMAKIS ("Mrs. Zapantis") was a tenured Assistant Principal working in Queens with over twenty years of service

at DOE.

490. She had a spotless record of service and was well regarded at her job.

491. Mrs. Zapantis timely submitted an application for religious accommodation through the Self-Service Online Leave Application System ("SOLAS").

492. Her application included a five-page letter setting forth her sincerely held religious objections to the Covid-19 vaccines, which provided links to source material and writings by the Church's Holy Elders and Saints and scripture that guide her religious objections.

493. Among other religious reasons, Mrs. Zapantis objects to the link between abortion and the vaccines and cannot take the vaccine because she believes that the Holy Spirit has clearly guided her on this issue.

494. DOE immediately responded with the same generic, autogenerated email it sent to all other applicants, claiming undue hardship under the unlawful *de minimis* standard.

495. Mrs. Zapantis was not contacted by any person at DOE to discuss her application before it was denied.

496. DOE did not individually review her application before sending out the autogenerated email denial.

497. As an Assistant Principal, Mrs. Zapantis could have been accommodated without undue hardship, just as *Kane* plaintiff Amaryllis Ruiz-Toro was allowed to be.

498. Mrs. Zapantis timely appealed and had a zoom hearing with Arbitrator Barry Peek and a representative of the DOE.

499. The DOE representative acknowledged that Mrs. Zapantis' religious objections were sincere.

500. However, the DOE representatives and Arbitrator Peek each asserted that she

cannot qualify because she is Greek Orthodox, and a leader in the North American branch of the Greek Orthodox Church allegedly supports vaccination.

501.　　Mrs. Zapantis explained that the Greek Orthodox church is autocephalous, and that she is not bound by that leader's beliefs.

502.　　She pointed out that many Bishops and Greek Orthodox churches that she follows share her religious objection the vaccines.

503.　　She also explained that she follows the teachings of the Holy Spirit, the Holy Elders and the Saints, and believes that their guidance is to abstain from the vaccines for religious reasons.

504.　　DOE argued, essentially, that this was heretical, and that the arbitrator must take the Archbishop's guidance as the only valid religious belief for a Greek Orthodox applicant.

505.　　No one mentioned any alleged "undue hardship" as a reason to deny her appeal.

506.　　Mrs. Zapantis was denied again, with no further explanation than an "x" next to the word denied.

507.　　On or about October 4, 2021, Mrs. Zapantis was placed on involuntary leave without pay for failing to violate her religious beliefs.

508.　　In November 2021, Mrs. Zapantis was informed that the Citywide Panel would conduct a *de novo* review and reinstate her with back pay if her beliefs qualified under lawful standards.

509.　　In or around March 2022, Mrs. Zapantis was issued an autogenerated email from the Citywide Panel, denying her application without explanation other than: "The decision classification for your appeal is as follows: DOE has demonstrated that it would be an undue hardship to grant this accommodation to appellant given the need for a safe environment for in-person learning."

510. Mrs. Zapantis could have easily been accommodated in person or remotely.

511. Mrs. Zapantis did not pose a direct threat based on her vaccine status. During the 2020-2021 school year, as a school supervisor, she routinely went to the school building to check on students and she was allowed to work every day unvaccinated at her post in person. She only took two sick days the entire year and remained healthy and well despite the fact that it was a far more dangerous phase of the pandemic.

512. Mrs. Zapantis also had been accommodated remotely in the spring of 2020 and could have been again. All of her obligations could have been successfully completed remotely as they had been during the Spring 2020 when DOE was in full lockdown, or in the 2020-2021 school year in instances where many teachers had remote accommodations.

513. She could have conducted her teacher supervisory observations online through Google classroom or Zoom as she had often done during the pandemic.

514. She could have completed all of her NYS reports, SPED and ENL reports, LAP paperwork, and emails remotely from home.

515. She could have made all of her usual daily phone calls to parents, teachers, and staff members remotely from home.

516. Any essential meetings with parents, teachers, school nurses, and support staff could have easily been done remotely via Zoom.

517. The Citywide Panel did not engage in cooperative dialogue with Mrs. Zapantis before denying her relief.

518. On or about March 17, 2022, Mrs. Zapantis was terminated from DOE.

519. Mrs. Zapantis timely initiated and timely filed an EEOC complaint, alleging that DOE and the City engaged in widespread discrimination and failure to accommodate in violation

of Title VII.

520.    DOE failed to adjust the claims or remedy the widespread discrimination.

521.    In August 2022, DOE sent Mrs. Zapantis and all other employees fired for refusing to violate their religious beliefs a letter offering reinstatement if they would get vaccinated.

522.    Mrs. Zapantis could not violate her religious beliefs so DOE would not take her back.

523.    After the Mandate was repealed, Mrs. Zapantis asked for her job back.

524.    DOE would not hire her back.

525.    Instead, DOE hired two different people to do her job, one of whom was primarily doing work that could and would typically be done remotely.

526.    Furthermore, DOE placed a problem code on Mrs. Zapantis' file which will not allow her to pass a security check to get rehired at DOE.

527.    This problem code has also impeded her ability to get work outside of DOE.

528.    Unable to live in New York City without income, Mrs. Zapantis had to move out of the country to Greece to try to survive.

529.    Mrs. Zapantis suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

530.    Despite diligent efforts, excellent qualifications, and a nationwide teacher shortage, she has been unable to get rehired at DOE or anywhere else. She believes that there is a problem code on her account that is contributing to this issue.

531.    On or after April 1, 2024, Mrs. Zapantis received a right to sue letter from the EEOC.

532.    This suit was timely commenced within ninety days thereafter.

**MARIANA ARGYROS**

533. In September 2021, Plaintiff MARIANA ARGYROS ("Mrs. Argyros") was a tenured elementary school teacher working in Queens with over 17 years of service at DOE.

534. Mrs. Argyros has a spotless record and was well regarded at her job.

535. Like many of the named Plaintiffs, she received Highly Effective ratings (the highest level rating possible) and was nominated for the Big Apple Award in teaching.

536. Mrs. Argyros has sincere religious objections to taking a Covid-19 vaccine due to her Greek Orthodox faith.

537. As Mrs. Argyros explained in her timely filed application for accommodation, she has been a devout follower of the faith all her life and married a man who is also Greek Orthodox.

538. The Greek Orthodox Church goes back to the beginning of Christianity and can trace its lineage to the apostles.

539. Mrs. Argyros has made pilgrimages with her family to Holy places, including several trips to Saint Gerasimos' monastery in Greece.

540. Orthodox Christians throughout the world believe Saint Gerasimos heals through God's grace, and Mrs. Argyros prays to Saint Gerasimos for healing and protection from illness.

541. Followers of the Greek Orthodox faith believe scriptures were derived from God, and Mrs. Argyros prays to God for all major medical decisions.

542. She has received clear guidance against vaccination from God.

543. Based on this guidance, she applied and was granted a religious exemption from the DOE for her older son until the state repealed that option in 2019.

544. Since 2019, her children have had to homeschool because she will not violate her faith by getting them vaccinated. This was extremely difficult, as Mrs. Argyros was a full-time

teacher herself.

545. Mrs. Argyros also articulated other religious objections in her letter, including an objection to the use of aborted fetal cell lines in the production of the vaccines.

546. DOE immediately sent Mrs. Argyros the generic autogenerated denial email sent to all applicants alleging that it would be "more than a minimal burden" to accommodate her.

547. No one at DOE reviewed her application or reached out to engage in cooperative dialogue before denying relief.

548. Mrs. Argyros timely appealed her denial.

549. She was not given a hearing but was simply denied with no further explanation than an "x" next to the word "denied."

550. Mrs. Argyros was placed on leave without pay on or about October 4, 2021.

551. In December 2021, she received notification that her application would be considered by the Citywide Panel.

552. On February 15, 2022, the Citywide Panel did not question her religious sincerity, but denied her application, with no further information than "The decision classification for your appeal is as follows: DOE has demonstrated that it would be an undue hardship to grant this accommodation to appellant given the need for a safe environment for in-person learning."

553. It would not have been an undue hardship to accommodate Mrs. Argyros for the reasons set forth in the undue hardship section of this complaint, *supra*.

554. As discussed in the undue hardship section, *supra,* Mrs. Argyros did not pose a direct threat based on her vaccination status and could have been easily accommodated in person or remotely.

555. She had already successfully taught in person with students through the worst of

the pandemic.

556.　She also taught in an Integrated Co-Teaching ("ICT") classroom, which meant she already had a co-teacher.

557.　During the pandemic, it was common in ICT classrooms for one teacher to work remotely with students through Google classroom while the co-teacher was present live in the classroom.

558.　During the 2020-2021 school year, unless there was a lockdown or temporary closure, Mrs. Argyros taught in person from her classroom at P.S. 11. She even livestreamed the students who were learning from home (students in her class were coming in person on alternating days) even though she was not required to, because she did not want them to miss out on any learning. These students were able to interact with the classroom and learned more effectively.

559.　Furthermore, she was a general education teacher at that time teaching in an ICT classroom on her own in a classroom that requires two teachers. The school could not find a substitute teacher to cover for the special education position during the pandemic so she was allowed to handle the class on her own without a co-teacher.

560.　During the 2021-2022 school year, Mrs. Argyros did have a co-teacher and could have done her co-teaching remotely while her co-teacher was physically present in the building.

561.　DOE accommodated some teachers this way whose religious beliefs were preferred under the discriminatory Stricken Standards for the 2021-2022 school year and could have granted the same accommodation to Mrs. Argyros.

562.　DOE even hired long-term substitutes as co-teachers for some classrooms that were not ICT classrooms so that the primary teacher could teach via Google Classroom unvaccinated with a co-teacher.

563.    But they only did this for those whose religious beliefs were deemed to meet the discriminatory criteria set forth in the Stricken Standards.

564.    Mrs. Argyros filed a request for a hearing, pursuant to Education Law 3020, on or about February 22, 2022, alerting the DOE to her claims and seeking adjustment.

565.    DOE refused to provide her with a 3020 hearing, even though they are prohibited by law from taking adverse action against a tenured employee without a 3020 hearing and refused to adjust her statutory claims either.

566.    In March 2022, DOE terminated Mrs. Argyros for failing to violate her sincerely held religious beliefs.

567.    In August 2022, Mrs. Argyros received a letter from DOE, inviting her to return to her old position but only on the condition that she get vaccinated.

568.    Mrs. Argyros could not violate her faith in this manner.

569.    She was not given any religious accommodation, even though Defendants knew she needed one.

570.    After the Mandate was repealed in February 2023, Mrs. Argyros tried diligently to get rehired at DOE.

571.    DOE refused to take her back or offer her a new position.

572.    Upon information and belief, she has a problem code attached to her file.

573.    As soon as she learned about the problem codes, Mrs. Argyros filed another notice of claim in April 2023, addressing her unlawful denial of accommodation, and the ongoing retaliation through the failure to provide a legally required 3020 hearing, refusal to rehire, and the problem code.

574.    Defendants failed to adjust these claims within thirty days of receipt.

575. Mrs. Argyros suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**MICHELLE BAPTISTE**

576. In September 2021, Plaintiff MICHELLE BAPTISTE ("Ms. Baptiste") was a tenured preschool teacher working in Brooklyn with over 28 years of service at DOE.

577. She was born at the now shuttered Brooklyn Women's Hospital on Eastern Parkway in Brooklyn within the bounds of the Community School District 17, attended District 17 as a kindergartener and returned to that same school to teach in her first teaching assignment as a first-grade teacher.

578. She has deep ties to the community

579. Ms. Baptiste was a well-respected and beloved teacher. She loved her job, and her students loved her.

580. Ms. Baptiste has sincerely held religious objections to vaccination.

581. She previously sought religious accommodation for her son from school vaccine mandates based on these same sincerely held religious objections and was not required to vaccinate him.

582. Ms. Baptiste timely applied for accommodation, explaining that she seeks guidance from God through prayer for every decision, major and minor, and vaccination conflicts with this guidance and violates her faith.

583. Ms. Baptiste was sent the same autogenerated email sent to all other applicants, saying it would be more than a minimal burden to accommodate her.

584. Ms. Baptiste could have been easily accommodated as set forth in the undue hardship section, *supra*.

585.    She was willing, ready and able to test weekly, or assist with any other mitigation teachers available to teachers across the state, and as set forth above, did not pose a direct threat based on her vaccine status.

586.    Moreover, Ms. Baptiste had been accommodated remotely in the past by DOE, and could have been allowed to work remotely again, just as those with favored religious beliefs were allowed to do.

587.    Ms. Baptiste timely appealed and submitted additional materials about her faith and questions about the process.

588.    She was not allowed to have a zoom hearing, but instead received a denial from Arbitrator Barry Peek with no further explanation than an "x" next to the word denied.

589.    Ms. Baptiste was placed on leave without pay on or about October 4, 2021.

590.    In November 2021, she was informed that the Citywide Panel was reviewing her application and would reinstate her with back-pay if her beliefs qualified under lawful standards.

591.    She submitted a longer letter to the Panel. As these materials address in more detail, Ms. Baptiste is a devout and lifelong Catholic, from a devout Catholic family.

592.    Her mother a pilgrimage to Lourdes, France, where she obtained a bottle of healing holy water, which Ms. Baptiste keeps, to this day, and uses sparingly for her faith healing.

593.    When Ms. Baptiste was six years old, the family became followers of Veronica Leuken, known as the Bayside Prophet, who many believed was being visited by the Holy Mother Mary.

594.    This sect of Catholicism is vehemently against participation in abortion, which they believe is a mortal sin and is imperiling the soul and future of all humanity.

595.     Ms. Baptiste was raised to understand that there is no grey area when it comes to participation in abortion – however indirect.

596.     In her eight page, single-spaced heartfelt letter, Ms. Baptiste explained that though she still considers herself Catholic, she does not believe the Catholic Pope was right to excuse the vaccine's use of aborted fetal cell lines. She received guidance from prayer and her religious conscience, and she believes that to avail herself of these vaccines would mean the destruction of her soul.

597.     The Citywide Panel summarily denied relief on or about January 26, 2022, stating, without further explanation that: "The decision classification for your appeal is as follows: Request does not meet legal parameters for an RA and DOE has demonstrated it would be an undue hardship to grant this accommodation to appellant given the need for safe in-person learning."

598.     Ms. Baptiste was terminated on or about February 18, 2022 for failing to violate her sincerely held religious beliefs.

599.     DOE continued to retaliate against her.

600.     Upon information and belief, Defendants placed a problem code on her file.

601.     Then, when Ms. Baptiste applied for unemployment insurance benefits, DOE opposed it, asserting that since the Pope disagreed with her, she was not entitled to a good cause determination and should be deemed to have quit.

602.     This was *well after* the Second Circuit chastised Defendants for denying people's religious accommodation requests based on the beliefs of the Pope and other religious leaders and *well after* Defendants acknowledged that such reasoning was unconstitutional.

603.     The Administrative Law Judge shockingly upheld this unconstitutional reason, reiterating DOE's argument to find: "Claimant acknowledged that the Pope was in favor of people

taking the vaccine and that no leader of the Roman Catholic Church was against taking the vaccine. Although claimant cites law asserting that the employer did not adequately implement an August 24, 2021 arbitration award, I conclude that if the arbitration award had been correctly implemented that claimant would still have lost her job because the leader of claimant's religion was against taking the vaccine. I, therefore, conclude that by choosing not to take the mandated vaccine, the claimant quit her job without good cause."

604.    This decision mirrored the Law Department's argument for why she should be denied, showing that the Law Department continued to violate the Second Circuit's direct orders to stop using the Stricken Standards.

605.    With no possibility of income or even the safety net of unemployment insurance, Ms. Baptiste was forced to take early retirement, at great penalty, due to Defendants' discriminatory actions, among many other harms.

606.    Ms. Baptiste and her family suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**VENESSA BURRELL-BARTLEY**

607.    In September 2021, Plaintiff VENESSA BURRELL-BARTLEY ("Mrs. Burrell-Bartley") was a tenured Special Education teacher working in Queens with four years of service at DOE.

608.    She had a spotless record, was rated "Highly Effective" and was appointed to the leadership team at her school, reviewing IEP's schoolwide, training new teachers and helping create modules and best practices to share.

609.    Mrs. Burrell-Bartley was unable to take a Covid-19 vaccine due to her sincerely held religious beliefs.

610.     She is a member of the Seventh Day Church of God, Reformed.

611.     Her religious leaders share her belief that vaccination against Covid-19 goes against the teachings of her religion.

612.     Mrs. Burrell-Bartley timely submitted an application for religious accommodation, including a letter from her Pastor, explaining that Covid-19 vaccination goes against the teachings of the Seventh Day Church of God, Reformed, for several reasons – one being the use of aborted fetal cell lines in the development of the vaccines.

613.     Like all the rest of her colleagues, Mrs. Burrell-Bartley was immediately denied through an autogenerated email stating it would be more than a minimal burden to accommodate her.

614.     No one reviewed her application before the denial was sent out or reached out to her to engage in cooperative dialogue.

615.     Mrs. Burrell-Bartley could have been accommodated without undue hardship for the reasons set forth in the undue hardship section, *supra*.

616.     Mrs. Burrell-Bartley timely appealed.

617.     She was notified that she would be exempt from the vaccine requirement until she got a determination on appeal.

618.     Mrs. Burrell-Bartley had a zoom hearing on or about September 28, 2021.

619.     The zoom hearing was brief.

620.     The DOE representatives chiefly argued that Mrs. Burrell-Bartley was not entitled to accommodation because her religion was wrong to object to the link between the vaccines and abortion.

621.     The DOE representative presented the letter from Commissioner Chokshi to try to

prove that these religious concerns were somehow overblown.

622.    Mr. Chokshi is not a member of Mrs. Burrell-Bartley's church and has no basis to weigh in on this religious question even if he was.

623.    Mrs. Burrell-Bartley was denied in October 2021, with no further explanation than an "x" placed next to the word denied.

624.    From approximately October 4, 2021, through October 15, 2021, Mrs. Burrell-Bartley was allowed to work remotely while her request for religious accommodation was pending.

625.    On or about October 15, 2021, Mrs. Burrell-Bartley was placed on Leave without Pay for failing to violate her sincerely held religious beliefs.

626.    In November 2021, Mrs. Burrell-Bartley received notification that her application was being considered by the Citywide Panel.

627.    She waited for months for a determination.

628.    Upon information and belief, no decision was issued.

629.    On or about September 5, 2022, Mrs. Burrell-Bartley received notification that she could be reinstated to her old position with no break in service if she was willing to get vaccinated in violation of her religious beliefs.

630.    She submitted her religious accommodation request again.

631.    On or about September 23, 2022, Mrs. Burrell-Bartley was informed that her religious accommodation request was being "administratively closed" since she was being terminated.

632.    Mrs. Burrell-Bartley could have been accommodated in person without hardship and could also have been accommodated remotely, as discussed in the undue hardship section, *supra*.

633.    In fact, she already was accommodated remotely for the 2020-2021 school year.

634.    She also was accommodated remotely for part of the 2021-2022 school year and was working remotely at the very time she was denied accommodation.

635.    She could have continued to do her job, since she had a co-teacher in every class she taught, and she could have had her breakout sessions with her special education students remotely even if they were in the classroom.

636.    DOE allowed other teachers to work remotely with a co-teacher but denied Mrs. Burrell-Bartley the same considerations because they did not approve of her religion.

637.    She also could have taught in one of the fully remote programs, and/or continued to handle the IEP documentation, which were all handled remotely anyway.

638.    But she was instead denied accommodation because Defendants discriminated against those whose beliefs included concerns about the link between the vaccines and abortion, among other discriminatory policies.

639.    Mrs. Burrell-Bartley never received a decision from the Citywide Panel and is therefore similarly situated to NYFRL plaintiff Solon, who was determined to have articulated a free exercise claim because she was only ever considered under the blatantly unconstitutional Stricken Standards policy.

640.    There is no material difference between plaintiff Solon and Mrs. Burrell-Bartley that would lead to a different outcome here.

641.    Mrs. Burrell-Bartley suffered severe financial, emotional, psychological and spiritual harm as a result of Defendants discrimination

**STEPHEN BYNOE**

642.    In September 2021, Plaintiff STEPHON BYNOE ("Pastor Bynoe") was a tenured

Special Educator and General Education Teacher with 22 years of service at DOE.

643.    When the Mandate was announced, Pastor Bynoe was employed by DOE as a UFT Teacher Center Coach/Specialist.

644.    His job was to teach professional development and workshops to new and experienced teachers across the DOE.

645.    Pastor Bynoe had an excellent reputation and was recognized for organizing and executing programming that went above and beyond what he was required to do.

646.    Pastor Bynoe has sincere religious objections to all vaccinations.

647.    He is the Pastor and congregation leader of a Ministry which grew out of the Seventh Day Adventist Churches many years before the pandemic.

648.    The church is opposed to all vaccination.

649.    Accordingly, Pastor Bynoe does not take vaccines, and his children have never been vaccinated.

650.    As a Pastor, Pastor Bynoe wrote religious accommodation requests for two individuals from his faith who worked or contracted with Defendants.

651.    Upon information and belief, both individuals received religious accommodation based on his Pastor letter.

652.    But DOE rejected Pastor Bynoe's timely filed application when he filed it on behalf of himself.

653.    First, DOE sent the same autogenerated email sent to all other employees, stating it would be "more than a minimal burden" to accommodate him given the need for children to have safe in-person learning.

654.    But Pastor Bynoe did not work in person with children.

655. He taught math and facilitated trainings for adult DOE teachers from his office in the UFT Teaching Center.

656. Since March of 2020, these trainings and workshops were all held virtually.

657. No one ever individually reviewed whether Pastor Bynoe could have been accommodated without undue hardship before sending the autogenerated denial on that basis.

658. In fact, no one ever individually reviewed his application at all before he was denied.

659. For the reasons set forth in the undue hardship section, *supra,* it would not have been an undue burden or created a direct threat to accommodate Pastor Bynoe in person.

660. Similarly, as detailed above, and in this section, it would not have been an undue hardship to accommodate Pastor Bynoe remotely as he already taught all his workshops virtually and worked in an administrative building.

661. Pastor Bynoe timely appealed, within one day of receiving his autogenerated denial.

662. The arbitrator denied him the right to have zoom hearing and denied the appeal, with no further explanation than an "x" next to the word "denied."

663. Pastor Bynoe was involuntarily placed on leave without pay on October 4, 2021.

664. In or around November 2021, Pastor Bynoe received notification that the Citywide Panel would review his application and reinstate him if he qualified under lawful standards.

665. On or about March 28, 2022, the Citywide Panel denied his appeal, again on the basis of "undue hardship", given the "need for a safe environment for in person learning."

666. Again, no one reviewed whether it would be an undue hardship to accommodate Mr. Bynoe before sending this denial.

667. Clearly it would not have been, since Pastor Bynoe did not work in classrooms or

even with children.

668.　　Pastor Bynoe and his family suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

669.　　He has lost everything, even his life insurance policy that he had to protect his children, which he could not pay due to Defendants' discriminatory actions.

## CONNI CALIA

670.　　Plaintiff CONNI CALIA is a resident of Queens County, New York. Prior to being denied religious accommodation, she was a tenured school psychologist working in Brooklyn with over 16 years of service at DOE.

671.　　Most of Mrs. Calia's work was on the computer, even before the pandemic.

672.　　As a school psychologist, her job included writing IEPs and holding IEP meetings (which are still done remotely even now), and some testing and IEP management, most of which was also done remotely or easily could have been.

673.　　At the school she worked at, there were several additional school psychologists who could have traded any tasks that had to be done in person.

674.　　During the 2020-2021 school year, Ms. Calia was given a medical accommodation to do her job fully remotely from home, with no issue or added expense.

675.　　In the fall of 2021, Ms. Calia applied for religious accommodation from the Mandate.

676.　　Ms. Calia is a devout Christian and has multiple sincerely held religious objections to the vaccine.

677.　　She suffers from several debilitating long-term health conditions and has learned to put her faith in God for healing and health matters.

97

678.     She prays over every medical intervention and believes that God did not want her to take this vaccine.

679.     Among other religious concerns, Ms. Calia is also opposed to the link between the vaccines and aborted fetal cell lines.

680.     Ms. Calia timely applied for religious accommodation and was immediately denied with the same autogenerated email sent to all DOE employees, stating it would be an undue hardship based on the "more than a minimal burden" standard.

681.     No one from DOE ever reviewed her application before she was denied.

682.     It would not have been an undue burden to accommodate Ms. Calia remotely.

683.     Ms. Calia also could have been accommodated safely in person without causing a "direct threat."

684.     Ms. Calia appealed within the 24 hours allotted.

685.     She was denied accommodation, with no opportunity for a hearing and no explanation, just an "x" next to the word "denied."

686.     In or around December 2021, Ms. Calia received notification that her application would be given fresh consideration by the Citywide Panel.

687.     On or about February 15, 2022, the Citywide Panel denied her application without explanation..

688.     No one from the Citywide Panel evaluated her individually to assess whether it would have been an undue hardship to accommodate her.

689.     DOE did not establish that it would have been an undue hardship to accommodate Ms. Calia either.

690.     Ms. Calia timely filed a notice of claim with the DOE, and DOE did not adjust it

within the time allotted.

691.    Ms. Calia's family was suffering terribly without her income.

692.    In or around August 2022, Ms. Calia was informed that she could return to her old position if she got vaccinated by September 6, 2022.

693.    To protect her children, she got vaccinated in violation of her faith and returned to work.

694.    Ms. Calia suffered serious adverse reactions, and lasting health issues as a result of getting vaccinated.

695.    Worse, she will never recover from the pain of being forced to violate her faith.

696.    Ms. Calia suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**ADRIANA CARBONE**

697.    Plaintiff ADRIANA CARBONE is a resident of Bronx County, New York. Prior to being denied religious accommodation, Ms. Carbone was a Community Associate working in Manhattan with over nine years of service at DOE.

698.    Ms. Carbone is a devout Christian and has sincere religious objections to taking a Covid-19 vaccine.

699.    Ms. Carbone is a single mother of a small son, and she chose to not vaccinate her son due to her religious beliefs.

700.    She timely applied for religious accommodation through SOLAS.

701.    Ms. Carbone was immediately denied accommodation through the same autogenerated email sent to all employees, alleging it would be an undue hardship to accommodate her.

702. Ms. Carbone's job was not in person with school children.

703. She worked in the Manhattan Borough Office – an administrative office, and upon information and belief the same office that NYFRL plaintiff Heather Clark worked in.

704. Ms. Carbone's primary job was to coordinate with nonprofits and oversee custodial payroll services.

705. Once a year, someone from her department would need to enter a school building to assess broken windows, custodial supplies or other similar inventory.

706. This could be done in the summer or after-hours when students were not in the building.

707. A number of other colleagues were available to do the assessment and it did not have to be Ms. Carbone.

708. Even before the Mandate, Ms. Carbone was asked to go to a school building to do that brief assessment only once in all the years she had worked at DOE.

709. Ms. Carbone never had to visit schools or be on site for any reason. Her main job site was in the Manhattan office, where no children were ever present.

710. Ms. Carbone could have easily been accommodated without undue hardship, remotely or in person at the administrative offices.

711. No one at DOE reviewed her application before denying her based on alleged undue hardship.

712. Ms. Carbone did not pose a direct threat to anyone based on her religious practices.

713. Ms. Carbone timely appealed her initial denial.

714. She had a hearing with an arbitrator and DOE representative on or about October 20, 2021.

715.     Pending the hearing she was placed on Leave Without Pay on October 4, 2021, even though some of her colleagues were allowed to keep getting paid until after their hearings.

716.     The arbitrator and DOE representatives were rude and dismissive of her religious beliefs at the hearing.

717.     They harassed her and emphasized that the Pope was vaccinated.

718.     The DOE representative said she just needed to go get vaccinated.

719.      Soon afterwards, the arbitrator issued a denial with no further explanation than an "x" next to the word "denied."

720.     In or around January 2022, Ms. Carbone was informed that she would receive "fresh consideration" by the Citywide Panel.

721.     On or about February 15, 2022, she received an autogenerated email from "salesforce" informing her that "The decision classification for your appeal is as follows: Employee did not establish religious belief that precludes vaccination."

722.     Ms. Carbone's religious accommodation request clearly established a sincerely held religious objection to the vaccine.

723.     Ms. Carbone's heartfelt letter explained, among other things, that she turns to God for life's major decisions, including decisions about health, seeking guidance from the Bible and from the personal language she believes God forms with her and each of his children, according to their own unique bond.

724.     She explained that she received clear guidance that she should not take the vaccine through prayer.

725.     Ms. Carbone explained that following this advice was not easy. She was terrified to lose her job and about the impacts of following God. But, as she stated in her letter, "the answer

that God provided was clear as his scripture and my inner knowing revealed that I must place my trust in God and his healing and shielding powers."

726. She explained that based on God's guidance, she had never taken *any* vaccine in her entire adult life.

727. She also explained that as a Christian, she does not use any vaccine or medication that uses fetal cells in its development, including Tylenol and Pepto-Bismol.

728. The City did not question Ms. Carbone's religious sincerity yet they denied her with little to no explanation, just like her colleagues.

729. The Citywide Panel had no basis to conclude that Ms. Carbone's sincerely held religious beliefs do not preclude vaccination.

730. The City may not agree with or understand the guidance that Ms. Carbone received from prayer, but they are not entitled to substitute judgment about what it means, as they did.

731. Ms. Carbone is a single mother.

732. She was now cut off not only from her income at DOE, but also from her side job waitressing due to the Key to NYC vaccine mandate, which did not allow for religious accommodation at all.

733. She suffered enormously, as did her family.

734. Losing her job deeply affected her and her son's living situation, and the stress caused by trying to provide for her young son at this time caused great hardship for her.

735. Ms. Carbone applied for unemployment insurance.

736. DOE contested the process, claiming she "quit" and was not entitled to a good faith determination because her beliefs don't merit religious protection. In making these arguments, the Law Department continued to argue that she did not qualify based on the unconstitutional criteria

struck down by the Second Circuit in *Kane.*

737.    Ms. Carbone had to appeal and won her unemployment insurance appeal.

738.    Up to and including this year, DOE continues to file frivolous motions to reconsider, even though they present no new evidence and lose every time.

739.    This is another form of harassment and retaliation and shows a deep animus towards her religious beliefs.

740.    Ms. Carbone and her family have suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**TRAVIS CARTER**

741.    Plaintiff TRAVIS CARTER ("Pastor Carter") is a resident of Richmond County, New York. Prior to being denied religious accommodation, Pastor Carter was a tenured art teacher working in Staten Island with over 21 years of service at DOE.

742.    Among other achievements, Pastor Cater was rated "Highly Effective" as a teacher.

743.    He was a beloved and well-respected teacher, that touched the lives of his students.

744.    He regularly received letters from his students, even years later, letting him know that he changed the course of their lives, and helped them at critical times to succeed and flourish despite adversity.

745.    Pastor Carter is a very religious man.

746.    He has faithfully attended the Pentecostal Tabernacle in Staten Island since he was a child, which is part of the United Pentecostal Church.

747.    At the time of his application for religious accommodation, Pastor Carter was the Assistant Pastor at the Church.

748.    For over twenty years prior to becoming Assistant Pastor, he was deeply involved

in the church, leading youth ministry, teaching Bible study groups, and attending religious education and training programs, among numerous other roles.

749. On January 1, 2023, Pastor Carter was appointed as a full Pastor of the church.

750. Due to his religious beliefs, Pastor Carter does not drink alcohol, smoke cigarettes, or consume any product that he believes will pollute God's temple.

751. Due to these same religious beliefs, Pastor Carter does not believe in vaccination.

752. Pastor Carter's wife shares his religious beliefs, and also lost her job due to a similar mandate for covered healthcare facilities, which was recently struck down as arbitrary and capricious.

753. Due to their religious beliefs, the Carters do not vaccinate their four children.

754. Before the Mandate was even announced, Pastor Carter proactively submitted a religious accommodation request on or about August 9, 2021, to ensure that DOE understood that he would need accommodation if a mandate was imposed.

755. He could see the writing on the wall, and believed that this was the direction that the City was headed.

756. No answer was provided.

757. On or about September 16, 2021, Pastor Carter resubmitted his request, which included a long, heartfelt letter detailing his religious beliefs and history, a letter from his Pastor at the Pentecostal Tabernacle Church, and proof of antibodies showing natural immunity due to recent Covid-19 infection.

758. The letter affirmed that Pastor Carter's religious beliefs preclude any vaccination.

759. His Pastor affirmed Pastor Carter's sincerely held religious belief and added that Mr. Carter's religious opposition to using any product containing aborted fetal cell lines is

consistent with the Bible and the teachings of the church.

760. Pastor Carter was immediately denied through the same autogenerated "undue hardship" email sent to all applicants.

761. Pastor Carter could have been accommodated without undue hardship as discussed, *supra*, in the undue hardship section.

762. He could have worked safely in person.

763. Like most of his colleagues, he had already had Covid-19 recently and had natural immunity.

764. And, in addition to any number of other accommodations, he could have worked remotely.

765. During the 2020-2021 school year, Pastor Carter had been given a medical exemption so that he could teach his art classes through Google Classroom and conduct his parent-teacher conferences remotely as well.

766. Moreover, DOE did accommodate other teachers accepted under the Stricken Standards during the 2021-2022 school year to work remotely as well.

767. For example, DOE accommodated at least one other art teacher by hiring a long-term substitute to work in person while the art teacher zoomed in via Google classroom.

768. That teacher was not easier to accommodate than Pastor Carter was – she just happened to have religious beliefs that were favored by Defendants under the unconstitutional religious accommodation policies they implemented and enforced.

769. Pastor Carter was also able to do a full schedule of digital design classes and drawing classes remotely on Google Classroom. Students were given instruction, able to talk in real time to get feedback, and submit work for grading during each online class period.

770.     Pastor Carter timely appealed his denial.

771.     He was allowed a zoom hearing on or about September 23, 2021.

772.     A representative of the DOE was present, as well as the arbitrator Carol Hoffman.

773.     The DOE attorney argued that Pastor Carter must be denied because he allegedly heard of a different Pentecostal church that was okay with the Covid-19 vaccine.

774.     The same day, Pastor Carter was issued a denial, with no explanation, just an "x" next to the word "denied."

775.     He was involuntarily placed on leave without pay on or about October 4, 2021.

776.     On or about the same day, he served a notice of claims on the Board of Education of his claims.

777.     The DOE failed to adjust his claims.

778.     In or around November 2019, Pastor Carter received notification that the Citywide Panel would review his application anew and reinstate him with back pay if he qualified under lawful standards.

779.     On or about March 17, 2022, the Citywide Panel sent an autogenerated email stating that he was denied based on undue hardship.

780.     He was then terminated for failing to get vaccinated in violation of his sincerely held religious beliefs.

781.     Pastor Carter filed a grievance, asking for a 3020 hearing, which he is entitled to as a tenured teacher. This met the requirements of a second notice of claim served on DOE, which was not adjusted.

782.     No hearing was provided under Education Law 3020 either.

783.     When DOE sent out letters to Pastor Carter and his colleagues stating that they

would reinstate anyone who got vaccinated on or before September 6, 2022, they failed to provide religious accommodation to Pastor Carter even though they knew he needed it and even though they knew they could have without causing any safety issue.

784. Since the repeal of the Mandate, Pastor Carter has tried repeatedly to get rehired by the DOE.

785. DOE will not rehire him, even after they posted an opening at his old school for an art teacher position this year.

786. Pastor Carter is currently working as a substitute teacher on a per diem wage. Pastor Carter continues to apply for other jobs too, but DOE will not hire him as a full time teacher despite his qualifications and massive teacher shortages.

787. Mr. Carter and his family have suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**JESSICA DALY**

788. Plaintiff JESSICA DALY is a resident of Richmond County, New York. Prior to being denied religious accommodation, she was a paraprofessional working in Staten Island, with over ten years of service at DOE.

789. In 2013, Ms. Daly's husband, a New York City firefighter, was diagnosed with Stage IV cancer from working at ground zero during and after the September 11, 2001, attack.

790. While the family waited for the results of the first biopsy, Mrs. Daly went to her room alone, got on her knees and cried and prayed to God like she had never prayed. She placed herself, from that moment on, in God's care, and asked that he help her, and her three children and her husband get through what was to come.

791. Mrs. Daly has sought guidance from God and the Holy Spirit through prayer ever

since in all matters, but especially medical matters.

792. She was guided through prayer that she could not take a Covid-19 vaccine.

793. When the Mandate came out, Mrs. Daly prepared a lengthy and heartfelt letter explaining her faith journey, and why she could not go against the guidance from God.

794. She explained that she was also religiously opposed to the use of aborted fetal cell lines in the development of the vaccines, among other issues.

795. Mrs. Daly was immediately denied through the autogenerated "undue hardship" email sent to all other applicants.

796. No one at DOE reviewed Mrs. Daly's application before it was denied.

797. Mrs. Daly could have been accommodated without undue hardship, in person or remotely as described in the undue hardship section, *supra*.

798. She posed no danger to anyone based on her vaccine status.

799. The year before, though she'd offered to work in person, her principal had already given her one of the remote classes.

800. There were students in 2021-2022 who she could have taught remotely as well.

801. Mrs. Daly timely appealed and was given a zoom hearing.

802. At the hearing, the DOE representative harassed her, mocked her, and made discriminatory statements.

803. The DOE representative was particularly adamant that Mrs. Daly must be denied because the Pope is vaccinated.

804. Mrs. Daly explained that she did not worship the Pope, or any man. She said, "I'm going to do what my heart tells me, what God tells me, because that's who I worship. If you were to read the letter I wrote, you would get that."

805. The DOE then pulled out the letter from Commissioner Chokshi and argued that based on the letter from Mr. Chokshi, Mrs. Daly should be denied accommodation.

806. Mrs. Daly explained that Commissioner Chokshi could not dictate what her faith required of her.

807. Soon after, Mrs. Daly received a denial, with no further explanation than an "x" next to the word "denied."

808. On October 4, 2021, she was involuntarily placed on leave without pay.

809. Mrs. Daly received notification in or around the end of November that her application would be given fresh consideration by a Citywide Panel.

810. On or about March 7, 2022, Mrs. Daly received an autogenerated notification from "salesforce" stating that she was denied because it would be an undue hardship to grant accommodation given the need for in-person learning.

811. Mrs. Daly was terminated for failing to violate her religious beliefs on or about March 17, 2022.

812. She was not given religious accommodation when the DOE sent out fresh offers of reinstatement for all employees willing to get vaccinated by September 6, 2022, even though the DOE knew she needed it and even though they could have safely granted it.

813. Last fall, Mrs. Daly's husband passed away. He was the 347th New York City firefighter to succumb to death by cancer as a result of his service to the City on 9/11.

814. Cast aside from her job at DOE, Mrs. Daly is now trying to support her three children on $16 an hour that she earns at the local Catholic school.

815. Ms. Daly and her family suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**SUZANNE DEEGAN**

816.    Plaintiff SUZANNE DEEGAN is a resident of Monmouth County, New Jersey. Prior to being denied religious accommodation, Mrs. Deegan was a tenured science teacher working in Staten Island, with over 20 years of service at DOE.

817.    Mrs. Deegan was a well-respected teacher and had been promoted to the position of Science Chair.

818.    She was also the sustainability coordinator, coached cheerleading, and took on a number of other leadership roles over and above her job duties.

819.    Mrs. Deegan has long-standing sincere religious objections to vaccinations.

820.    Mrs. Deegan's children are unvaccinated and both have religious accommodations from school vaccine requirements.

821.    Mrs. Deegan's husband received a religious accommodation from his workplace as well.

822.    Mrs. Deegan timely submitted a religious accommodation request, detailing her sincerely held religious beliefs.

823.    She was immediately denied due to alleged "undue hardship" through the same autogenerated email sent to everyone else.

824.    No one reviewed Mrs. Deegan's application before she was denied.

825.    Mrs. Deegan could have easily been accommodated remotely as set forth above in the undue hardship section and in this section.

826.    Much of her job involved scheduling and running state test reviews, which was often remote, and because she was the science chair, she could have taught any classroom components remotely, with any teacher in the building serving as the in-person co-teacher.

827. Mrs. Deegan's colleague was accommodated by the school in this same manner for her medical accommodation request during the 2021-2022 school year even though it was harder to accommodate her remotely than it was to accommodate Mrs. Deegan remotely.

828. Mrs. Deegan timely appealed her denial.

829. While she waited for her appeal, she was ostracized at school after her principal shared her vaccine status without permission and allowed people to make fun of her for it.

830. She had a zoom hearing with an arbitrator and DOE representative.

831. The DOE representative and arbitrator were dismissive and hostile about her beliefs.

832. The DOE lawyer informed Mrs. Deegan that the Catholic Church believes in vaccines, so her beliefs were wrong, though DOE did not question that they were sincere.

833. Mrs. Deegan explained patiently that she is not a Catholic.

834. The DOE representative still argued she must be denied based on the Pope's views.

835. Soon after the hearing, Mrs. Deegan received a denial, with no further explanation than an "x" next to the word "denied."

836. Mrs. Deegan was placed on leave without pay on or about October 4, 2024.

837. In or around November 2021, Mrs. Deegan was told that her application would be given fresh consideration by a newly created "Citywide Panel" and that she would be reinstated with backpay if her religious beliefs qualified under lawful standards.

838. On March 7, 2022, Mrs. Deegan received an autogenerated email from "salesforce" providing a generic denial with a decisional criteria of "undue hardship" without any individualized analysis.

839. Ms. Deegan and her family suffered severe financial, emotional, psychological and

spiritual harm because of Defendants' discriminatory actions and policies.

**STEPHANIE DICAPUA**

840. Plaintiff STEPHANIE DICAPUA is a resident of Richmond County, New York. Prior to being denied religious accommodation, Mrs. DiCapua was a tenured physical education teacher working in Staten Island, with nearly five years of service at DOE.

841. Ms. DiCapua was in excellent standing and was consistently recognized for going above and beyond for her students.

842. She regularly volunteered for extra projects to give her students the best possible experiences. She created a physical education leader club, raised money for the school's first ever Wellness Room, created the school's first ever Wellness Committee, developed a student and staff cookbook, and created various additional school-wide wellness initiatives for students.

843. In addition to her normal duties, Ms. DiCapua also coached softball and organized before and after school fitness and sports programs.

844. Before she was denied accommodation, she was selected to be a physical education reviewer through the Office of School Wellness to develop the first ever physical education scope and sequence for students across the New York City Department of Education.

845. Due to her sincerely held religious beliefs, she was unable to get vaccinated.

846. These beliefs are long-standing and also reflect the official teachings of her particular Christian church.

847. Ms. DiCapua timely submitted her application for religious accommodation along with a letter from her pastor, supporting the exemption and pointing out teachings of the Bible that support and guide their religious objection to vaccines.

848. She was summarily denied, like all applicants, through an autogenerated email

asserting it would be more than a minimal burden to accommodate her.

849.    No one reviewed her application before denying her.

850.    Ms. DiCapua could have been accommodated in person or remotely without undue hardship as set forth in the undue hardship section above.

851.    She could have been allowed to undergo weekly or daily Covid testing to monitor for infection. She would have been more than willing to test every day, but it was never offered to her by her superiors as option.

852.    She could have been allowed to wear a face mask, face shield, or other personal protective equipment during instruction and while interacting with students and staff.

853.    Physical education was already adjusted during the school year before the vaccine mandate was in place, so students could participate in PE while maintaining social distance. Classes could have been scheduled and conducted in larger outdoor spaces to make social distancing even easier.

854.    Classes could have been set in staggered class times to reduce contact with large groups and minimize indoor exposure risks.

855.    All of Ms. DiCapua's classes were taught with a co-PE teacher. It could have been arranged that she social distanced during lessons while the other teacher did more hands-on corrections. She could have also taken on more of the planning and curriculum writing while her co-teacher again did more of the hands-on correction and feedback.

856.    Furthermore, enhanced hygiene protocols could have been practiced, i.e. regular cleaning of shared PE equipment with support from custodial staff or increased air purifiers in the gymnasium.

857.    Lastly, strategic use of technology to minimize physical interaction and to keep a

distance could have also been easily implemented, such as: the use of microphones, megaphone, headsets, or sound system to maintain distance while still engaging with students effectively.

858.    She appealed but was immediately denied, without the right to a hearing, even though she met the criteria set forth in the Stricken Standards, with no explanation, just an "x" next to the word "denied."

859.    She was placed on leave without pay on or about October 4, 2021.

860.    Ms. DiCapua was one of the original plaintiffs in the *Kane* lawsuit.

861.    After the Second Circuit held that she was likely to succeed and ordered fresh consideration by the Citywide Panel, submitted additional materials to the City, including a six-page heartfelt letter explaining her well-documented and long-standing sincere religious objection, a letter from her pastor, and confirmation that she had never taken a vaccine in her adult life.

862.    On or about December 10, 2021, she was denied, with no further explanation than "does not meet criteria."

863.    After she filed an emergency motion, the City prepared an unsigned concocted summary, generated in anticipation of litigation, to further explain the denial as follows:

**APPEAL NO. 00004828, Stephanie DiCapua**
After carefully reviewing the documentation provided by all parties, the
Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny
Appellant DiCapua's reasonable accommodation. The record before the Panel
demonstrated that the employee's sincerely held religious beliefs, which the
panel does not question, are not preventing the employee from vaccination.
Rather, it appears the employee's decision to refuse vaccination is based on her
factual views of the COVID-19 mandate and vaccine. The employee did not
provide, beyond the most general response, any examples of other medications
or specific vaccines she has refused due to her articulated religious belief.
Even assuming the appellant had established a valid basis for a reasonable
accommodation, the panel believes the DOE has satisfied what is necessary
under the law to demonstrate undue hardship. Appellant is a classroom
teacher who, under the present circumstances, cannot physically be in the
classroom while unvaccinated without presenting a risk to the vulnerable and still primarily
unvaccinated student population. DOE has met its burden

under the law that diverting the appellant from classroom duties constitutes an undue hardship.

864. The explanation makes no sense, and it appears that the Citywide Panel never read Ms. DiCapua's submissions in their haste to concoct reasons to deny her relief.

865. For example, the summary states that Ms. DiCapua did not provide any examples of other medications or specific vaccines she declined because of her religious beliefs. But Ms. DiCapua's six-page letter detailed many other medications declined on the basis of her religious beliefs, including, specifically, her original realization as a young adult that it violated her religion to take the flu vaccine.

866. Moreover, Ms. DiCapua's letter was solely focused on her religious beliefs. Never once did she mention any factual opposition to the Mandate or vaccines nor is that the source of her religious objection.

867. Nor is Ms. DiCapua a direct threat due to her vaccine status as set forth in the undue hardship section, *supra* and in this section.

868. She worked in-person all throughout the worst of the pandemic and has natural immunity.

869. Additionally, other similarly situated teachers who were accommodated in the original unconstitutional process, were allowed to be accommodated for their religious beliefs.

870. There is no reason Ms. DiCapua should have been treated any differently.

871. The Citywide Panel never interviewed Ms. DiCapua and had no basis to draw the conclusions it did. Upon information and belief, the Citywide Panel never even read her materials but simply made up a hasty reason to deny Ms. DiCapua.

872. On or about February 11, 2022, Ms. DiCapua was terminated.

873. On or about July 21, 2022, Ms. DiCapua filed a charge of discrimination with the EEOC, detailing the widespread religious discrimination that Defendants were imposing on her, and thousands of other teachers.

874. The charge provides notice of class-wide issues.

875. Ms. DiCapua was at the time it was filed, in a proposed class action lawsuit addressing the widespread class wide Constitutional violations.

876. Ms. DiCapua could not add Title VII claims to her lawsuit until she had a right to sue letter, which was not issued until April 23, 2024, at that time, she had no pending lawsuit in a lower court to add these claims to.

877. Because the district court declined to exercise supplemental jurisdiction over her state law claims in or around August 2022, Ms. DiCapua was allowed to pursue her related state law claims in state court, where she was lead plaintiff in the proposed class action in *DiCapua v. City of New York*.

878. That lawsuit was filed and decided before a right to sue letter was issued as well, so could not have included her Title VII claims.

879. On or about September 6, 2023, the New York State Supreme Court, Richmond County, issued a decision and order holding that the Citywide Panel's denials were arbitrary and capricious, and directing that DOE reinstate her and her nine similarly situated colleagues with back pay and benefits and no break in service.

880. Additional relief is available under Title VII, including compensatory and punitive damages, among other relief.

881. Moreover, Ms. DiCapua has not yet been reinstated.

882. Even though the Mandate had been dropped over a year and a half before, and even though the DOE was ordered to reinstate her by the New York State Supreme Court, Defendants refuse to honor this order, claiming that they can legally "stay" reinstatement pending appeal since they are a government employer.

883. Ms. DiCapua's state law claims are now on appeal to the Second Department Appellate Division, New York State Supreme Court.

884. To ensure that her Title VII claims, which were asserted to protect her right to sue along with her similarly situated colleagues, Ms. DiCapua now joins this lawsuit, for the sole purpose of asserting Title VII claims along with the Class.

885. She files on behalf of herself and the Class, including a subclass of original *Kane* plaintiffs along with all other DOE employees denied relief from the Mandate.

886. Ms. DiCapua does not assert any other claims in this lawsuit other than the three Title VII claims.

887. Like the rest of her colleagues, Ms. DiCapua and her family suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**LEAH ERLENBACH**

888. Plaintiff LEAH ERLENBACH is a resident of Kings County, New York. Prior to being denied religious accommodation, Ms. Erlenbach was a paraprofessional working in Brooklyn with 5 years of service at DOE.

889. Ms. Erlenbach has sincere religious objections to vaccination.

890. A devout Catholic, Ms. Erlenbach believes that participation in abortion is a mortal sin.

891.    She has lived her life by this religious tenet and made many sacrifices to stand by her beliefs.

892.    Ms. Erlenbach was appalled to learn, in early 2020, that the vaccine industry uses aborted fetal cell lines to develop and test vaccines.

893.    She never took another vaccine again and did not give any more vaccines to her children after that point.

894.    Based on their shared religious beliefs, Ms. Erlenbach's twenty-year old daughter had to defer college due to the vaccine mandate in place.

895.    When the Covid-19 vaccine Mandate was announced, Ms. Erlenbach timely submitted a religious accommodation request in September 2021.

896.    She was immediately denied through the same autogenerated email sent to all applicants, claiming it would be more than a minimal burden to accommodate her.

897.    No individual at DOE reviewed Ms. Erlenbach's application before she was denied.

898.    Ms. Erlenbach could have been accommodated without undue hardship.

899.    She had been granted an accommodation to work remotely the year before.

900.    She timely appealed the DOE's 2021 denial of the same accommodation request.

901.    She was not given a hearing, just a denial, with no explanation other than an "x" next to the word "denied."

902.    She was involuntarily placed on leave without pay.

903.    In or around November 2021, Ms. Erlenbach was informed that her application would be given fresh consideration by the City and that she would be reinstated with back pay if her religious beliefs qualified under lawful standards.

904.    On or about February 2, 2022, Ms. Erlenbach received an autogenerated email from

the Citywide Panel, denying her application without any explanation other than – "The decision classification for your appeal is as follow: Employer undue hardship."

905. No one individually reviewed whether she could have been accommodated in good faith before sending that denial.

906. She was fired later that month.

907. She was not offered accommodation when the reinstatement offer was made in August 2022.

908. Ms. Erlenbach is the victim of serious domestic violence, and her youngest child has special needs.

909. Ms. Erlenbach suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**MEGAN FICCHI**

910. Plaintiff MEGAN FICCHI is a resident of Richmond County, New York. Prior to being denied religious accommodation, Mrs. Ficchi was an Assistant Principal working in Richmond County with over ten years of service at DOE.

911. Mrs. Ficchi has sincere religious objections to the Covid-19 vaccines.

912. She is a devout Catholic, and, like many Catholics, could not take the vaccine once she learned of the connection to aborted fetal cell lines.

913. Mrs. Ficchi also prayed for guidance from God and the Holy Spirit, as Pope Francis counseled all Catholics to do on this issue, and received clear guidance that she could not take the vaccine.

914. Mrs. Ficchi timely submitted an application for religious accommodation in September 2021.

915.    She was immediately sent the same autogenerated "undue hardship" email as all of her colleagues.

916.    No one from DOE individually reviewed her application before denying her relief.

917.    No one from DOE considered whether it would have been an undue hardship to accommodate Mrs. Ficchi before denying her relief.

918.    It would not have been an undue hardship to accommodate Mrs. Ficchi, as set forth above, and as the DOE's accommodation of Mrs. Ruiz-Toro, a *Kane* plaintiff with the same job, illustrates

919.    Mrs. Ficchi supervised six different schools with multiple locations. She did not typically visit all six locations Often, the sites would be without her and a site coordinator would handle duties when she was not present on site.

920.    She could have done her job remotely and had been accommodated to do this remotely in the past.

921.    The year before, Mrs. Ficchi was pregnant and was allowed to do her job remotely for most of the school year while others worked in person.

922.    Mrs. Ficchi could have been safely accommodated in person as well, as set forth in the undue hardship section, *supra.*

923.    Mrs. Ficchi timely appealed.

924.    Arbitrator Barry Peek declined to allow her a zoom hearing, and simply denied her, with no explanation, just an "x" next to the word denied.

925.    On or about October 4, 2021, Mrs. Ficchi was involuntarily placed on leave without pay.

926.    In November 2021, Mrs. Ficchi was informed her application would be given fresh

consideration by the City and she would be reinstated with backpay if her religious beliefs qualified under lawful standards.

927.    At no time did anyone from the Citywide Panel engage in cooperative dialogue with Ms. Ficchi about possible accommodations or difficulties therewith.

928.    On or about February 15, 2022, the Citywide Panel denied religious accommodation on the sole basis of unexplained "undue hardship."

929.    On or about August 22, 2022, Mrs. Ficchi was offered reinstatement if she got vaccinated, which DOE knew was against her religious beliefs.

930.    Defendants refused to accommodate her.

931.    To avoid termination, Mrs. Ficchi applied for and was granted childcare leave, but this meant that she had to go many more months without pay.

932.    She would not have applied for childcare leave if her religious beliefs had been accommodated.

933.    Mrs. Ficchi suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**KELLY FINLAW**

934.    Plaintiff KELLY FINLAW is a resident of New York County. Prior to being denied religious accommodation, Ms. Finlaw was a tenured art teacher working in Manhattan with over fourteen years of service at DOE.

935.    Some years before, when testifying to Congress, Ms. Finlaw said that she felt she won the lottery in life.

936.    She felt she was born to be a teacher and born to teach art in Washington Heights.

937.    She loved her job and her students so much that she bought an apartment four

blocks from the school.

938. She went above and beyond for her students and the school and was well-respected and beloved.

939. Ms. Finlaw was highly respected and beloved by her school and the students. She was nominated for the Big Apple Award on two different occasions, as well as the Lifechanger of the Year Award.

940. Ms. Finlaw has long-standing sincerely held religious objections to vaccines.

941. On or about September 16, 2021, Ms. Finlaw uploaded her application for religious accommodation to the SOLAS portal.

942. She included an eight-page, single-spaced letter, explaining her deeply personal and detailed faith journey and innermost sacred beliefs, and why vaccination conflicts with them.

943. Ms. Finlaw explained her deep commitment to her Christian faith, having attended religious schooling from elementary school until high school, and then choosing to attend Christian colleges for both her undergraduate degree and graduate degree.

944. Due to her religious beliefs, Ms. Finlaw has not had a single vaccine since she was seventeen years old.

945. Since 2012, she has spent the summer traveling the world and teaching art to communities and children in need – and yet, not *once* has she taken a single vaccine during these travels due to her religious beliefs.

946. Ms. Finlaw follows a special diet, in accordance with guidance from scripture and prayer, and she does not take medication, even for headaches.

947. Among many other reasons detailed in her letter, Ms. Finlaw explained that she cannot take any product that is developed using fetal cell lines.

948. She also included a detailed and very personal letter from her pastor, who has watched Ms. Finlaw's journey over the years, and could attest to her religious sincerity and long-standing religious objection to vaccination.

949. Like all other applicants, Ms. Finlaw was immediately denied through an autogenerated email claiming it would be more than a minimal burden to accommodate her.

950. No one from the DOE individually reviewed Ms. Finlaw's application before denying her relief.

951. Ms. Finlaw could have been accommodated without undue hardship remotely or in person as set forth in the undue hardship section, *supra*.

952. She timely appealed the denial of accommodation.

953. She was given a zoom hearing.

954. During the hearing, the DOE representative argued that beliefs derived from guidance from God and scripture, and concerns about abortion are inherently "philosophical" not religious.

955. Ms. Finlaw disagreed, pointing out that these are her sincerely held *religious* beliefs.

956. Shortly thereafter, she received a denial, without any explanation, just an "x" next to the word "denied."

957. In or around November 2021, Ms. Finlaw received notification that her application would be given fresh review by the Citywide Panel, and that she would be reinstated with back pay if her religious beliefs qualified for accommodation under lawful standards.

958. She submitted another heartfelt supplemental letter, explaining how distressing it was to be cut off from teaching her students, and how horrible it felt to pour her heart out about

her most sacred and deeply held religious beliefs, only to have DOE mock them, and cavalierly attempt to dismiss them as "philosophical" instead of religious despite her pastor's long letter in support.

959.    No one from the Citywide Panel met with her or engaged with her questions.

960.    Instead, on March 17, 2022, Ms. Finlaw was denied through an autogenerated email stating that the decision classification was undue hardship, without further explanation.

961.    Ms. Finlaw timely served a notice of claim in early 2022 on both the City and DOE, and each failed to adjust her claims.

962.    On or about August 22, 2022, Ms. Finlaw was offered reinstatement if she got vaccinated, which DOE knew was against her religious beliefs.

963.    They refused to accommodate her.

964.    Ms. Finlaw suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**MICHELE GARRETT**

965.    Plaintiff MICHELE GARRETT is a resident of Suffolk County, New York. Prior to being denied religious accommodation, she was a tenured math teacher working in Queens with nearly twenty years of service at DOE.

966.    She started at DOE as a student teacher in 2003. She was hired in her 3rd year of college, after a highly respected principal in the district observed her teaching a middle school math class, and was so impressed, she called Ms. Garrett's advisor and worked with her to allow her to graduate early and begin teaching immediately.

967.    Over the years, Ms. Garrett was consistently rated MOTP highly effective, and was highly recommended and sought after in the district.

968.     Ms. Garrett has sincere religious objections to vaccines.

969.     She applied for religious accommodation before the deadline set forth in the Stricken Standards.

970.     A devout Christian, Ms. Garrett believes the body is a temple, and she prays over medical decisions.

971.     She was given clear guidance not to take the vaccines.

972.     She also objects to the use of aborted fetal cell lines in development of the vaccines, among other concerns.

973.     To comply with the Stricken Standards, Ms. Garrett also uploaded clergy letters from a church that shares her religious beliefs.

974.     Like all other applicants, she was immediately denied through an autogenerated email claiming it would be more than a minimal burden to accommodate her.

975.     No one from DOE individually reviewed Ms. Garrett's application before denying her relief.

976.     Ms. Garrett not only could have been accommodated to work remotely – in the fall of 2021, she was already working remotely at the time she was denied based on alleged "undue hardship."

977.     Ms. Garrett had a co-teacher, and it would not have been a burden to allow her to continue to work remotely.

978.     She also could have been accommodated in person, as set forth above.

979.     Ms. Garrett timely appealed the denial of accommodation.

980.     She was not given a zoom hearing, just a paper denying her accommodation, with no explanation, just an "x" next to the word "denied."

981.     In or around November 2021, Ms. Garrett received notification that her application would be given fresh review by the Citywide Panel, and that she would be reinstated with back pay if her religious beliefs qualified for accommodation under lawful standards.

982.     She submitted another heartfelt supplemental letter, explaining how distressing it was to be cut off from teaching her students, and how long-standing and sincere her religious beliefs in homeopathy and other remedies she believed that God preferred have been.

983.     On March 17, 2022, the Citywide Panel denied her relief.

984.     She was terminated for failing to violate her religious beliefs.

985.     Ms. Garrett timely served notice of claim in early 2022 on both the City and DOE, and each failed to adjust her claims.

986.     On or about August 22, 2022, Ms. Garrett was offered reinstatement if she got vaccinated, which DOE knew was against her religious beliefs.

987.     Defendants refused to offer her religious accommodation, even though they knew they could have without undue hardship.

988.     Ms. Garrett suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**BONNIE SKALA KILADITIS**

989.     Plaintiff BONNIE SKALA KILADITIS is a resident of Queens County, New York. Prior to being denied religious accommodation, she was a tenured elementary school teacher working in Queens with over twenty-four years of service at DOE.

990.     She was a beloved and well-respected teacher.

991.     Ms. Kiladitis has sincerely held religious objections to vaccination based on her Christian faith.

992. She timely submitted a heartfelt six-page letter detailing some of her objections.

993. DOE granted religious exemptions from school vaccine requirements to both of her children, based on the same beliefs she described in her letter.

994. Beginning in the fall of 2019, when the religious exemption was repealed in New York, Ms. Kiladitis homeschooled her two children rather than violate her sincerely held religious beliefs, which has been very difficult, especially since her eldest son has serious special needs.

995. Though DOE accepted her children's religious accommodation requests, when Ms. Kiladitis applied for religious accommodation at DOE for herself, she was immediately denied through the autogenerated email sent to all applications, alleging undue hardship.

996. No one from DOE individually reviewed her application to see if she could be accommodated.

997. Ms. Kiladitis could have been accommodated remotely as set forth in the undue hardship section, *supra*.

998. As she worked with a classroom paraprofessional, she could have taught via Zoom lessons to those in the classroom. She could have Zoomed with students who were homebound. She could have worked remotely with parents.

999. Also as set forth above, she also could have taught in person without posing a direct threat, as she did from 2020-2021 without issue.

1000. Ms. Kiladitis timely appealed. She was not given a zoom hearing, just denied with no further explanation than an "x" next to the word "denied."

1001. She was involuntarily placed on leave without pay on October 4, 2021.

1002. In November, Ms. Kiladitis was informed she would get a Citywide Panel review.

1003. She submitted additional materials, further detailing her sincerely held religious

beliefs.

1004.   No one engaged in cooperative dialogue with her regarding potential accommodations.

1005.   On or about March 7, 2022, the Citywide Panel sent an autogenerated email denying Ms. Kiladitis based on alleged and unspecified undue hardship.

1006.   On March 21, 2022, DOE mailed Ms. Kiladitis a letter telling her she was terminated for failing to violate her religious beliefs.

1007.   She timely submitted notice of claims to the DOE, which were not adjusted.

1008.   After she was terminated, she applied for unemployment insurance compensation.

1009.   But DOE retaliated against her and claimed she "quit" when she did not. DOE also claimed she had committed "misconduct" for failing to get vaccinated.

1010.   On or about August 22, 2022, Ms. Kiladitis was offered reinstatement if she got vaccinated, which DOE knew was against her religious beliefs.

1011.   After she was terminated, Ms. Kiladitis was elected PTA President of her son's special needs public school in Queens. She was unanimously elected to serve as PTA President, a volunteer role, at P 177 Q once the mandates were lifted. This election was in the spring of 2023 for the 2023-2024 school year, and she was later reelected unanimously for the 2024-2025 school year. Soon she will run again for 2025-2026.

1012.   During the Mandate, she was allowed to and did participate in and organize many volunteer activities in DOE public school buildings, yet, Defendants claimed it was an undue hardship for her to continue to do her job for pay inside the buildings.

1013.   Ms. Kiladitis suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**ARIJANA LUKACEVIC**

1014.  Plaintiff ARIJANA LUKACEVIC is a resident of Queens County, New York. Prior to being denied religious accommodation, she was a paraprofessional working in Queens with over two years of service at DOE.

1015.  Ms. Lukacevic has sincere religious objections to taking a Covid-19 vaccine.

1016.  She timely filed an application for accommodation, and on or about September 18, 2021, she received a confirmation email thanking her for the submission. .

1017.  In her letter, Ms. Lukacevic explained that she cannot take a Covid-19 vaccine without violating her Muslim faith due to the use of fetal cell lines in the production and development of the vaccines.

1018.  Because of her faith, she further explained she will not eat pork, fat that comes from pork, meat that is not halal or alcohol, and she cannot do acupuncture, blood transfusions or several other healthcare interventions that are considered Haram in her faith, as she understands it.

1019.  DOE immediately sent the same autogenerated email sent to everyone else, stating it would be more than a minimal burden to accommodate Ms. Lukacevic.

1020.  No one from the DOE reviewed her application before denying her relief.

1021.  Ms. Lukacevic could have easily been accommodated remotely and had been in the past and as set forth more fully in the undue hardship section, *supra* as well as other paragraphs in this section.

1022.  Ms. Lukacevic's main job duties as a paraprofessional were focused and individualized, not reliant on her physical presence in the classroom.

1023.  She worked one on one with a student, who had a main classroom teacher that was in person, and the student could have easily done her breakout one-on-one work with Ms.

Lukacevic through Google Classrooms or zoom.

1024. Because her role as a paraprofessional centered entirely on direct, individualized student support, it was particularly well-suited to remote work. The successful transition to remote support during the pandemic clearly demonstrated that her responsibilities could be completed fully and effectively from home.

1025. During the pandemic, she performed all of her duties remotely via Zoom during certain periods. She regularly used breakout rooms to meet with students one-on-one, provided academic support, assisted them with tasks, and helped keep them engaged, all of which mirrored the work she did in person, with no reduction in effectiveness or quality.

1026. Given that the core functions of her job were already proven to be compatible with a remote setting, a remote work accommodation would have been both reasonable and minimally disruptive to school operations. Allowing her to continue in her role remotely would have upheld her sincerely held religious beliefs while ensuring uninterrupted support for students.

1027. Other employees in similar roles were able to continue working remotely during the 2021-2022 school year, and the infrastructure for doing so (Zoom, breakout rooms, remote communication) was already in place and functioning effectively.

1028. Ms. Lukacevic could have also been safely accommodated in person as she did not pose a direct threat to anyone based on her religious practices as set forth more fully in the undue hardship section, *supra.*

1029. While working in person, like her co-plaintiffs, she complied with school safety protocols and was tested weekly for COVID-19.

1030. In fact, Ms. Lukacevic tested positive for Covid-19 on September 24, 2021, about ten days prior to the October 4, 2021, deadline for receiving the vaccine. .

1031.  DOE was aware of this, since Ms. Lukacevic was testing weekly at the time and informed them, and stayed home until she tested negative again.

1032.  Other employees who had had Covid-19 within ninety days of the deadline to be vaccinated were accommodated, at least temporarily, even if they did not have religious objections to the vaccine, but the DOE refused to extend the same accommodation to Ms. Lukacevic.

1033.  She timely requested an appeal and submitted a supplemental statement, providing even more detail about why her Muslim faith does not allow her to take a Covid-19 vaccine, and explaining that she'd written the same letter for her two children, whose religious accommodations had been accepted by their colleges.

1034.  Martin Scheinman reviewed her appeal, and denied her without the opportunity for a hearing, with no further explanation than an "x" next to the word denied.

1035.  Ms. Lukacevic was involuntarily placed on leave without pay on or about October 2, 2021.

1036.  On or about March 28, 2022, Ms. Lukacevic was informed through an autogenerated email that the Citywide Panel was denying her appeal.

1037.  No one individually reviewed whether Ms. Lukacevic could have been accommodated before issuing this determination.

1038.  Ms. Lukacevic could have been accommodated without undue hardship.

1039.  On both August 1 and August 24, 2022, Ms. Lukacevic received reminders stating that unless she provided proof of vaccination before September 5, 2022 and returned to work on September 6, 2022, she would be deemed to have voluntarily resigned, even though DOE knew that she required religious accommodation.  .

1040.  Ms. Lukacevic was terminated in the fall of 2022 for failing to get vaccinated in

violation of her sincerely held religious beliefs.

1041.    DOE continues to retaliate against Ms. Lukacevic to this day.

1042.    She tried to get a job at DOE but was rudely told she could not be reinstated.

1043.    She finally got a job at a private preschool, but upon information and belief, DOE's problem code is triggering problems with her security clearance.

1044.    Ms. Lukacevic has no criminal or disciplinary history which should trigger any kind of security clearance problem.

1045.    Yet, the DOE's problem code continues to result in her being denied a security clearance by the New York City Department of Health and Mental Hygiene, which denied her security clearance as recently as July 8, 2024. This continues to impact Ms. Lukacevic's employment prospects.

1046.    Ms. Lukacevic suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**ANAMARIE MEDINA**

1047.    Plaintiff ANAMARIE MEDINA is a resident of Westchester County. Prior to being denied religious accommodation, Ms. Medina was a tenured teacher working in the Bronx with 27 years of service at DOE.

1048.    Ms. Medina was certified as a Special Education and ESL teacher.

1049.    She was beloved by her students and well respected at her job.

1050.    Ms. Medina has sincerely held religious beliefs in opposition to vaccination.

1051.    Ms. Medina is a devout Christian.

1052.    She is a member of the Ministry of Foreign Affairs for Superior Church, and her religious leaders share her religious opposition to vaccination.

1053. Ms. Medina also received clear and strong guidance from the Holy Spirit that she could not violate her faith and take the vaccine without violating God's will.

1054. Ms. Medina timely applied for religious accommodation and was immediately denied through the same autogenerated email sent to all other applicants, asserting it would be an undue hardship to accommodate her based on the "more than a minimal burden" standard.

1055. No one from the DOE individually reviewed Ms. Medina's application to see if she could be accommodated before denying her.

1056. Ms. Medina could have been accommodated in person or remotely without undue hardship as set forth in more detail in the undue hardship section, *supra* and in this section.

1057. The DOE had granted her a medical accommodation to work remotely the previous year due to her severe and multiple autoimmune conditions.

1058. She could have continued to work with her students remotely during the 2021-2022 school year as well or taught other students who were already remote and needed instruction, among other accommodations.

1059. Ms. Medina timely appealed.

1060. She was not even allowed a zoom hearing, even though her religious leaders agreed with her religious opposition to vaccination.

1061. Instead, Ms. Medina was denied, with no further explanation than an "x" next to the word "denied."

1062. Ms. Medina received notification that her appeal would be given fresh consideration by the Citywide Panel.

1063. The Citywide Panel did not reach out to Ms. Medina to discuss possible accommodations or difficulties therewith.

1064.  Ms. Medina does not recall getting a response from the Citywide Panel, but she was terminated in the Spring of 2022, which effectively means she was denied. This makes her similarly situated to the NYFRL plaintiff Natasha Solon, whose free exercise claims were reinstated since the Citywide Panel never issued her a denial.

1065.  On or about August 22, 2022, Ms. Medina was offered reinstatement if she got vaccinated, which DOE knew was against her religious beliefs.

1066.  Defendants failed to offer her an accommodation.

1067.  Ms. Medina has lost everything as a result of her unjust denial of accommodation.

1068.  Nonetheless, she continues to follow the will of God and try to follow his will.

1069.  After the trauma of having her religious rights violated so egregiously, Ms. Medina decided to turn it into something positive and pursue her dream of becoming an ordained minister.

1070.  This Spring, she graduated from Seminary with a master's degree in interreligious theology.

1071.  Ms. Medina has just returned from a three-week course at the Vatican on "Interreligious Dialogue of the Ecumenical Movement with the Friars of Atonement", having been awarded a competitive scholarship for religious leaders and outstanding recent seminary graduates to be able to attend and to meet Pope Francis.

1072.  She prays that God will guide this Court to give justice to her and all of the other teachers and educators who were unjustly treated for attempting to follow their faith, in accordance with their legal rights.

1073.  Ms. Medina suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**AYELLET MOAS**

1074. Plaintiff AYELLET MOAS is a resident of Broward County, Florida. Prior to being denied religious accommodation, Ms. Moas was a tenured special education teacher working in Manhattan with over thirteen years of service at DOE.

1075. Ms. Moas was well-respected, routinely receiving "Highly Effective" ratings and was beloved by her students and their parents.

1076. She has sincerely held religious beliefs that conflict with the vaccine, which are a result of her Jewish faith.

1077. Ms. Moas timely applied for religious accommodation, submitting a personal and heartfelt letter along with a letter from her Rabbi, who supports her beliefs.

1078. She was immediately denied through the same autogenerated email sent to all applicants, which asserted undue hardship under the "more than a minimal burden" standard.

1079. No one at the DOE individually reviewed Ms. Moas' application before denying her accommodation.

1080. Ms. Moas could have been accommodated in person or remotely without undue hardship as set forth more fully below and in the undue hardship section, *supra*.

1081. During the 2020-2021 school year, when remote learning was implemented due to the COVID-19 pandemic, Ms. Moas successfully adapted her special education teaching to the online environment. Her students actively engaged with the Seesaw program, a remote learning platform designed to foster interactive and personalized learning.

1082. Ms. Moas was responsible for teaching a small group of students with autism and intellectual disabilities. She successfully adapted her teaching methods to ensure that her students continued to make progress both academically and developmentally.

1083. Ms. Moas's special education students made significant academic and

developmental gains, demonstrating her ability to effectively teach in a virtual setting.

1084. Both Ms. Moas and her classroom paraprofessional were assigned to a blended model of instruction, which included a combination of in-person and remote learning for both students and teachers. This flexible approach enabled them to effectively engage with all students, whether they were learning remotely or in the classroom.

1085. Ms. Moas and her paraprofessional were able to integrate all students into the classroom experience, ensuring no student was left behind, regardless of whether they were attending in-person or remotely. The successful execution of this blended model demonstrated that it could have been continued throughout the following year without disruption.

1086. The same group of students was assigned to Ms. Moas for the 2021-2022 school year, emphasizing the continuity and stability that had been established in the previous year. This continuity allowed her to build upon the strong relationships and educational foundation she had already established, fostering an environment of trust and consistent learning.

1087. Ms. Moas's typical day began with setting up virtual learning materials and ensuring that all students had access to the Seesaw platform, where she could upload interactive lessons, assignments, and other resources. She would then host live Zoom sessions to engage with students in real-time. The lessons were tailored to each student's needs, aligned with their Individualized Education Program (IEP).

1088. Her daily tasks included: morning check-ins via Zoom to connect and assess students before diving into lessons; interactive lessons through Seesaw, which allowed her to upload videos, pictures, and recorded explanations to engage the students; managing small group breakout sessions in Zoom, which was particularly effective given the small size of the class; working collaboratively with the paraprofessional to provide individualized support for the

students; and maintaining continual assessments of the students' progress, while keeping communication lines open with parents and other teachers.

1089. The combination of Zoom and Seesaw allowed for a seamless and engaging learning experience. The small class size made it easier for Ms. Moas to effectively manage the sessions and ensure that no student was left behind. The breakout room feature on Zoom allowed for individualized instruction and peer interactions, further enhancing the learning experience. Ms. Moas was able to provide direct feedback and support in real-time, which was especially important for students with special needs.

1090. Given the success of remote learning and the fact that Ms. Moas was able to deliver individualized, effective instruction, there was no reason why she could not have been accommodated remotely for the remainder of the school year. The technology and infrastructure were already in place, and there was no disruption to learning during the remote period. Her ability to teach remotely demonstrated that it was possible for her to continue providing high-quality education without needing to be physically present in the classroom.

1091. Throughout this period of remote instruction, Ms. Moas was consistently rated as 'Highly Effective' by the Department of Education, further attesting to her dedication, expertise, and ability to deliver quality education remotely.

1092. Additionally, during the periods from September to November 2020 and March to June 2021, when Ms. Moas continued to work in person, she adhered to strict safety protocols, including masking, social distancing, and regular COVID-19 testing. She was able to continue delivering instruction safely while maintaining the health and safety of her students and colleagues. Given this, it is clear that Ms. Moas did not pose a direct threat to anyone's health and safety, and she could have been accommodated in-person without risk.

1093.   Given her success in the remote teaching environment, it is clear that Ms. Moas could have been accommodated without causing any undue hardship. The school system had the technology and infrastructure in place, and there was no legitimate reason to believe that accommodating her remotely would have created significant disruption or hardship.

1094.   As discussed, *supra,* other classroom teachers found to have qualifying beliefs under the Stricken Standards were accommodated by placing co-teachers in the classroom and allowing them to zoom in, among other methods.

1095.   DOE could have allowed Ms. Moas to work in this way during the temporary mandate.

1096.   Ms. Moas could have also been accommodated in person without causing a direct threat.

1097.   The DOE's claim that Ms. Moas posed a direct threat to the health and safety of others is unsupported, as detailed in this complaint and also by her individual history. During the school year, from September 2020 to November 2020 and March 2021 to June 2021, Ms. Moas continued to work regularly in-person, providing quality education to both remote and in-person students. Throughout this period, safety measures such as masking, social distancing, and COVID-19 testing were consistently practiced, ensuring a safe environment for all.

1098.   Given her successful integration of these safety protocols and her continued effective teaching in person during far worse periods of the mandate, it is clear that Ms. Moas did not pose any direct threat to her students or colleagues, and she could have been accommodated in-person without risk.

1099.   If anything, the undue hardship lay in terminating Ms. Moas. Losing her due to the Covid-19 mandate forced the school to dismantle the program she taught, disrupting an entire class

of special education students with autism and intellectual disabilities. After two years together, these students were suddenly separated, causing them confusion, emotional distress, and setbacks in their progress. Families struggled to find comparable support, and the loss of stability affected these vulnerable students.

1100. Ms. Moas timely appealed and was allowed a zoom hearing.

1101. She submitted additional materials, including a letter explaining that the DOE's original denial, based on undue hardship, violated the terms of the arbitration award, which promised that "An employee who is granted a medical or religious exception under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll…"

1102. She noted that she fit within the criteria, and asked if she could bring her Rabbi, who could attest that her beliefs were sincerely held, and that they are shared by her religious leaders.

1103. She was told she was not allowed to bring any witness to testify, even her Rabbi.

1104. In the zoom hearing, the DOE representative and the arbitrator asked irrelevant questions and the DOE representative argued that she should be denied because some unspecified rabbis in Israels were vaccinated (even though Ms. Moas' own Rabbi supported her belief and was not allowed to come testify to that fact).

1105. Ms. Moas was involuntarily placed on leave without pay on October 4, 2021.

1106. In late November 2021, Ms. Moas was informed that she would get a fresh review by the Citywide Panel.

1107. On March 28, 2022, the Citywide Panel denied her through an autogenerated email stating the reason as: "[t]he employee has failed to establish a sincerely held religious belief that

precludes vaccination. DOE has demonstrated that it would be an undue hardship to grant accommodation to the employee given the need for a safe environment for in-person learning."

1108. On or about August 22, 2022, Ms. Moas was offered reinstatement if she got vaccinated, which DOE knew was against her religious beliefs.

1109. Ms. Moas searched diligently for work. Despite her excellent qualifications and a serious staffing shortage, she was repeatedly turned down.

1110. Ms. Moas suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

1111. Among other harms, she had to sell her house to pay down the crushing credit card debt incurred so that she could live while out of work.

**MICHAEL MONZILLO**

1112. Plaintiff MICHAEL MONZILLO is a resident of Nassau County, New York. Prior to being denied religious accommodation, he was a biology teacher, working in Queens with over eight years of service at DOE.

1113. Mr. Monzillo has sincere religious beliefs and believes that the Covid-19 vaccines violate his Catholic faith.

1114. He timely submitted an application for accommodation, detailing his sincerely held religious beliefs, including his opinion that participation in abortion is tantamount to spiritual death, and attached the Congregation for the Doctrine of Faith, which explains the Church's religious objections to the use of products like Covid-19 vaccines, which were developed using aborted fetal cell lines, three court cases involving aborted fetal tissue, and a clergy letter of support.

1115. He was immediately denied through the same autogenerated email sent to all

applicants, claiming undue hardship on the "more than a minimal burden" standard.

1116.   No one at the DOE individually reviewed Mr. Monzillo's application before denying him accommodation.

1117.   Mr. Monzillo could have been accommodated remotely or in person without undue hardship as set forth in more detail in the undue hardship section, *supra.*

1118.   Mr. Monzillo timely appealed and was denied, without the opportunity to have a zoom hearing, with no further explanation than an "x" next to the word "denied."

1119.   On or about October 4, 2021, Mr. Monzillo was involuntarily placed on leave without pay.

1120.   In or around December 2021, Mr. Monzillo received notification that his application would be reviewed by the Citywide Panel.

1121.   No one from the City ever engaged in cooperative dialogue with Mr. Monzillo to discuss the feasibility of accommodation possibilities.

1122.   Mr. Monzillo notified the DOE of his claims on February 22, 2022.

1123.   No one from the DOE adjusted his claims.

1124.   He was never provided with any denial or reason from the Citywide Panel directly.

1125.   Instead, on March 31, 2022, he received an autogenerated email from the Division of Human Resources stating: "We have been advised that the City of New York Reasonable Accommodation Appeals Panel  has denied your appeal and you should have received email notice directly. If you cannot find this in your employee inbox, please note that it may appear as being sent from noreply@salesforce.com.

1126.   Mr. Monzillo searched and did not find any such email and was never provided with a reason for his denial from the Citywide Panel.

1127. In or around August 2022, Mr. Monzillo received notification that he could be reinstated to his former position, but only if he got vaccinated.

1128. Mr. Monzillo was desperate at the time. He was about to lose his house and his family of six, who relies on him, was struggling to eat.

1129. On or about August 22, 2022, Mr. Monzillo was offered reinstatement if he got vaccinated, which DOE knew was against his religious beliefs.

1130. Left with no real choice as he watched his family go hungry, he got vaccinated in violation of his sincerely held religious beliefs and returned to work on or about September 5, 2022.

1131. Mr. Monzillo was deeply harmed by being forced to violate his faith.

1132. As an extra slap in the face, the DOE never even asked to see proof of a second dose (though the Mandate required it), revealing that the "public health" justification was pretextual.

1133. Mr. Monzillo suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**DONNY NAPOLITANO**

1134. Plaintiff DONNY NAPOLITANO is a resident of Saint John's County in Florida. Prior to being denied religious accommodation, he was a tenured secondary math teacher working in Brooklyn with over eight years of service at DOE.

1135. Mr. Napolitano was a highly regarded and commended teacher.

1136. Mr. Napolitano has sincerely held religious beliefs opposing vaccination.

1137. His oldest child was granted religious accommodation prior to New York State's repeal of the religious exemption for children in 2019.

1138.   His younger children were not old enough to attend school yet when New York offered a religious exemption, but in accordance with his religious beliefs, they have never been vaccinated and were homeschooled after the repeal until the family moved to Florida, where the children all receive religious accommodation from vaccine mandates.

1139.   Mr. Napolitano timely submitted a lengthy, well-articulated letter explaining his faith journey as a Christian, and some of his religious objections to vaccination, including but not limited to guidance from prayer, the need to put faith in God rather than man, and the sanctity of the blood, and the job of each Christian to avoid contaminating it with any impure substance, including products tainted by a link to abortion. He also included a clergy letter supporting his request.

1140.   Mr. Napolitano was immediately denied through the same autogenerated email sent to all applicants, claiming undue hardship on the "more than a minimal burden" standard.

1141.   No one at the DOE individually reviewed Mr. Napolitano's application before denying him accommodation.

1142.   Mr. Napolitano could have been accommodated remotely or in person as without undue hardship as set forth more fully in the undue hardship section, *supra*.

1143.   He had been already been granted an accommodation to work remotely for the entire year and a half before.

1144.   Mr. Napolitano timely appealed, explaining that the undue hardship denial violated the law, and that he could have easily been accommodated remotely or in person, with the accommodation of testing weekly, which was allowed in neighboring school districts and all other City departments at the time.

1145.   He had a zoom hearing.

1146.   At the zoom hearing, the DOE representative acknowledged that Mr. Napolitano had sincere religious beliefs, but argued that his beliefs were wrong, and thus should not be granted accommodation.

1147.   Mr. Napolitano was involuntarily placed on leave without pay on or about October 4, 2021.

1148.   In or around December 2021, Mr. Napolitano received notification that the Citywide Panel would review his application.

1149.   No one from the City reached out to engage in cooperative dialogue about possible accommodations or difficulties posed by them.

1150.   On or about March 17, 2021, Mr. Napolitano was denied by the Citywide Panel through an autogenerated email and terminated.

1151.   Mr. Napolitano is the sole provider for his family of five.

1152.   His wife suffers health problems.

1153.   His children have special needs.

1154.   On or about August 22, 2022, Mr. Napolitano was offered reinstatement if he got vaccinated, which DOE knew was against his religious beliefs.

1155.   After the Mandate was repealed, Mr. Napolitano attempted to get rehired, but was shut out of the system and was unable to apply.

1156.   He and his family suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**MAWULI OLIVIERRE**

1157.   Plaintiff MAWULI OLIVIERRE is a resident of Kings County, New York. Prior to being denied religious accommodation, he was a tenured social studies teacher working in

Brooklyn with over 21 years of service at DOE.

1158.   Mr. Olivierre was a well-respected and beloved teacher in good standing.

1159.   He has a Masters degree in Instructional Technology from New York State Institute of Technology, as well as a state certificate in teaching technology.

1160.   Mr. Olivierre has sincerely held religious objections to taking a Covid-19 vaccine.

1161.   He timely submitted a request for religious accommodation on or about September 20, 2021.

1162.   In his letter, he explained that he believes that he is part of a diaspora of the Hebrew Tribes of Israel, whose four fathers are Abraham, Issac, Jacob and Moses under the teachings of Jesus Christ. As such, Mr. Olivierre explained that he follows strict dietary and religious practices, including avoiding all vaccines or other pre-emptive medical intervention.

1163.   Mr. Olivierre was immediately denied through the same autogenerated email sent to all applicants, claiming undue hardship on the "more than a minimal burden" standard.

1164.   No one at the DOE individually reviewed Mr. Olivierre's application before denying him accommodation.

1165.   Mr. Olivierre could have been accommodated remotely or in person without undue hardship as set forth more fully in the undue hardship section, *supra*.

1166.   Mr. Olivierre timely appealed.

1167.   He was denied, without a hearing, and without any explanation other than an "x" next to the word "denied."

1168.   Mr. Olivierre was involuntarily placed on leave without pay on or about October 4, 2021.

1169.   In or around December 2021, he was notified that his application would be given

fresh consideration by the Citywide Panel.

1170.   No one from the City reached out to engage in cooperative dialogue about possible accommodations.

1171.   On or about March 28, 2022, the Citywide Panel sent an autogenerated denial of accommodation.

1172.   No one individually reviewed Mr. Olivierre's application or individually considered whether it would be an undue hardship before denying him relief on this basis.

1173.   In April 2022, Mr. Olivierre was terminated for failing to get vaccinated in violation of his sincerely held religious beliefs.

1174.   On or about August 22, 2022, Mr. Olivierre was offered reinstatement if he got vaccinated, which DOE knew was against his religious beliefs.

1175.   Mr. Olivierre and his family suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**PETER OTTO**

1176.   Plaintiff PETER OTTO is a resident of Suffolk County, New York. Prior to being denied religious accommodation, Mr. Otto was a tenured teacher and programmer with just under fifteen years of service at DOE.

1177.   Mr. Otto had a dual role. He taught social studies, and he also served as the school programmer, spending at least three periods a day on computer work in an office away from students.

1178.   Mr. Otto has sincerely held religious beliefs that conflict with the Covid-19 vaccine mandate.

1179.   He timely submitted a deeply personal four-page single-spaced letter, detailing his

most sacred innermost beliefs and his faith journey.

1180.   He explained how he and his wife, who are both deeply religious Christians, developed a personal relationship with God after many trials and tribulations, and learned to seek guidance directly.

1181.   Mr. Otto believes that it would violate God's will to take a Covid-19 vaccine based on this guidance, and also is opposed to the use of aborted fetal cell lines in the production and development of the vaccines. He also has come to believe that pre-emptive medical intervention is not in God's will, but treatment for sickness is.

1182.   Mr. Otto was immediately denied through the same autogenerated email sent to all applicants, claiming undue hardship on the "more than a minimal burden" standard.

1183.   No one at the DOE individually reviewed Mr. Otto's application before denying him accommodation.

1184.   Mr. Otto could have been accommodated in person or remotely without undue hardship as more fully set forth, *supra* and in this section.

1185.   As the school programmer, he was involved in all stages of setting up remote learning. He designed the school's remote learning system. All of this work was done through computers and could have been done from anywhere.

1186.   During the year and a half of the pandemic preceding the Mandate, Mr. Otto's classes were taught online, though he had not requested that to happen.

1187.   During the 2021-2022 school year, he retained his job as the school programmer, which was done in his programming office away from students. His programming tasks consisted of programming teachers, students, rooms, working transcripts and counselors, using NYC computer applications and other fully digital jobs that required no in-person interaction at all.

1188. Even his meetings with NYC Central Programming Administrators were conducted by Zoom, never in person.

1189. School programming is a digital job.

1190. It should also be noted that Mr. Otto does not know of any other School Programmer in NYC Schools that teaches four periods per day. Most school programmers don't teach any periods or if they do, it is only one class per day. But he taught four periods per day, with the other half of the day programming. Mr. Otto could have easily done all of the programming remotely, since it is all digital. Additionally, he could easily have taught all of his students remotely. It would not have been an undue hardship to have a body sit in a classroom with his students while they received instruction remotely. This is how he taught his students during the previous school year under NYC's Hybrid Model.

1191. Mr. Otto timely appealed.

1192. He was given a zoom hearing, during which, DOE acknowledged that they did not question the sincerity of his beliefs. The arbitrator asked him if he rejected all medical treatment, he explained that he is not against medical treatment but does not believe in pre-emptive intervention, such as vaccination, quoting Bible verse to support his position.

1193. Soon after, he was denied, with no further explanation than an "x" next to the word "denied."

1194. Mr. Otto was involuntarily placed on leave without pay.

1195. In or around November 2021, he received notification that his application would be considered by the Citywide Panel and submitted supplemental materials.

1196. On or about February 15, 2022, the Citywide Panel denied his application through an autogenerated email asserting (without explanation) undue hardship as the only reason.

1197.   Mr. Otto was given seven days to get vaccinated or face termination.

1198.   His family was suffering greatly, and he was unable to get hired anywhere, even outside of the district, despite ample qualifications, teacher shortages in his field, and a stellar record.

1199.   Upon information and belief, this was due to the problem code DOE placed in his employment files.

1200.   Out of desperation, Mr. Otto was forced to get vaccinated in violation of his sincerely held religious beliefs so that he could feed his family.

1201.   Having to violate his faith was deeply traumatic, and Mr. Otto has still not been made whole for the months he was forced to stay on unpaid leave.

1202.   Mr. Otto and his family suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

1203.   Mr. Otto's school also suffered serious harm as a result of his denial of religious accommodation. As the only one with the necessary permissions to handle any number of crucial daily tasks required under law, his loss resulted in chaos and compliance issues. The undue hardship was not in accommodating Mr. Otto, it was in failing to accommodate him.

**LEONARD PIZZA**

1204.   Plaintiff LEONARD PIZZA is a resident of Suffolk County, New York. Prior to being denied religious accommodation, he was a tenured science teacher working in Queens with eighteen years of service at DOE.

1205.   Mr. Pizza was beloved by his students and the faculty, staff and parents.

1206.   He is a devout Catholic and seeks guidance from his religious conscience, which according to his faith, is the voice of the Holy Spirit.

1207. When the Mandate was announced, Mr. Pizza received direct guidance from his conscience that the vaccine was evil.

1208. He believes, through contemplation and prayer, that it represents the mark of the beast, and that it would be a grave sin to take it.

1209. Mr. Pizza timely filed a request for religious accommodation from the Mandate, including a detailed letter and a clergy letter in his request.

1210. In less than 24 hours, he was denied through the same autogenerated, generic email that was sent to all applicants.

1211. No one from DOE individually reviewed his application before it was denied.

1212. Mr. Pizza could have been accommodated remotely or in person without undue hardship as further set forth in the undue hardship section, *supra*.

1213. During the past year, he taught hundreds of lessons via Google Meet for those students who stayed remote.

1214. While many DOE employees worked remotely the year before, often on flimsy excuses, Mr. Pizza worked in person without posing any threat.

1215. He already had gotten and recovered from Covid-19, and had natural immunity, which was known to create far more robust and durable and effective immunity than the vaccine.

1216. Mr. Pizza timely appealed.

1217. He was not give a zoom hearing, just denied, with no further explanation than an "x" next to the word "denied."

1218. He was involuntarily placed on leave without pay.

1219. In or around November 2021, Mr. Pizza was informed his application would be given fresh review by the Citywide Panel.

1220. He waited for months for a decision, while he and his family became desperate without any income.

1221. On or about January 26, 2022, Mr. Pizza could wait no longer and so returned to work by getting vaccinated against his sincerely held religious beliefs.

1222. He got very sick and suffered severe spiritual harm as a result.

1223. Upon his return, DOE retaliated against Mr. Pizza.

1224. For example, he was subjected to invasive and stressful disciplinary proceedings for telling his students before he was placed on leave without pay in October that he would likely have to go on leave soon, but that he was not abandoning them.

1225. He never mentioned anything about the reason for his anticipated leave, or anything political or inappropriate.

1226. He was ultimately cleared of wrongdoing, but upon information and belief, the investigation was meant to punish him and retaliate against him for his religious beliefs.

1227. Months later, after he was already back at work, he finally received a denial from the Citywide Panel, who sent him an autogenerated email giving the sole reason that it would be an undue hardship to accommodate him (without explanation).

1228. Mr. Pizza and his family suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**SAUNDRA RAYMOND**

1229. Plaintiff SAUNDRA RAYMOND is a resident of Westchester County, New York. Prior to being denied religious accommodation, she was a tenured first-grade teacher working at the same school in the Bronx for over twenty-four years of service at DOE.

1230. Ms. Raymond was a well-respected and beloved teacher in good standing.

1231.  She is also a devout Pentecostal Christian, and long-term member of the Eben-Ezer Church in Yonkers, where she heads several ministries and served as secretary to the assembly at the time of her application.

1232.  Ms. Raymond has applied for, and been granted, religious accommodation from other DOE requirements that violated her faith in the past.

1233.  Ms. Raymond has sincerely held religious objections to Covid-19 vaccination.

1234.  OnSeptember 16, 2021, she timely applied for religious accommodation.

1235.  In less than 24 hours, she was denied through the same autogenerated, generic email that was sent to all applicants.

1236.  No one from DOE individually reviewed her application before it was denied.

1237.  Ms. Raymond, who had a co-teacher at that time, could have been accommodated remotely without undue hardship, as accommodation was granted to other teachers accepted under the Stricken Standards by hiring a sub to co-teach in-person while they taught from home during the 2021-2022 school year..

1238.  She had a co-teacher, and she could have stayed in person and facilitated Ms. Raymond to join via Google Classrooms.

1239.  In the past, Ms. Raymond was already acccommodated in this manner when she was undergoing cancer treatment during which time she was accommodated by being assigned to work from a converted closet in her school building until the union helped her arrange to work from home.

1240.  Moreover, Ms. Raymond's position as the general education teacher, who co-taught with the special education teacher, provided the flexibility to split the class into small groups as the teachers saw fit for instruction. During lockdown, this was seamlessly done in

breakout rooms.

1241. As an ICT class, in addition to the two teachers, at least one paraprofessional is assigned to the class to help students with special needs.

1242. As successfully demonstrated during the lockdown, every single task could have been seamlessly done remotely.

1243. Ms. Raymond timely appealed.

1244. Ms. Raymond was not given any zoom hearing, just denied, with no further explanation than an "x" next to the word "denied."

1245. She was involuntarily placed on leave without pay.

1246. On November 19, 2021, Ms. Raymond was informed that her application would be considered by the Citywide Panel. Ms Raymond provided more exhibits, including a notarized letter requesting reinstatement and several emails showing religious accommodation requests before the mandates.

1247. No one from the City ever engaged in cooperative dialogue with her about possible accommodations, including the accommodation she'd had when she had cancer.

1248. Instead, on or about February 7, 2022, Ms. Raymond received an autogenerated email from the Division of Human Resources informing her that they'd been advised that the Citywide Panel had denied Ms. Raymond's appeal.

1249. Ms. Raymond did not receive an email from the Citywide Panel providing reasons.

1250. On or about February 18, 2022, Ms. Raymond was terminated for failing to get vaccinated in violation of her sincerely held religious beliefs.

1251. She timely filed a grievance and asked for a 3020 hearing, which tenured teachers are entitled to before any adverse action is taken against them.

1252. She was not given a hearing.

1253. Instead, the DOE retaliated against her, contesting her application for unemployment, and falsely accusing her of "misconduct" and having "voluntarily quit" when in reality she was denied religious accommodation and forced out.

1254. On or about August 22, 2022, the DOE mailed Ms. Raymond a letter, inviting her to be reinstated to her old position, keeping her tenure and other benefits, but only if she got vaccinated, which DOE knew was against her religious beliefs.

1255. DOE refused to give Ms. Raymond religious accommodation from this requirement, despite the fact that they were well aware that vaccination served no public health benefits. Ms. Raymond, to this day, has still not taken the covid vaccine and has also recovered completely from all of the cancer related health issues, just as she was assured personally, by God.

1256. Ms. Raymond suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**ROBERT RETTINO**

1257. Plaintiff ROBERT RETTINO is a resident of Putnam County, New York. Prior to being denied religious accommodation, he was a tenured teacher working in the Bronx with over sixteen years of service at DOE.

1258. Mr. Rettino has sincerely held religious objections to taking a Covid-19 vaccine.

1259. He timely submitted his religious accommodation request, along with a letter from the pastor of his church, confirming that Mr. Rettino is a member of the congregation and that the that his sincere religious objections to vaccination were consistent with the tenets of the Church.

1260. In less than 24 hours, he was denied through the same autogenerated, generic

email that was sent to all applicants asserting "undue hardship" based on the more than a minimal burden standard.

1261.   No one from DOE individually reviewed Mr. Rettino's application before it was denied.

1262.   Mr. Rettino could have been accommodated remotely or in person without undue hardship as set forth more fully in the undue hardship section, *supra* and herein.

1263.   Mr. Rettino was part of the Absent Teacher Reserve ("ATR") program, which is an active pool of educators whose positions were eliminated when schools that they taught in lost enrollment or were consolidated.

1264.   As an ATR teacher, Mr. Rettino was able to be placed anywhere there was a need and was entitled to his salary under the contract.

1265.   At the time he was denied, DOE was still offering a fully remote program that it maintained throughout the 2021-2022 school year.

1266.   At the time Mr. Rettino was denied, the remote program still needed educators, and Mr. Rettino could have done that job.

1267.   Shortly before Mr. Rettino was denied accommodation, and for some years before, multiple press outlets reported that Mayor de Blasio was aggressively trying to winnow down the pool of ATR teachers.

1268.   Upon information and belief, one goal of the Mandate was also to winnow highly paid tenured teachers, like Mr. Rettino and others, who were protected by their union contracts from adverse action.

1269.   Mr. Rettino timely appealed.

1270.   On or about September 23, 2021, Mr. Rettino received a denial from Martin F.

Scheinman, with no opportunity for a hearing, and no explanation, just an "x" next to the word "denied."

1271. On or about October 4, 2021, he was involuntarily placed on leave without pay.

1272. In or around December 2021, Mr. Rettino received notification that his application would be considered by the Citywide Panel.

1273. He waited months, as his family struggled desperately.

1274. His wife, who was a paraprofessional, was also denied religious accommodation and placed on leave without pay.

1275. Finally, on or about March 28, 2022, Mr. Rettino received a generic (autogenerated) email letting him know that the Citywide Panel had denied his accommodation request.

1276. He never received a termination notice.

1277. On or about August 22, 2022, he received a letter, offering reinstatement with his tenure and seniority, if he would get vaccinated, though they knew this violates his sincerely held religious beliefs.

1278. To this day, Mr. Rettino has not received any formal notice of termination.

1279. He has attempted to get his job back or be rehired, but DOE refuses to rehire him.

1280. Mr. Rettino suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**NICOLE RIVICCI**

1281. Plaintiff NICOLE RIVICCI is a resident of Richmond County, New York. Prior to being denied religious accommodation, she was a tenured teacher working in Brooklyn with six years of service at DOE.

1282. She was a well-respected ENL teacher that was beloved by her students and

colleagues.

1283.   Mrs. Rivicci is a devout Christian with sincerely held religious beliefs that do not allow her to take a Covid-19 vaccine.

1284.   She timely applied for religious accommodation, explaining that she has not taken any vaccine since she was nineteen years old, and that she does not take any medication associated with abortion, among other concerns.

1285.   She was immediately denied through the same autogenerated, generic email that was sent to all applicants asserting "undue hardship" based on the more than a minimal burden standard.

1286.   No one from DOE individually reviewed Mrs. Rivicci's application before it was denied.

1287.   Mrs. Rivicci could have been accommodated remotely or in person without undue hardship as set forth more fully in the section on undue hardship, *supra* and in this section.

1288.   Mrs. Rivicci's job title was English as a New Language teacher. Her school used a "push in/pull out" method in order to serve the students. She is not a classroom teacher, but rather an additional co-teacher to the classroom teacher who only provided ENL services.

1289.   Since she was not the main teacher, her job could have easily been accomplished and accommodated outside of a classroom setting.

1290.   In fact, her job description included virtual push-in support, highlighting the remote nature of her job duties. She could have held regular virtual sessions with students and their parents. She could have held virtual meetings in collaboration with classroom teachers. All of her designed materials and lessons could have been shared with students, parents, and classroom teachers digitally, as was often the case anyway. She tracked students' progress remotely

monitoring their assessments as a regular job task as well. All of these daily duties could have easily been done, as per her usual day-to-day requirements for her job.

1291. Mrs. Rivicci timely appealed and was denied a zoom hearing, without explanation.

1292. Instead, Mrs. Rivicci's appeal to the arbitrator was denied, with no further explanation than an "x" next to the word "denied."

1293. Mrs. Rivicci was involuntarily placed on leave without pay on or about October 1, 2021.

1294. In or around November 2021, Mrs. Rivicci was informed that her application would be considered by the Citywide Panel.

1295. She was summarily denied in or around the Spring of 2022 on the alleged (and unexplained) basis of undue hardship.

1296. No one from the Citywide Panel engaged in cooperative dialogue to discuss possible accommodations or difficulties therewith before denying her.

1297. On or about March 17, 2022, Mrs. Rivicci was terminated for failing to get vaccinated in violation of her religious beliefs.

1298. On or about August 22, 2022, Mrs. Rivicci was offered reinstatement if she got vaccinated, which DOE knew was against her religious beliefs.

1299. The DOE continued to retaliate against her.

1300. After the Mandate was repealed in February 2023, Mrs. Rivicci applied for reinstatement.

1301. Her principal immediately wanted to hire her.

1302. She told Mrs. Rivicci that she could not complete the hiring process because her account was flagged.

1303. When Mrs. Rivicci called human resources to ask about the problem code, she was told they were not allowed to discuss why she had a problem code.

1304. Mrs. Rivicci had a spotless record of employment.

1305. There is no reason that she should have a problem code attached to her file other than for failing to get vaccinated in violation of her religious beliefs, which DOE has claimed in other proceedings is "not misconduct."

1306. Eventually, she was able to get reinstated in 2023, after months of suspension without pay. In February 2025, Mrs. Rivicci's principal offered her an F-status position (part-time) after being out on maternity leave for four months. She applied for this position, but her background investigation would not clear due to a problem code on her account (once again). She was told the problem code was removed back in 2023 when she was first rehired. It took over a month and several phone calls to HR to remove the problem code.

1307. However, the DOE still has not restored her tenure, stating that "legal" is still trying to decide how to treat employees like Mrs. Rivicci, who were fired for failing to violate their sincerely held religious beliefs, and so she is currently on a three-year probation.

1308. Mrs. Rivicci and her family suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

1309. Her husband, a New York City Firefighter, was also wrongfully denied religious accommodation from the Mandate and terminated.

1310. He won a lawsuit challenging the denial, but the City appealed and they are still engaged in endless litigation to enforce their basic rights.

**CHRISTIAN SCHMIDT**

1311. Plaintiff CHRISTIAN SCHMIDT is a resident of Kings County, New York. Prior

to being denied religious accommodation, he was a tenured art teacher, working in Manhattan with over sixteen years of service at DOE.

1312.   Mr. Schmidt was well respected, consistently rated highly effective, and beloved by students.

1313.   Mr. Schmidt, a devout Gnostic Catholic, has sincerely held religious beliefs in opposition to vaccination.

1314.   Mr. Schmidt timely submitted a religious accommodation request. He explained that he believes vaccination is a sin, and has never been vaccinated in his adult life for this reason. He further explained that he prayed about the Covid-19 vaccine, as he does about all major decisions, and received clear guidance from the Holy Spirit that he must not succumb and get the vaccine, as it would be a sin.

1315.   Mr. Schmidt included a letter from his Bishop of the Gnostic Catholic Apostolic Ecclesia of North America, who attested that Mr. Schmidt has sincerely held religious beliefs in opposition to vaccination and that it would violate his religious obligations to get vaccinated in violation of guidance from his religious conscience.

1316.   Mr. Schmidt's Principal and Vice Principal expressed support for Mr. Schmidt's accommodation.

1317.   Mr. Schmidt made it clear to his bosses, the DOE, the UFT, and arbitration that he was willing to take a weekly test.

1318.   Like everyone else who applied, Mr. Schmidt received an autogenerated email almost immediately after submitting his application, alleging that it would be more than a minimal burden to accommodate him.

1319.   No one individually reviewed his application before denying it.

1320. Mr. Schmidt could have been accommodated, remotely or in person without undue hardship, as set forth above in the undue hardship section and in this section.

1321. The DOE accommodated other teachers during the 2021-2022 school year whose religious beliefs were deemed to meet the Stricken Standards criteria.

1322. Mr. Schmidt timely appealed.

1323. Martin F. Scheinman reviewed his application.

1324. He was not given a zoom hearing, just a denial, with no explanation, just an "x" next to the word "denied."

1325. Mr. Schmidt wrote an email to Mr. Scheinman directly, reiterating that he was willing to negotiate with all parties involved and take hardships upon himself if it meant his religious beliefs were respected and accommodated.

1326. Mr. Schmidt was involuntarily placed on leave without pay on or about October 4, 2021.

1327. In late November 2021, Mr. Schmidt received an email letting him know that his application was being given fresh consideration by the Citywide Panel.

1328. No one from the Citywide Panel ever engaged in cooperative dialogue with Mr. Schmidt about possible accommodations or difficulties therewith.

1329. On or about March 7, 2022, the Citywide Panel sent him an autogenerated email stating that he was denied, and the decisional classification was: "The employee has failed to establish a sincerely held religious belief that precludes vaccination" and that DOE had allegedly demonstrated that it would be an undue hardship to accommodate him.

1330. Mr. Schmidt was desperate at this point.

1331. Under extreme duress, he got vaccinated so that he could return to work on or about

March 15, 2022.

1332. The experience was extremely traumatic. He was physically injured, and has lasting heart issues, and worse, he was spiritually traumatized by having to violate his religious conscience.

1333. Mr. Schmidt suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**DAMARIS SCOTT**

1334. Plaintiff DAMARIS SCOTT is a resident of Bronx County, New York. Prior to being denied religious accommodation, she was a secretary, working in the Bronx with over twenty-four years of service at DOE.

1335. Ms. Scott was a well-respected administrator, who was on the verge of retiring through the fifty-fife/twenty-five plan that she had been paying into for over thirteen years.

1336. She is deeply religious, and her husband is the Pastor at Refreshing Word Ministries, a non-denominational Christian Church serving the Bronx since 2005.

1337. Ms. Scott timely applied for religious accommodation, including a letter from the Church affirming that she is a long-standing member, and the Church believes that vaccination violates God's will and Ms. Scott's obligations as a Christian.

1338. Like all other applicants, Ms. Scott was immediately denied through an auto generated email claiming it would be more than a minimal burden to accommodate her.

1339. No one reviewed Ms. Scott's application before denying her relief.

1340. Had they, it would have been immediately obvious that she could have been accommodated without undue hardship.

1341. Ms. Scott was a secretary and did not work in a student-facing job.

1342.   She could have been accommodated remotely without issue or in person without posing a direct threat to anyone.

1343.   Ms. Scott timely appealed.

1344.   She had a zoom hearing on or about September 28, 2021.

1345.   The arbitrator and DOE affirmed they do not question her sincerity but questioned the validity of the Church's religious beliefs.

1346.   They asked her, for example, whether she takes any medication.

1347.   But, as detailed in her letter and supplemental materials submitted on appeal, Ms. Scott explained that she is not opposed to treating illness, but is opposed to pre-emptive interventions, especially those as invasive as attempting to change one's God-given immune system, and especially if the intervention involves a product tainted by its use of aborted fetal cell lines in production or development.

1348.   Ms. Scott detailed her extensive religious history, how she and her husband started the ministry for the underserved Bronx community that she lives in over fifteen years ago, and how she prays over every major decision that she makes.

1349.   Ms. Scott was immediately denied the same day, with no further explanation than an "x" next to the word "denied."

1350.   Ms. Scott was then involuntarily placed on leave without pay.

1351.   In or around November 2021, she was informed that her application would be considered by the Citywide Panel.

1352.   On or about February 15, 2022, the Citywide Panel denied her application, with no further explanation than: "DOE has demonstrated that it would be an undue hardship to grant this accommodation to appellant given the need for a safe environment for in-person learning."

1353.  No one individually assessed whether it would have been an undue hardship to accommodate Ms. Scott, who was a secretary and did not work in a student-facing position, before making this determination.

1354.  Ms. Scott was forced to retire early, just shy of her twenty-five years, so that she could keep her home and so that she and her family could meet their basic needs.

1355.  Ms. Scott suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**JUDITH STAMOS**

1356.  Plaintiff JUDITH STAMOS is a resident of Suffolk County, New York. Prior to being denied religious accommodation, she was an occupational therapist, working in Queens with over ten years of service at DOE.

1357.  Mrs. Stamos has long-standing sincerely held religious beliefs that conflict with vaccination.

1358.  She timely applied, explaining her beliefs and noting that her children (by then in their 20's) had religious accommodations throughout their schooling, and during college continued to be granted accommodation from vaccine requirements based on the family's religious opposition, which is based on their Christian faith and guidance from prayer and reflection on what God requires of them.

1359.  Mrs. Stamos attached a clergy letter to her application.

1360.  Like all other applicants, Mrs. Stamos was immediately denied through an auto generated email claiming it would be more than a minimal burden to accommodate her.

1361.  No one reviewed Mrs. Stamos' application before denying her relief.

1362.  Mrs. Stamos could have been accommodated in person or remotely without undue

hardship as further detailed in the undue hardship section of this complaint.

1363.  She was not even a classroom teacher, but rather a therapist.

1364.  For the eighteen months prior to being denied accommodation, she had been working remotely, first due to the pandemic closures and then because she was granted remote work as a medical accommodation.

1365.  During the eighteen months of remote work, she was able to perform occupational therapy highly effectively, without issue, and had been commended for her success rate.

1366.  Mrs. Stamos immediately appealed and was granted a zoom hearing.

1367.  During the hearing, the DOE representative and arbitrator acknowledged that her religious objections were sincere.

1368.  However, the arbitrator harassed her, aggressively grilling her about irrelevant aspects of her faith and whether she belonged to a religious organization that shared these same beliefs.

1369.  Mrs. Stamos had an attorney present, who objected repeatedly that the arbitrator was asking unconstitutional questions.

1370.  Mrs. Stamos felt that she was in a heresy inquisition and left shaken and traumatized.

1371.  Mrs. Stamos then received a denial, with no explanation, just an "x" next to the word "denied."

1372.  She was placed on leave without pay on or about October 4, 2021.

1373.  In or around November 2021, Mrs. Stamos was informed that her application would be reconsidered by the Citywide Panel.

1374.  No one from the City engaged in cooperative dialogue about possible

accommodations or difficulties therewith.

1375.   On or around February 16, 2022, Mrs. Stamos was sent an autogenerated email stating that her appeal had been denied on the sole alleged reason that: "DOE has demonstrated that it would be an undue hardship to grant this accommodation to appellant given the need for a safe environment for in-person learning."

1376.   No one from DOE individually reviewed her request before making this alleged determination.

1377.   Later that Spring, Mrs. Stamos was terminated for failing to get vaccinated in violation of her sincerely held religious beliefs.

1378.   DOE retaliated against Mrs. Stamos and the others denied religious accommodation by placing a problem code on her fingerprint records.

1379.   Mrs. Stamos, who has had a spotless record and is eminently qualified in a field that is chronically short-staffed, was repeatedly turned down from jobs as a result of the code.

1380.   She first applied to New York Therapy Placement services, in or around March 2022.

1381.   She was informed that she could not be hired due to a problem code that showed up when they ran her fingerprints.

1382.   The problem code sent by DOE stated: "Notification of Ineligibility due to Problem Code: The following employee does not have full security clearance and must be immediately removed from contact with students pending further review and investigation. In addition, their roster status must be changed from active to inactive immediately."

1383.   The compliance coordinator for the New York Therapy Placement Service wrote that Mrs. Stamos could not be hired because of the DOE's problem code and added: "there's really

no way of determining what the action is that's caused her to lose her clearance but she can't be placed until she clears it up."

1384.   Mrs. Stamos has known the person who was in charge of hiring at New York Therapy Placement for over twenty years. She encouraged Mrs. Stamos to pay for a private finger-printing service for $110 to see if a problem code showed up there.

1385.   Mrs. Stamos did pay for private fingerprinting investigation and found that there was no problem code that showed up that way.

1386.   The DOE was the one that placed the code on her file, and was trying to make sure she could not continue to work in her field.

1387.   Still, the damage had been done, and Mrs. Stamos struggled to find work due to DOE's retaliation.

1388.   On or about August 22, 2022, Mrs. Stamos was offered reinstatement if she got vaccinated, which DOE knew was against her religious beliefs.

1389.   After the repeal of the Mandate in February 2023, Mrs. Stamos attempted to get her job back at DOE.

1390.   Her former supervisor, Marybeth Fitzgerald, explained she would have to apply as a new hire, despite all her years of service and seniority at the DOE.

1391.   She received an offer to start in May 2023.

1392.   The offer letter was for significantly less than she'd been making, but she was assured that would quickly be adjusted after she was hired.

1393.   For unexplained reasons, however, she was notified that her start date had to be pushed back multiple times due to unspecified issues in the security clearance.

1394.   Two weeks before her extended start date the next fall, Mrs. Stamos was told that

DOE required her to sign a waiver if she wanted to return.

1395.   Mrs. Stamos explained that she could not sign a waiver, as she believed her religious rights had been violated and intended to pursue relief.

1396.   At the time, the DOE was submitting multiple letters in the pending appeal in the Second Circuit claiming that they were not imposing a waiver on DOE employees who had been denied religious accommodation who wanted to return.

1397.   The *Kane* plaintiffs filed Mrs. Stamos' waiver as proof this was not true.

1398.   The DOE's attorney submitted multiple conflicting statements to try to explain the imposition of the waiver requirement on Mrs. Stamos.

1399.   In truth, the DOE selectively applies the waiver requirement only on some employees, without any fixed rule about which ones will get it or not.

1400.   Some therapists, teachers, paraprofessionals and all other class of employees have been asked to sign the waiver, others have not.

1401.   In any event, Mrs. Stamos was informed that because she would not sign the waiver, her offer was rescinded, and she could not come back to the DOE if she wanted to enforce her right to seek legal redress for the unlawful denial of her religious accommodation request.

1402.   Mrs. Stamos suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

**ZABDIEL VALERA**

1403.   Plaintiff ZABDIEL VALERA is a resident of Essex County, New Jersey. Prior to being denied religious accommodation, he was a tenured teacher, working in Manhattan with over fifteen years of service at DOE.

1404.   Mr. Valera is a devout Christian and has sincerely held religious objections to

vaccination.

1405.   A Seventh Day Adventist, he does not drink alcohol, smoke tobacco or eat meat, and believes that pharmaceutical products should be used seldom, if ever, and only after prayer and reflection.

1406.   Mr. Valera timely applied for accommodation, explaining in a heartfelt and personal letter detailing his objections, including, most importantly, that he'd received guidance from prayer not to take it, and also that he objected on multiple other grounds, including the use of aborted fetal cell lines in production and development of the vaccines.

1407.   Like all other applicants, Mr. Valera was immediately denied through an auto generated email claiming it would be more than a minimal burden to accommodate him.

1408.   No one reviewed Mr. Valera's application before denying him relief.

1409.   Mr. Valera could have been accommodated in-person or remotely without undue hardship and without presenting a direct threat to anyone as set forth in the undue hardship section, *supra*, and here.

1410.   He knows another teacher who was accommodated despite being unvaccinated and believes he could have been just as easily accommodated.

1411.   As a special education teacher and an ENL teacher, many of his job duties could have been accomplished remotely too.

1412.   Given the breadth of his responsibilities, several aspects of his teaching role could have been reasonably adjusted or done remotely, such as: virtual co-teaching using Zoom (like some NYC teachers had done during remote and hybrid instruction during lockdowns); remote IEP writing and meetings over Zoom (again, both common practice during the pandemic); transition coordinator services like career planning, virtual college workshops, transition

assessments and agency outreach (all could have happened remotely); family and student communication; curriculum support and lesson planning; professional development and instructional team meetings; and documentation and compliance work like IEP writing, progress monitoring, ENL logs, and many other documentation tasks that were typically all done digitally anyway.

1413. The majority of Mr. Valera's responsibilities could have been effectively done remotely or through a hybrid model with appropriate support and collaboration from the school team.

1414. Mr. Valera timely appealed and was given a zoom hearing.

1415. In the hearing, the DOE representative stated that though DOE did not question Mr. Valera had sincerely held religious beliefs, he must be denied because the leadership of the Seventh Day Adventist religion was vaccinated.

1416. The DOE presented a letter from the President/leadership committee of the Church as evidence.

1417. Mr. Valera was denied shortly thereafter without any explanation, just an "x" next to the word "denied."

1418. Mr. Valera was placed on leave without pay on or about October 4, 2021.

1419. On or about November 19, 2021, Mr. Valera received notification that the Citywide Panel would review his application.

1420. The Citywide Panel never issued a determination.

1421. Instead, after waiting months for a determination on his appeal, on or about March 17, 2022, the DOE notified Mr. Valera that he was terminated for failing to get vaccinated.

1422. Mr. Valera suffered severe financial, emotional, psychological and spiritual harm

because of Defendants' discriminatory actions and policies.

## **FIRST CAUSE OF ACTION**

### **(Failure to Accommodate in Violation of Title VII)**

*Class and all Plaintiffs against all Defendants*

1423.  Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

1424.  As and for a First Cause of Action, Plaintiffs assert that both Defendants failed to accommodate their religious beliefs in violation of Title VII.

1425.  Plaintiffs were each entitled to accommodation, but were denied religious accommodation, first by the DOE and then the City, in violation of Title VII.

1426.  Title VII imposes an affirmative obligation on employers to make reasonable accommodations for their employees' (or potential employees') religious beliefs and practices. 42 U.S.C §2000e(j); 20 C.F.R. §1605.2(b).

1427.  Each Plaintiff has a sincerely held religious belief in opposition to vaccination.

1428.  DOE knew that each Plaintiff and proposed class member needed religious accommodation from the Mandate, since they all applied for it.

1429.  Both Defendants initially attempted to refuse to accommodate anyone.

1430.  After Defendants were ordered by the Court and an arbitrator to offer religious accommodation, they responded by pretending to offer it, but denying every single applicant on alleged "undue hardship" based on the unlawful "more than a minimal burden" without ever assessing in good faith whether they could have accommodated any employee.

1431.  The same denial was sent out to employees who already worked remotely or easily could have done so.

1432.   Defendants did not individually review the applications before sending out the denials.

1433.   The denials stated on their face that they were issued in accordance with the Stricken Standards, which were later found unconstitutional.

1434.   After they were denied religious accommodation, Plaintiffs were each placed on leave without pay for failing to violate their faith by taking a Covid-19 vaccine.

1435.    Each Plaintiff was then denied reasonable accommodation again in the arbitration appeal.

1436.   The arbitrators were also governed by the Stricken Standards and both the DOE and the arbitrators made openly discriminatory comments during the implementation of the initial administrative appeals.

1437.   Each Plaintiff was then denied again by the City during the Citywide Panel review.

1438.   The Citywide Panel also did not follow Title VII standards in determining whether to grant relief, even though they had promised to do so.

1439.   Instead, the Citywide Panel continued to categorically deny personally held religious beliefs, and beliefs grounded in concerns about the use of aborted fetal cells, among others.

1440.   The Citywide Panel also imposed a blanket undue hardship denial for nearly all employees, without engaging in the required good faith analysis or meeting its burden of proof.

1441.   All Plaintiffs and their similarly situated class members could have been accommodated without undue hardship.

1442.   As a result of the City's denials, Plaintiffs were denied the right to be reinstated with back pay, as promised by the City and DOE to anyone whose religious beliefs were found

to qualify under lawful standards after the remedial fresh consideration by the Citywide Panel.

1443.   The DOE then compounded the problem by offering reinstatement to all DOE employees in the fall of 2022, but refusing to accommodate Plaintiffs' known religious practices, which did not allow for them to take the vaccine as a condition of rehire.

1444.   Religious accommodation is required under Title VII is not just required for employees but also potential employees that an employer knows – or should know – needs religious accommodation.

1445.   Defendants knew that Plaintiffs and their colleagues required religious accommodation from the vaccine condition.

1446.   Defendants knew they could have safely provided such accommodation.

1447.   But Defendants refused to offer such accommodation and outright denied all requests for it.

1448.   Plaintiffs suffered multiple adverse employment consequences as a result of both Defendants' actions, including loss of pay, suspension, derogatory records placed in their file, termination, to name a few.

1449.   To the extent that Defendants claim "undue hardship" as a defense, Plaintiffs reserve the right to rebut such allegations in more detail, as undue hardship is an affirmative defense and cannot give rise to dismissal for failure to state a claim.

1450.   Under Title VII, the burden is on the employer to demonstrate "that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employers' business." 42 U.S.C. §2000e(j).

1451.   For a Title VII claim, undue hardship is shown "when a burden is substantial in the overall context of an employer's business". *Groff v DeJoy*, 143 S Ct 2279, 2294 (2023). "[A]n

employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 2295 (internal citations omitted).

1452.   To prevail on this defense, Defendants must show they considered all options for accommodation in good faith and proved, prior to denial, that such options were untenable according to statutory factors and analysis of objective evidence assessed against each individual's circumstances.

1453.   Defendants did not meet their undue hardship burden, and the denials on this basis were pretextual.

1454.   Moreover, Defendants did not engage in an interactive process to determine the feasibility of accommodating Plaintiffs before denying them relief.

1455.   Defendants made no good faith effort to accommodate Plaintiffs' need for religious accommodation and did not engage in an individualized assessment of possible accommodations pursuant to the required statutory standards before denying accommodation.

1456.   Defendants did not assess the significance, duration, or likelihood of any danger that would result from allowing Plaintiffs to remain unvaccinated.

1457.   Nor did Defendants assess the best available scientific and medical sources to make this determination.

1458.   Instead, Defendants relied on assumption and speculation and issued a blanket determination that they each could not accommodate Plaintiff.

1459.   Defendants also did not assess possible accommodations on an individualized basis that could have mitigated any actual risks.

1460.   Instead, in a stunning show of bad faith, the DOE immediately denied 100% of

the applicants based on alleged and unexplained "undue hardship."

1461. Without waiving their right to submit further proofs, Plaintiffs' facts show that Plaintiffs could have been accommodated without undue hardship.

1462. Plaintiffs did not pose a direct threat based on their vaccination status.

1463. Each of them could have been safely accommodated in person.

1464. The Covid-19 vaccines cannot stop transmission of Covid-19 to any meaningful degree.

1465. And even if they could stop transmission, the presence of one million unvaccinated students rendered the impact of the relatively small percentage of DOE staff that needed to be accommodated meaningless.

1466. Most Plaintiffs also had natural immunity, which the data show is longer-lasting, vastly superior, and more durable than vaccine immunity.

1467. To the extent that Defendants were able to prove that Plaintiffs would pose a direct threat if allowed to work in person unvaccinated, multiple less dramatic measures than suspension and termination were available, including, but not limited to, testing, masking, symptom checks, social distancing, and air filtration to mitigate the risk.

1468. Plaintiffs could have also been accommodated remotely if they were a direct threat.

1469. Each of them had been accommodated remotely for various periods during the previous eighteen months and could have been accommodated remotely again.

1470. Many of them already worked remotely in the fall of 2021 or had jobs that did not require any in person contact with students.

1471. To the extent that Defendants truly could not accommodate Plaintiffs in person or

remotely without substantial hardship, Defendants could have provided other accommodations, such as allowing Plaintiffs to return without waiving their seniority or tenure, providing leave with health insurance not tied to coercive waivers, allowing them to work at other jobs during the leave, and refraining from attaching problem codes and/or accusing the employees of misconduct and attempting to block their efforts to collect unemployment insurance while they waited for the "emergency" to subside so they could return to work.

1472. The DOE did not assess any of these potential accommodations to determine whether they would have posed a substantial hardship.

1473. Instead, Defendants denied 100% of applicants, and then, argued for and enforced a discriminatory policy on appeal to categorically uphold most of the denials based on impermissible criteria, such as whether a person belonged to a preferred religion, or whether their supposed religious leader was vaccinated.

1474. Tellingly, after the appeals, the DOE *did accommodate* at least 163 employees, some of them teachers, who posed no different threat than Plaintiffs and the thousands denied.

1475. They made this determination based on criteria having nothing to do with safety or economic differences, and only to do with impermissible criteria such as membership in a preferred religious organization.

1476. As set forth more fully in the Complaint, the City aided, abetted, encouraged and directed the DOE's original discrimination and is jointly liable for it.

1477. The City is also directly responsible for the failure to accommodate.

1478. After the Second Circuit held that both Defendants had likely violated the constitution by imposing DOE's original discriminatory religious accommodation policies, the City agreed to provide fresh consideration as a form of remediation.

1479.   But it failed to provide fresh consideration to most applicants.

1480.   Except for one person, those who were given "fresh consideration" were all denied based on undue hardship (with no analysis of the required factors) and sometimes also told, once more, that their beliefs "do not qualify" pursuant to unlawful standards.

1481.   The City's denials were pretextual and were intended to try to rubber stamp and affirm as many of the initial denials as possible.

1482.   As a direct and proximate result of Defendants' failure to accommodate them, Plaintiffs suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, including physical symptoms, for which they are entitled to an award of monetary damages in an amount to be determined at trial.

1483.   Plaintiffs are also entitled to other compensatory damages, for financial and other consequences arising from Defendants actions. Plaintiffs incurred high interest debt, suffered penalties and losses as a result of the deprivation of their income and benefits, incurred medical debt, and suffered other harms caused by Defendants actions, for which they are entitled to an award of monetary damages in an amount to be determined at trial.

1484.   Plaintiffs are also entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

1485.   Plaintiffs are also entitled to punitive damages in an amount to be determined at

trial. Under Title VII, Plaintiffs can "recover punitive damages . . . [by] demonstrat[ing] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

1486.   And Plaintiffs are entitled to reasonable attorneys' fees and costs.

1487.   Defendants were put on notice many times over that their religious accommodation policies were unconstitutional and discriminatory and yet they displayed reckless disregard for Plaintiffs' rights by failing to give their application fresh review in good faith even after the Second Circuit chastised them for their policies.

1488.   Yet, they continued to inflict the same discriminatory criteria that they acknowledged was unconstitutional and continued to deny accommodation in bad faith.

1489.   Defendants' use of problem codes, coercive and unlawful waivers, and other retaliatory measures, and their failure to reinstate most of the wrongfully terminated employees shows further malice.

1490.   Pursuant to the single filing rule, Plaintiffs are entitled to join this lawsuit because two of the named Plaintiffs in this lawsuit (Ms. Zapantis and Ms. DiCapua) timely filed complaints with the EEOC alerting the DOE and the City about class-wide discrimination and failure to accommodate, and this lawsuit was timely commenced within ninety days of these Plaintiffs receiving a right to sue letter.

1491.   Pursuant to the same rule, all members of the proposed class are entitled to Title VII relief on the same basis without individually exhausting administrative remedies. *See Tolliver v. Xerox Corp.,* 918 F.2d 1052 (2d Cir. 1990).

1492.   The claims of the administrative claimants and the rest of the proposed class and

group all arise out of the same circumstances and within the same time frame. This is sufficient to allow the entire class to join in this claim pursuant to the single-filing rule. *Id.* at 1058.

1493.   Additionally, though they need not have in this action, the administrative claims of Ms. DiCapua and Ms. Zapantis provided notice that the issues were class wide.

1494.   Defendants and the EEOC were also on notice that the issues were class wide through the filing of hundreds of other claims from similarly situated DOE employees, and multiple related proposed class-action lawsuits referencing the widespread violation of Title VII and anticipated actions regarding same. Moreover, Plaintiffs can also file this claim under the single filing rule in reliance on other colleague's timely filed lawsuits after receipt of right to sue letters on such claims, including those filed by Natalya Hogan and Carlos Contreras.

1495.   All of these claims give notice of classwide discrimination and failure to accommodate issues. Ms. DiCapua is one of the named plaintiffs in *Kane v. de Blasio*, which is a proposed class action lawsuit addressing widespread discrimination and referenced the lawsuit in her complaint, explaining that the issues were class wide.

1496.   As a named Plaintiff in the proposed class-action lawsuit, Ms. DiCapua has purported to represent the class.

1497.   Plaintiffs each individually and as a class have asserted failure to accommodate claims under Title VII.

## SECOND CAUSE OF ACTION

### (Discrimination in Violation of Title VII)

*Class and all Plaintiffs against all Defendants*

1498.   Plaintiffs reincorporate all paragraphs of this Complaint as if fully written herein.

1499.   In addition to failure accommodate claims, Plaintiffs assert straight religious

discrimination claims against both Defendants – both pattern and practice and as applied.

1500. Title VII was enacted with the purpose of prohibiting employment discrimination based on religion, among other protected characteristics. 42 U.S.C § 2000e et seq. 71.

1501. Under Title VII, it is an unlawful employment practice for an employer: (1) to fail or to refuse to hire or discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C §2000e-2(a).

1502. Plaintiffs and their proposed class are all members of a protected class – specifically, they all have protected religious beliefs.

1503. Each was qualified to hold their position, as evidenced by the fact that they were all DOE employees in good standing before they were denied religious accommodation.

1504. The fact that accommodation was offered shows that it was not an employment qualification to be vaccinated, since employees could receive religious accommodation and still be qualified to work, and at least 163 employees did receive such accommodation to work unvaccinated.

1505. Moreover, related litigation has already held that the City lacked the authority to require vaccination as a condition of employment for DOE employees, and Defendants are precluded from relitigating that issue here.

1506. Plaintiffs each suffered an adverse employment condition, including, *inter alia*, being denied religious accommodation, suspended without pay, charged with "misconduct",

denied unemployment compensation, having problem codes placed in their files, and for most, being terminated and barred from return to the DOE or in many cases, private employers too.

1507.  These adverse actions occurred under circumstances giving rise to an inference of discrimination.

1508.  In fact, the evidence in this case raises much more than just an *inference* of discrimination, which is the most that is required under notice pleading standards.

1509.  Defendants' adoption, implementation, ratification and enforcement of a facially discriminatory religious accommodation policy, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with unorthodox religious beliefs, shows discrimination as a matter of law.

1510.  The Supreme Court has held that an employer's adoption of a policy that makes express classifications based on a protected characteristic constitutes "direct evidence of discrimination," which is sufficient as a matter of law to win relief absent an affirmative defense. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985).

1511.  In so holding, the Supreme Court explained that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Id.* at 121 (referencing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).

1512.  Use of such classifications demonstrates a discriminatory purpose as a matter of law, without regard to the decision-makers' animus or subjective intent. *See Miller v. Johnson*, 515 U.S. 900, 904–05 (1995); *see also Hassan v. City of New York*, 804 F.3d. 277, 295 (3d Cir. 2015) ("Put another way, direct evidence of intent is 'supplied by the policy itself.'").

1513.  The Plaintiff's case here is even stronger than *TWA*, because unlike the age discrimination statutes, there is no affirmative defense to a policy that discriminates between

orthodox and unorthodox religious beliefs.

1514. The Stricken Standard policy made express classifications based on protected characteristics – to wit – membership in a disfavored religious group and defined all other religious beliefs as somehow not meriting the same protection as those the policy favored.

1515. Contrary to the Stricken Standards' unlawful criteria, the term "religion" includes all aspects of religious observance and practice, as well as belief. 42 U.S.C §2000e(j).

1516. Protected religious beliefs also include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R. 1605.1; 42 U.S.C §2000e(j).

1517. It is well-settled law, acknowledged by the Supreme Court of the United States all the way down to the district courts and administrative agencies as well as state court systems, that an individual seeking to demonstrate a sincerely held religious belief under New York State or federal statutory or constitutional standards need not prove that his belief is part of the recognized dogma of a religious sect. *See, e.g., Widmar v. Vincent*, 454 U.S. 263 (1981) ("The beliefs need not be consistent with the dogma of any organized religion, whether to not the plaintiffs belong to any recognized religious organization.")

1518. "The fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee." 29 C.F.R. 1605.1.

1519. An employee's belief or practice can be "religious" under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief or practice, or if few – or no – other people adhere to it. *Welsh v. U.S.*, 398 U.S. 333, 343 (finding that petitioner's beliefs were religious in nature although the church to which he belonged

did not teach those beliefs); *Thomas v. Rev. Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981) (disagreement among sect workers as to whether their religion made it sinful to work in an armaments factory irrelevant to whether belief was religious in nature because "[t]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.").

1520.  Employers, especially government employers, must not entangle themselves in religious questions when assessing a request for religious accommodation.

1521.  Employers, especially government employers, cannot substitute judgment for the employee about whether the belief is religious in nature.

1522.  Nor can employers, especially government employers, deny an applicant because her religious beliefs overlap with similar secular concerns – religious employees are entitled to have both religious and secular concerns, and this does not diminish protection of the employee's religious practices.

1523.  The Supreme Court of the United States cautions: "it must be remembered that, in resolving these exemption problems, one deals with the beliefs of different individuals who will articulate them in a multitude of ways. In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight." *U.S. v. Seeger*, 85 S.Ct. 850, 863 (1965); *See also EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 393 (E.D.N.Y. 2016) ("Delineating the meaning of 'religion' for purposes of Title VII often requires resort to First Amendment cases, where nontraditional religious practices are a frequent source of litigation.").

1524.  It is impermissible "to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).

1525.  Defendants violated each of these cardinal rules and more.

1526.  In addition to adopting a written policy that makes express classifications and favors certain religions over others, hostile comments by high-level City actors' and DOE agents about the invalidity of sincere religious objections grounded in concerns about abortion or personal prayer, or derived from religions other than Christian Science, constitute further direct evidence of discrimination.

1527.  As and for another count of direct evidence of discrimination, the City and DOE further discriminated against Plaintiffs by subjecting those who did not qualify under the Stricken Standards to a more onerous undue hardship standard than those who were favored under the unconstitutional criteria.

1528.  Under the Stricken Standards, those who met the discriminatory definition "shall be accommodated" and no provision was made for an undue hardship defense. Pursuant to that policy, at least 163 people were accommodated.

1529.  But when the Citywide Panel gave supposed "fresh consideration" to the applications of some of those denied under the original Stricken Standards, they applied a blanket undue hardship ban on accommodation for any teacher and most other employees – thus imposing a less generous standard.

1530.  By adopting a substantially different undue hardship standard for those who were deemed to meet the discriminatory criteria of the Stricken Standards, both DOE and the City showed direct discrimination against unorthodox religious beliefs.

1531.  Moreover, they continued to apply the same unconstitutional bar against accommodation of personally held religious beliefs and beliefs grounded in concerns about abortion.

1532.   Under the direct evidence standard of review, it must be presumed that the adverse employment actions were pretextual and discriminatory, and, under this framework, Defendants cannot survive summary judgment without asserting an affirmative defense.

1533.   No such defense is available because it is black letter law that the government may not target religious minorities for disparate treatment, no matter how well-intentioned the subject regulation may be. *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).

1534.   In the alternative Plaintiffs set forth a prima facie case under the *McDonnell Douglas* framework.

1535.   Plaintiffs were each qualified for employment at the time they were denied, and each could have been accommodated without undue hardship, but they were denied and subjected to adverse employment actions, including, as one of many examples, being suspended without pay.

1536.   Plaintiffs have more than established an inference of discriminatory intent, as DOE representatives and the City's representatives have repeatedly made public comments and official comments dismissing and showing animus towards religious opposition to vaccination (other than supposedly for Christian Scientists).

1537.   Plaintiffs also provided ample evidence that gives rise to an inference of further discrimination.

1538.   For example, even though they'd been ordered to make religious accommodations (by a court and by an arbitrator), Defendants denied 100% of all applicants immediately upon receipt of their application, leading to the strong presumption that the denials were pretext, and based on discrimination rather than a good faith undue hardship finding.

1539.   The DOE's representatives then argued repeatedly that applicants should be

denied for discriminatory reasons in the appeal hearings before an arbitrator provided under the Stricken Standards, claiming all Jews, Muslims, Catholics and Buddhists, should be presumptively disqualified based on their religion, among other discriminatory policies.

1540. The evidence also leads to an inference that the Citywide Panel's affirmance of all denials except one were infected by the same animus and were also pretextual.

1541. This is compounded by hostile and dismissive comments made by the Mayor and Mr. Eichenholtz, who was placed in charge of the Citywide Panel process by the Mayor.

1542. It is also shown by the email sent to Mr. Eichenholtz by a trainee on the panel, who confirmed that Mr. Eichenholtz had told her that beliefs related to a concern about abortion would not be accommodated.

1543. It is also shown by the Citywide Panel's notations received in related discovery, which show that the Citywide Panel continued to reject personally held beliefs, such as guidance from prayer, unlawfully substituting judgment to find that such beliefs, while sincere, are somehow "not religious in nature" or "do not preclude the applicant from getting vaccinated."

1544. Defendants' discrimination impacted all applicants for religious accommodation, including Plaintiffs, many of whom were told, point blank told that they were being denied relief because their religious "leader" allegedly did not share their beliefs, among other discriminatory reasons.

1545. Plaintiffs should also prevail under a disparate impact theory of discrimination.

1546. Disparate impact discrimination is also barred by Title VII, and "occurs when an employer uses facially neutral policies or practices that a have a disproportionately adverse effect on protected groups." *Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009).

1547. "Disparate-impact claims do not require a showing of discriminatory intent."

*United States v. Brennan*, 650 F.3d 65, 90 (2d Cir. 2011). Rather, "a plaintiff establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)).

1548.   An employer can rebut a prima facie case "by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" *Id*.

1549.   The plaintiff, in turn, can rebut that showing by "showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Id*. (citing §§ 2000e–2(k)(1)(A)(ii) and (C)).

1550.   "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir.2003).

1551.   Most people can take a Covid-19 vaccine without violating their religious beliefs.

1552.   But a recognized minority of people cannot.

1553.   Those who cannot were disparately impacted by the Covid-19 vaccine policy, and the draconian religious accommodation policies that were imposed as a result.

1554.   The employers cannot show that imposing the Mandate was consistent with business necessity, as the vaccines do not stop transmission.

1555.   But even if they could, the DOE could have been far less punitive with those employees who were unable to take the vaccine.

1556.   DOE did not have to put a scarlet letter on people's files, or strip them of tenure, or coerce them into signing waivers, or try to prevent them from getting work anywhere – at the DOE or elsewhere, or refuse to do 3020 hearings, which by law, they were required to provide to

all tenured employees before making any change to conditions or benefits.

1557.   And the DOE could have come up with ways to accommodate employees, like weekly testing, which was sufficient at every other school district in the state and could have worked at the DOE too.

1558.   And there is of course a disparate impact claim among religions, as some religions and types of religious beliefs were preferred over others during the religious accommodation process.

1559.   As a direct and proximate result of each Defendants' discrimination, Plaintiffs suffered harms, including but not limited to those set forth in the first cause of action.

1560.   Plaintiffs seek injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

1561.   Plaintiffs are also entitled to reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION

**(Retaliation and Harassment in Violation of Title VII)**

*Class and all Plaintiffs against all Defendants*

1562.   Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

1563.   Pursuant to the single filing rule, Plaintiffs also assert retaliation and harassment claims in violation of Title VII.

1564.   Plaintiffs each sought religious accommodation from the vaccine mandate, which is protected activity pursuant to statute.

1565.   Defendants were aware that Plaintiffs sought to protect their religious rights, as

each Plaintiff applied for accommodation and each Defendant acknowledged receipt of their application and indicated that it would be considered.

1566. Rather than accommodate Plaintiffs, Defendants denied accommodation, terminated them, attached damaging problem codes to their files, and then blocked their efforts to get unemployment insurance, asserting that they'd engaged in misconduct for being unable to violate their sincerely held religious beliefs and/or that they'd "voluntarily" quit when in reality they were terminated against their will.

1567. Defendants used many of the discriminatory and unconstitutional arguments they already knew were unlawful – such as that applicants had to be denied unemployment insurance because the Pope did not agree with their beliefs.

1568. Defendants also denied Plaintiffs a 3020 hearing, even though it is illegal to take adverse action against a tenured employee, or attach a finding of "misconduct" to their files without such hearing.

1569. Defendants also refuse to rehire most Plaintiffs without coercive and unnecessary conditions not imposed on new hires.

1570. Defendants also harassed and denigrated Plaintiffs in the arbitration hearings and made dismissive and derogatory comments about their faith to the press and to their face.

1571. As a direct and proximate result of each Defendants' discrimination, Plaintiffs suffered harms, including but not limited to those set forth in the first cause of action.

1572. Plaintiffs seek injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

1573. Plaintiffs are also entitled to reasonable attorneys' fees and costs.

## **FOURTH CAUSE OF ACTION**

### **(Violation of SHRL)**

*Class and all Plaintiffs except DiCapua against all Defendants*

1574. For the reasons set forth in the first three causes of action, *supra*, Plaintiffs assert claims under the SRHL against both defendants for failure to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the SHRL.

1575. Plaintiffs repeat and realleges all paragraphs of this Complaint as if fully set forth herein.

1576. At all relevant times, the SHRL has been in full force and effect, and has applied to both Defendants' conduct.

1577. Defendants worked in concert to deprive Plaintiffs of reasonable accommodation.

1578. The SHRL provides:

> It shall be an unlawful discriminatory practice for an employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion…unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business.

N.Y. Executive Law § 296(10(a).

1579. It is also a violation of the SHRL for any party to aid or abet another in the violation of rights guaranteed thereunder.

1580. Undue hardship is defined under the SHRL as "an accommodation requiring significant expense or difficulty (including significant interference with the safe or efficient operation of the workplace…)." N.Y. Executive Law § 296(10(d)

1581.  If the undue hardship is alleged based on a safety concern, "the employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information to ascertain: the nature, duration and severity of the risk; the probability that the potential injury will actually occur, and whether reasonable accommodations, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11.

1582.  At all relevant times, Defendants were Plaintiff's employer, or potential employer, as defined by the SHRL.

1583.  The City was also the DOE's agent, in the Citywide Panel reviews, and controlled the DOE, directing, aiding and abetting the discriminatory practices at every level of review.

1584.  For the same reasons set forth above in the First Claim, Defendants violated the SHRL by failing to accommodate Plaintiffs.

1585.  The same standards which define protected religious beliefs under federal standards govern state and local statutory accommodation requests, though the SHRL and CHRL are more generous and expressly include creed as a protected category of religious belief.

1586.  Similar standards govern the undue hardship determination, though there is a heightened burden on employers under the SHRL to show a *significant* burden and to assess specific factors using the most current objective evidence prior to denial of relief.

1587.  Failure to engage in cooperative dialogue about undue hardship also leads to a strong presumption of discrimination under the state statutory requirements.

1588.  Accommodating Plaintiffs would not have required significant expense or difficulty from DOE.

1589. Accommodating Plaintiffs would not significantly interfere with the safe or efficient operation of the DOE's workplaces.

1590. Accommodating Plaintiffs would not require the DOE to violate a bona fide seniority system.

1591. Defendants failed to engage in any interactive process with Plaintiffs regarding potential accommodations or the difficulties posed by any prior to denial.

1592. Defendants violated the SHRL by denying Plaintiffs' request for reasonable accommodation without first engaging in an interactive process and assessing the statutory factors.

1593. Instead of accommodating Plaintiffs' religious beliefs, Defendants retaliated against Plaintiffs by suspending them, and terminating them if they would not violate their religious beliefs.

1594. For the same reasons set forth in the preceding claims, and herein, Defendants also are liable under the SHRL for discrimination, harassment and retaliation based on religion.

1595. The SHRL adopts the same frameworks for assessing discrimination, retaliation and harassment claims but is governed by a standard even more generous to Plaintiffs.

1596. Aiding and abetting discrimination is expressly also listed as a standalone violation of the statute even if the colluder is not the employer.

1597. Plaintiffs seek relief on behalf of themselves and all others similarly situated to address widespread discriminatory practices.

1598. This goal meets the public interest exception to the notice of claim requirements applicable to the DOE.

1599. There are no notice of claim requirements attaching to claims under the SHRL against the City.

1600. Moreover, multiple plaintiffs did file notices of claims with the DOE within three months of the occurrence.

1601. And the functional notice requirements were met in any event by timely EEOC complaints by Plaintiffs DiCapua and Zapantis, who provided the DOE with notice of class wide discrimination.

1602. As a direct and proximate result of each Defendants' discrimination, retaliation and harassment, Plaintiffs suffered harms, including but not limited to those set forth in the first cause of action.

1603. Plaintiffs seek injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

1604. And Plaintiffs are entitled to reasonable attorneys' fees and costs under the SHRL. Executive Law § 297(10).

## FIFTH CAUSE OF ACTION

### (Violation of CHRL)

*Class and all Plaintiffs except DiCapua against all Defendants*

1605. For the reasons set forth in the first four causes of action, *supra*, Plaintiffs assert claims under the CHRL against both defendants for failure to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the CHRL.

1606. Plaintiffs repeat and realleges all paragraphs of this Complaint as if fully set forth herein.

1607. At all relevant times, the CHRL has been in full force and effect and has applied to Defendants' conduct.

1608.    Pursuant to the CHRL:

It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate, or forego, a practice of, such person's creed or religion,…and the employer shall make reasonable accommodation to the religious needs of such person.

N.Y.C. Admin Code § 8-107(3)(a).o

1609.    Like the SHRL, the CHRL also prohibits encouraging, aiding or abetting the violation of any rights provided therein.

1610.    Plaintiffs each have sincerely held religious belief (and creed) that prevents them from being able to take a Covid-19 vaccine.

1611.    Plaintiffs each requested reasonable accommodation to retain their employment without violating their faith.

1612.    The DOE denied Plaintiff's request for reasonable religious accommodation and suspended them pursuant to a facially unconstitutional religious exemption policy.

1613.    The City, who had agreed to review the initial denials after DOE's religious accommodation policies were held unconstitutional, also denied Plaintiffs religious accommodation requests, thereby depriving Plaintiffs of the right to be reinstated with back pay as agreed if they met the statutory accommodation statutes.

1614.    As a result of each Defendants' actions, Plaintiffs were each suspended and/or terminated, and in some instances forced to submit to vaccination in violation of their sincerely held religious beliefs.

1615.    Both Defendants actions violated Plaintiffs' rights and proximately caused their adverse employment consequences.

1616.    Both Defendants also failed to engage in the required cooperative dialogue with Plaintiffs before denying their accommodation requests, which is a separate and independent act

of discrimination under the CHRL.

1617.   The CHRL prohibits denial of accommodation until the employer engages in a cooperative dialogue.

> The determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue.

N.Y.C. Admin. Code § 8-107(28)(2).

1618.   Pursuant to statute, the cooperative dialogue must include analysis and discussion about any possible accommodation and the challenges they might face, so that the employee has a chance to engage with the process and offer suggestions too which can be considered in good faith before denial.

1619.   This amendment was made in response to a Court of Appeals holding that the failure to engage in cooperative dialogue, while very important and indicative of whether an employer acted in good faith, was not enough to result in a summary judgment determination absent more.

1620.   The legislative history of the CHRL amendment notes that the amendment was meant to cure this holding, and to make failure to engage in cooperative dialogue an independent basis for finding summary judgment against the employer, even if undue hardship could have ultimately been proven.

1621.   Other important amendments are relevant too.

1622.   In 2005, the New York City Council amended the CHRL by passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85.

1623.   "In amending the []CHRL, the City Council expressed the view that the []CHRL had been 'construed too narrowly' and therefore 'underscore[d[ that he provisions of New York

City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes.'" Restoration Act § 1.

1624.    To bring about the change, the Act established two new rules of construction. First, it created a "one way ratchet" by which interpretations of state and federal civil rights statutes can serve only "'as a *floor* below which the City's Human Rights law cannot fall.'" Restoration Act § 1. Second, it amended the CHRL to require that its provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." Restoration Act § 7 (amending N.Y.C. Admin. Code § 8-130).

1625.    In 2011, New York City enacted the Workplace Religious Freedom Act, amending sections 8-102 and 8-107, to adopt a stiffer standard for assessing undue hardship. The committee report noted that the City Council's intention was "to provide greater protection to workers under the City Human Rights Law than the federal, and even the State, human rights provisions provide." N.Y.C. Council, Report of Committee on Civil Rights on Proposed Int. No. 632, Aug. 16, 2011.

1626.    Under the CHRL, undue hardship is defined:

"Reasonable accommodation" as used in this subdivision, shall mean such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business. The employer shall have the burden of proof to show such hardship. "Undue hardship" as used in this subdivision shall mean an accommodation requiring significant expense or difficulty (including a significant interference with the safe or efficient operation of the workplace or a violation of a bona fide seniority system.)

N.Y.C. Admin. Code § 8-107(3)(b).

1627.    Plaintiffs were able to perform the essential duties of their job with reasonable

accommodation.

1628.  Accommodating Plaintiffs would not require significant expense or difficulty from the Defendants.

1629.  Accommodating Plaintiffs would not require the Defendants to violate a bona fide seniority system.

1630.  Accommodating Plaintiffs would not significantly interfere with the safe or efficient operation of Defendant's workplace.

1631.  Plaintiffs and their colleagues each asserted sincere religious objections and there was no basis to question their sincerity.

1632.  Defendants did not establish that Plaintiffs posed a direct threat because of their vaccine status, nor can they do so, as set forth more fully above.

1633.  Plaintiffs also assert discrimination, harassment, and retaliation claims pursuant to CHRL, as more fully described in the SHRL and Title VII causes of action, which apply the same standards, though the CHRL is to be the most favorably construed towards Plaintiffs.

1634.  As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiffs have suffered and continues to suffer substantial losses, for which she is entitled to an award of monetary damages which exceeds the jurisdiction limits of all lower courts, along with reinstatement, declaratory nominal, compensatory and other relief.

1635.  As a direct and proximate result of Defendants' failure to accommodate Plaintiffs, Plaintiffs suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages in an amount to be determined at trial.

1636.   As a direct and proximate result of Defendants' failure to accommodate, Plaintiffs are also entitled to injunctive and declaratory relief, nominal and compensatory damages, pain and suffering and punitive damages.

1637.   As set forth above, Defendants' conduct was willful and showed a reckless disregard for Plaintiffs' rights, and the rights of all of her similarly situated colleagues. In denying accommodation, Defendants violated their own policies as well as well-established law, all while flouting multiple court orders.

1638.   Plaintiffs are also entitled to attorneys' fees, expert fees, and other costs under the CHRL N.Y.C. Admin Code §8-502(g).

## SIXTH CAUSE OF ACTION

### (Violation of the U.S. Constitution - Equal Protection Clause)

*Class and all Plaintiffs except DiCapua against all Defendants*

1639.   Plaintiffs reincorporate all paragraphs of this Complaint as if fully written herein.

1640.   Plaintiffs assert that DOE's adoption of a facially discriminatory religious accommodation policy, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with unorthodox religious beliefs, constitutes direct evidence of discrimination in violation of the Equal Protection Clause of the United States Constitution.

1641.   Defendants are judicially and collaterally estopped from arguing that the Stricken Standards policy is non-discriminatory. As the Second Circuit already noted: "The City concedes that the Arbitration Award…'may' have been 'constitutionally suspect,' [] and its defense of that process is half-hearted at best. Indeed, it offers no real defense of the Accommodation Standards at all." *Kane v. de Blasio,* 19 F.4th 152, 167 (2d Cir. 2021). "We confirm the City's 'susp[icion]'

…" *Id.*

1642.    First, the Court held that the written policy is not neutral, because on its face, it singles out unorthodox beliefs and faiths for disparate and unequal treatment: "We conclude, first, that the procedures specified in the Arbitration Award and applied to Plaintiffs are not neutral. The Supreme Court has explained that 'the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.' *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* ---U.S.---, 138 S. Ct. 1719, 1731 (2018)." *Id.* at 168. Moreover, hostile comments by high-level City actors' and DOE agents about the invalidity of sincere religious objections grounded in concerns about abortion or personal prayer, or derived from religions other than Christian Science, constitute additional direct evidence of discrimination.

1643.    Next, the Court also acknowledged additional direct evidence of discrimination in the application of DOE's facially unlawful standards, for example, through DOE's pattern of recharacterizing people's beliefs as personal rather than religious. "Denying an individual a religious accommodation based on someone else's publicly expressed religious views – even the leader of her faith – runs afoul of the Supreme Court's teaching that [i]t is not within the judicial ken to question the centrality of particular beliefs or practices of faith, *or the validity of particular litigants' interpretation of those creeds." Id.* at 168-169 (emphasis in original).

1644.    Moreover, the City's choice to apply a more onerous undue hardship to employees who did not meet the discriminatory criteria under the original Stricken Standards than those who were unlawfully preferred under the original policy constitutes another express classification and is yet another instance of direct evidence of discrimination.

1645.   Moreover, Defendants' discriminatory statements made when implementing the policy constitute further direct evidence of discrimination.

1646.   Because Defendants adopted written and de facto policies with express classifications based on which religion a person belonged to, and because of the other Direct Evidence of discrimination set forth above, Plaintiffs' denials of accommodation must be presumed to be pretextual and discriminatory under this framework, and Defendants cannot survive summary judgment since there is no affirmative defense.

1647.   As a direct and proximate result of Defendants' discrimination, Plaintiffs suffered, and continue to suffer, economic consequences, and severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages in an amount to be determined at trial.

1648.   Plaintiffs are entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

1649.   Plaintiffs also seek declaratory relief and nominal damages. *Id.*

## SEVENTH CAUSE OF ACTION

### (Infringement of Free Exercise Clause – United States Constitution)

*Class and all Plaintiffs except DiCapua against all Defendants*

1650.   Plaintiffs repeat and reallege all paragraphs of this Complaint as if fully set forth herein.

1651.   The Free Exercise Clause of the First Amendment to the United States Constitution prohibits the government from burdening the free exercise of religion.

1652.    The First Amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof…" U.S. Const. amend. I.

1653.   The Supreme Court has held that "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).

1654.   Where there is evidence of animus, or where there is a mechanism for exemption or lack of general neutrality requirements, an infringement must be strictly scrutinized, and the Defendants bear the burden of showing that they applied a law or policy using the least restrictive means available to further a compelling state interest.

1655.   Plaintiffs' sincerely held religious beliefs prohibit them from taking a Covid-19 vaccine.

1656.   Defendants' denials of accommodation substantially burdened Plaintiffs' free exercise of religion, in that they were forced to violate their faith if they wanted to keep her job and avoid serious consequences.

1657.   Defendants' refusal to accommodate Plaintiffs' religious practices created coercive pressure on them to change or violate their sincerely held religious beliefs.

1658.   The Mandate, which Defendants used to justify the denial of accommodation, was not neutral nor was it generally applicable as this complaint fleshes out in a way that the complaint assessed in NYFRL or Kane did not.

1659.   The Mandate is not generally applicable, because the Mayor and other members of the Executive Branch is empowered to make exceptions to the Mandates in their sole discretion.

1660.   Since the DOE Mandate was issued, the Mayor has issued over a hundred executive orders, extending and expanding coverage of the City's vaccine mandates to various different groups, and then making carve-outs and exceptions according to secular reasons that undermine the Government's stated reason the same way that a religious carve out would.

1661.   The Mandate is also not generally applicable because it makes exceptions for secular reasons that defeat the purpose of the Mandate in the same manner.

1662.   For example, the DOE Mandate allows bus drivers to remain unvaccinated, even though they are in enclosed busses with unvaccinated children, and it allows students to remain unvaccinated and attending class in person, though they are just as able to spread Covid-19 to their peers as teachers, but it requires teachers to be vaccinated.

1663.   The Mandate is also not generally applicable, because, on its face, it allows employers to exercise a mechanism for individualized exception – to wit, medical or religious accommodation.

1664.   Pursuant to state and municipal law, discretionary mechanisms for exemption existed whereby each of the Defendants was not only allowed but required to consider whether to grant a religious or medical accommodation when an employee applies.

1665.   These exemption reviews are defined to be individualized processes, which are, like the "good cause" standard, open to interpretation and not a ministerial act, like determining whether a person has a doctor's note. Thereby, discretion is routinely applied in deciding whether to accept or deny an application for accommodation.

1666.   The DOE also adopted a policy for religious accommodations, thereby defeating any argument that the Mandates were general applicable without a mechanism for accommodation, as applied, and the City also added an express provision, coupled by a promise to a state court, that religious accommodation and exemption would be allowed.

1667.   The religious accommodation policies implemented and enforced by the DOE and the City were also themselves government policies that burdened religion, and they were not neutral nor generally applicable either.

1668.   As recognized by the Second Circuit, DOE's adoption of a discriminatory written policy and comments by DOE decision makers defeats neutrality.

1669.   This complaint adds further detail showing that the City also directly participated in and facilitated the discrimination that occurred under the Stricken Standards, and then after the Second Circuit held they were unconstitutional, failed to disavow them and continued to enforce them.

1670.   Because the policies were not neutral, strict scrutiny applies.

1671.   The Second Circuit also already held that the Defendants' religious accommodation policies were not generally applicable, because decision-makers exercised discretion about whether to grant or deny accommodation, thereby evidencing a mechanism for individualized exemption.

1672.   Because the policies were not generally applicable, strict scrutiny applies.

1673.   Defendants, who are each state actors, did not have a compelling interest in requiring Plaintiffs to be vaccinated.

1674.   The vaccine cannot stop transmission, and there is therefore outside of the state's police powers.

1675.   To the extent that the Defendants could prove that any significant danger existed because of Plaintiff's vaccine status, reasonable accommodations such as weekly testing, daily symptom checks, mask use or allowing remote or off-site meetings could have been implemented without undue hardship.

1676.   In refusing to accommodate Plaintiff's sincerely held religious beliefs, Defendants did not use the least restrictive means of furthering any compelling state interest.

1677.   More importantly, as the Second Circuit pointed out, Defendants did not have a compelling interest in any event in conditioning access to accommodation on membership in a favored religious organization.

1678.   Nor do Defendants have a compelling interest in applying a more favorable undue hardship analysis to those found to meet the criteria for the impermissibly favored religions.

1679.   Defendants' actions injured and continue to injure Plaintiffs, by chilling their right to practice their religion and imposing lasting consequences and harm to their emotional, psychological, physical, and financial wellbeing, as well as their reputation.

1680.   As a direct result of the violation of their First Amendment rights, most Plaintiffs are still unlawfully removed from their jobs.

1681.   Plaintiffs seek, and are entitled to, declaratory relief and nominal damages stating that the denial of their religious accommodation and subsequent employment consequences are void ab initio and violated their First Amendment right to freely practice their religion.

1682.   Plaintiffs are entitled to, and seek, reinstatement with no break in service, and full compensation for front and back pay of salary, benefits, retirement credits and all employment benefits, including anticipated raises, as if she had never been denied religious accommodation,

along with compensatory damages for actual harm, including pain and suffering and emotional damages, along with punitive damages and attorney's fees. *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).

## EIGHTH CAUSE OF ACTION

**(Violation of the Establishment Clause of the United States Constitution)**

*Class and all Plaintiffs except DiCapua against all Defendants*

1683.    Plaintiffs repeat and reallege all paragraphs of this Complaint as if fully set forth herein.

1684.    The Establishment Clause of the First Amendment to the United States Constitution prohibits the State from preferencing any particular religion or religious dogma or belief, or abridging Plaintiffs' rights to free exercise of religion.

1685.    Defendants each violated the Establishment Clause by expressing a preference for certain faiths and leaders over others and by expressing animus towards religious objection to vaccination.

1686.    The DOE took this so far as to adopt a facially discriminatory policy, which favors Christian Scientists on its face, and requires discrimination against minority and unorthodox faiths.

1687.    The various preferences expressed by the state actors for some religions and religious leaders or religious beliefs over others trigger strict scrutiny of Defendants' denial of Plaintiffs' religious beliefs as a violation of the Establishment Clause.

1688.    Defendants cannot meet the burden of proof to show that their denial of accommodation was narrowly tailored to further a compelling state interest.

1689.    There is no legitimate, rational or compelling interest in applying the Mandate to discriminate against unorthodox religious beliefs.

1690. The Mandate is not the least restrictive means of achieving an otherwise permissible government interest, which could be achieved by other protective measures but not by favoring some religious beliefs over others.

1691. The Mandate, on its face and as applied, has caused, is causing and will continue to cause irreparable harm and actual undue hardship to Plaintiffs from the violation of their sincerely held religious beliefs and the occupational, professional, social, and economic consequences pleaded above.

1692. Plaintiffs seek and are entitled to declaratory relief and nominal damages, injunctive relief including reinstatement with no break in service, back and front pay and benefits, actual, compensatory and punitive damages, along with attorneys' fees, costs and expenses.

**WHEREFORE,** for all causes of action pleaded above, Plaintiffs pray that this Court grant judgment to her containing the following relief:

A. A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to Title VII along with nominal damages and attorneys' fees and costs; and

B. A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the New York City Human Rights Law along with nominal damages and attorneys' fees and costs; and

C. A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute

unlawful discriminatory practices pursuant to the New York State Human Rights Law along with nominal damages and attorneys' fees and costs; and

D. A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the Equal Protection Clause of the United States Constitution along with nominal damages and attorneys' fees and costs; and

E. A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio because and violate the Free Exercise Clause of the First Amendment of the United States Constitution along with nominal damages and attorneys' fees and costs; and

F. A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio because and violate the Establishment Clause of the First Amendment of the United States Constitution along with nominal damages and attorneys' fees and costs; and

G. An order that Defendants reinstate Plaintiffs to their former positions with full seniority, no break in service, status, retirement credits, salary increments, bonuses and benefits as if the denials of accommodation had never occurred; and

H. An award of actual and compensatory damages in an amount to be determined at trial; and

I. An award of costs in this action and any appeals, including reasonable attorney's fees and expert fees under 42 U.S.C. § 1988, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and other governing laws; and

J.     An order for civil fines and penalties pursuant to New York Executive Law §297(9); and

K.     An award of pre- and post-judgment interest on all amounts awarded to Plaintiffs and the class at the highest rates and from the earliest dates allowed by law on all causes of action; and

L.     Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38(b) of the Local Rules, Plaintiffs demand trial by jury for all the issues pleaded herein so triable.

Dated: Ithaca, New York
         April 11, 2025

Respectfully Submitted,
Gibson Law Firm, PLLC

By:     */s/ Sujata S. Gibson*
Sujata S. Gibson
120 E Buffalo Street, Suite 201
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law
*Attorneys for the Plaintiffs*