# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

EMILY ZAPANTIS-DALAMAKIS, et al,

                        Plaintiffs,

      vs.

CITY OF NEW YORK, et al,

                        Defendants.

CASE NO. 24-4631

---

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**GIBSON LAW FIRM, PLLC**
*Attorneys for Plaintiffs*
Sujata S. Gibson, Esq., Of Counsel
120 E. Buffalo St, Suite 2
Ithaca, New York 14850
(607) 327-4125

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

STANDARD OF REVIEW .....................................................................................................8

ARGUMENT ...........................................................................................................................9

   I.    The City is a proper party to this action.................................................................9

   II.   The SAC pleads viable failure to accommodate claims .........................................11

      A. Plaintiffs each pleaded prima facie failure to accommodate claims.....................11

         1. Each plaintiff asserts bona fide religious beliefs ...........................................12

      B. Defendants are not entitled to the undue hardship defense "as a matter of law"...15

         1. Religious accommodations were allowed and granted under the Mandate .....16

         2. Lack of evidentiary support precludes dismissal as a matter of law ..............16

         3. Failure to engage in cooperative dialogue precludes dismissal ......................18

   III.  Plaintiffs articulated free exercise claims ..............................................................19

      A. The SAC establishes that the Mandate was not generally applicable as applied by Defendants .................................................................................................21

      B. The religious accommodation policies were not neutral on facially or as applied ....................................................................................................24

   IV.  Plaintiffs articulated discrimination claims ..........................................................27

      A. Plaintiffs assert establishment clause claims .......................................................27

      B. Plaintiffs assert equal protection claims ..............................................................28

      C. Plaintiffs plead statutory discrimination claims...................................................29

      D. Plaintiffs plead retaliation and harassment claims...............................................31

   V.   Plaintiffs' claims are not limited to Article 78 proceedings and are not time-barred..31

   VI.  Plaintiffs' claims are not barred by res judicata or collateral estoppel ....................33

   VII.  Plaintiffs' state law claims against DOE are not barred by notice of claim requirements...............................................................................................35

      A. Plaintiffs' state claims fall under state law exceptions .........................................36

      B. Plaintiffs met the notice of claim requirements in any event................................36

   VIII. Plaintiffs' Title VII claims are not barred by failure to exhaust .............................37

   IX.  The Amended Complaint does not violate Rule 8 ..................................................39

CONCLUSION......................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agudath Israel of America v. Cuomo,*
    983 F.3d 620, 632 (2d Cir. 2020) ........................................................................23

*Ashcroft v. Iqbal,*
    556 U.S. 662, 678 (2009) ..............................................................................9, 10

*Baker v. The Home Depot,*
    445 F.3d 541, 546 (2d Cir. 2006) ........................................................................12

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, 570 (2007) ..............................................................................8, 9

*Borkowski v. Valley Cent. Sch. Dist.,*
    63 F.3d 131, 143 (2d Cir. 1995) ....................................................................15, 17

*Broeker v. New York City Department of Education,*
    2023 WL 2710245 at 8 (E.D.N.Y. 2023) ......................................................25, 36

*Buon v. Spindler,*
    65 F.4th 64 (2d Cir. 2023) ........................................................................31

*Caputo v. Copiague Union Free Sch. Dist.,*
    218 F. Supp 3d 186 (E.D.N.Y. 2016) ..................................................................36

*Chinchilla v. New York City Police Dep't,*
    No. 23 CIV. 8986 (DEH), 2024 WL 3400526 at 10 (S.D.N.Y. July 12, 2024) .............16, 19

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520, 533 (1993) ..............................................................................24

*City of New Orleans v. Dukes,*
    427 U.S. 297, 303 (1976) ..............................................................................29

*Colorado River Water Conservation Dist. v. United States,*
    424 U.S. 800, 817 (1976) ..............................................................................32

*Connick v. Thompson,*
    563 U.S. 51, 61-62 (2011) ..............................................................................11

*Dahl v. Board of Trs. of W. Mich. Univ.,*
    15 F.4th 728, 733(2021) ..............................................................................22

*Davidson v. Capuano*,
 792 F.2d 275, 278 (2d Cir. 1986)........................................................34

*DiCapua v. City of New York*,
 2023 Slip Op 34645(U) (Sup. Ct. Richmond Cty. 2023).................................2, 34

*Does 1-11 v. Board of Regents of the University of Colorado*,
 100 F.4th 1251 (10th Cir. 2024)........................................................22

*Employment Div., Dept. of Human Resources of Oregon v. Smith*,
 494 U.S. 872, 877 (1990)........................................................22

*Fulton v. City of Philadelphia, Pennsylvania*,
 593 U.S. 522 (2021)........................................................22

*Gardner-Alfred v. Federal Reserve Bank of New York*,
 143 F.4th 51, 63 (2d. Cir. 2025)........................................................13

*Groff v. DeJoy*,
 143 S. Ct. 2279 (2023)........................................................2, 17

*Gunn v. Beschler*,
 No. 22-971, 2023 U.S. App. LEXIS 8082 at 4 (2d Cir. 2023)........................................................35

*Hassan v. City of New York*,
 804 F.3d 277, 295 (3d Cir. 2015)........................................................29

*Jacobsen v. New York City Health & Hosps. Corp.*,
 22 N.Y.3d 824, 838 (2014)........................................................19, 20

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*,
 438 F.3d 195, 204 (2d Cir. 2006)........................................................29

*Johnson v. Holder*,
 564 F.3d 95 99-100 (2d Cir. 2009)........................................................25

*Kadrmas v. Dickinson Pub. Schs.*,
 487 U.S. 450, 457 (1988)........................................................29

*Kane v. de Blasio*,
 19 F.4th 152, ___ (2d Cir. 2021)........................................................*passim*

*Kern v. Joyce*,
 857 F. App'x 691, 694 (2d Cir. 2021)........................................................33

*Larson v. Valente,*
    456 U.S. 228, 244 (1982).................................................................................................28

*Littlejohn v. City of New York,*
    795 F.3d 297, 306 (2d Cir. 2015) ......................................................................8, 27, 30

*Lynch v. City of New York,*
    952 F.3d 67, 74 (2d Cir. 2020)....................................................................................8, 9

*Marte v. Montefiore Med. Ctr.,*
    No. 22-cv-03491, 2022 U.S. Dist. LEXIS 186884 at 19 (S.D.N.Y. Oct. 12, 2022)............12

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n,*
    138 S. Ct. 1719, 1731 (2018) .................................................................................24, 26

*Miller v. Johnson,*
    515 U.S. 900, 904 (1995)............................................................................................29

*Mills v. County of Monroe,*
    59 N.Y.2d 307, 311 (1987) .........................................................................................36

*Monell v. Department of Social Services,*
    436 U.S. 658, 691-94 (1978) ....................................................................................9, 39

*Ne. Fla. Chapter of the Associated Fen. Contractors of Am. v. City of Jacksonville,*
    508 U.S. 656, 666 (1993)............................................................................................30

*Nestor v. Pratt & Whitney,*
    466 F.3d 65, 71 (2d Cir. 2006)....................................................................................35

*New Yorkers for Religious Liberty, Inc. v. City of New York,*
    125 F.4[th] 319 (2d Cir. 2025) ............................................................................ *passim*

*New York Gaslight Club, Inc. v. Carey,*
    447 U.S. 54 (1980)......................................................................................................35

*Patterson v. County of Oneida,*
    375 F.3d 206, 226 (2d Cir. 2004) .................................................................................9

*Pembaur v. City of Cincinnati,*
    475 U.S. 469, 480 (1986) .............................................................................................9

*Philbrook v. Ansonia Bd. of Educ.,*
    757 F.2d 476, 482 (2d Cir.1985), *aff'd and remanded*
    479 U.S. 60 (1986) .....................................................................................................12

*Phillips v. City of New York,*
    66 A.D.3d 170, 182 (2009) ........................................................................17

*Razzano v. Remsenburg-Speonk Union Free Sch. Dist.,*
    751 F. App'x 24, 27 (2d Cir. 2018) ..........................................................33

*Riccardo v. N.Y.C. Dep't of Educ.,*
    No. 16-cv-4891, 2016 WL 7106048 (SD.N.Y. Dec. 2, 2016) ...................37

*Sch. Bd. of Nassau Cnty., Fla. v. Arline,*
    480 U.S. 273, 287 (1987) .........................................................................19

*Sotomayor v. City of New York,*
    862 F. Supp. 2d 226, 248 (E.D.N.Y. 2012) ...............................................9

*Spivack v. City of Philadelphia,*
    109 F.4th 158 (3d Cir. 2023) ...................................................................22

*Syeed v. Bloomberg L.P.,*
    568 F.Supp3d 314, 321 (S.D.N.Y. 2021) .................................................34

*Tolliver v. Xerox Corp.,*
    918 F.2d 1052, 1058 (2d Cir. 1990).........................................................39

*Trans World Airlines, Inc. v. Thurston,*
    138 S. Ct. 2392, 2423 (2018) ..................................................................30

*Trump v. Hawaii,*
    469 U.S. 111 (1985) .................................................................................30

*Union Free Sch. Dist. No. 6 v. N.Y. State Human Rights Appeal Bd.,*
    36 N.Y.2d 371 (1974) ..........................................................................36, 37

*United States v. Seegar,*
    380 U.S. 163, 184 (1965) .........................................................................12

*Vega v. Hempstead Union Free Sch. Dist.,*
    801 F.3d 87 (2d Cir. 2015).......................................................................27

*We the Patriots USA, Inc. v. Connecticut Office of Early Childhood Development,*
    76 F.4th 130, 151 (2d Cir. 2023)..............................................................23

*Whitfield v. City of New York,*
    96 F.4th 504, 528 (2d Cir. 2024) .........................................................32, 34

**Statutes**

N.Y.C. Admin Code §8-102 ................................................................................ 20

N.Y.C. Admin Code §8-107(3)(a) ...................................................................... 11

N.Y.C. Admin Code §8-107(28)(2) .................................................................... 19

N.Y. Executive Law §296(10)(a) ....................................................................... 11

NYCHRL ..................................................................................................... *passim*

NYSHRL ...................................................................................................... *passim*

Title VII ........................................................................................................ *passim*

U.S. Const. amend. XIV ....................................................................................... 3

20 C.F.R. §1605.2(b) ........................................................................................ 11

42 U.S.C. §2000e(j) .......................................................................................... 11

**Other references**

EEOC Compliance Manual on Religious Discrimination § 12-I(A)(3) (2021) ........................... 12

## PRELIMINARY STATEMENT

This case alleges systematic religious discrimination against NYC Department of Education (DOE) employees who were denied reasonable accommodations from the COVID-19 vaccine mandate. Thirty-one plaintiffs, including teachers, psychologists, administrators, and remote workers like Pastor Bynoe—a respected religious leader whose faith precludes vaccines—were denied accommodation under a policy that, on its face, preferenced Christian Scientists while excluding Catholics, Jews, Muslims, Buddhists and most other religions (the "Stricken Standards"). In November 2021, the Second Circuit held that the Stricken Standards religious accommodation process likely violated the Free Exercise Clause, ordering a "fresh" remedial review as a form of injunctive relief. *Kane v. de Blasio*, 19 F.4th 152 (2d Cir. 2021).

The City formed a "Citywide Panel," controlled by its' defense attorneys, promising reinstatement with backpay for those qualifying under lawful standards. But this was a hollow promise. While the Stricken Standards appeals process did not consider undue hardship, the Citywide Panel denied nearly everyone because of "undue hardship," even if their beliefs qualified. Accordingly, while 169 similarly situated colleagues, many of them classroom teachers, were accommodated under the Stricken Standards and still have their jobs today, only one employee was ever accommodated under the "remedial" process. The thousands of others denied under the unconstitutional Stricken Standards were either provided with no Citywide Panel determination or summarily denied.

In *New Yorkers for Religious Liberty, Inc. v. City of New York*, 125 F.4th 319 (2d Cir. 2025) (NYFRL), the Second Circuit assessed constitutional claims an early complaint, filed before the Citywide Panel had issued more than a handful of denials. On the limited facts and claims before it, the Court held that two plaintiffs asserted a free exercise challenge and the rest had not,

due to the conclusory nature of the allegations about the undue hardship denials and continued animus.

This suit differs from NYFRL by including statutory claims under Title VII, NYSHRL, and NYCHRL, shifting the burden to Defendants to prove significant, unmitigable hardship. The Second Amended Complaint (SAC) also addresses NYFRL's pleading gaps with detailed evidence supporting a strong inference that the Citywide Panel's process was pretextual, and in any event failed to remedy the original unconstitutional denials, which should trigger strict scrutiny of all Plaintiffs' constitutional claims. The SAC shows that the denials, based on the outdated "de minimis" standard rejected in *Groff v. DeJoy*, 143 S. Ct. 2279 (2023), lacked individual assessment.

In 2023, on a more detailed complaint, the Court held that the undue hardship determinations were arbitrary and capricious because they treated similarly situated employees differently without explanation. *Dicapua v. City of New York*, 2023 NY Slip Op 34645(U) (Sup. Ct., Richmond County 2023) (Gibson Aff, Exhibit 1). City witness Eric Eichenholtz confirmed that the City did not even assess undue hardship but assumed that any accommodation would be more than a minimal burden. Pretext can be inferred from the City's repeated application of "undue hardship" to employees who already had remote jobs. Pretext can also be inferred based on the numbers. The Citywide Panel only reinstated one employee out of five hundred reviewed and failed to even issue a decision for most employees denied under the original policy. Oddly, the one person accommodated had a student facing job.

The SAC also details City animus. In NYFRL, the Court recognized that the City discriminated against plaintiff Clark's personally held religious beliefs. The SAC here shows this was not an isolated incident but a systemic issue. Emails collected in discovery show that City

decision-makers instructed panelists to reject personally held religious beliefs and religious concerns about abortion, and panelist notes show that the Citywide Panel continued to rely on this advice as well as a discriminatory letter from the City's Commissioner of Health instructing same. After failing to remediate the harm, Defendants also retaliated by, among other actions, attaching "problem codes" to plaintiffs' employment files, blacklisting them from future employment, and failing to rehire them after the Mandate was rescinded despite critical staffing shortages.

Plaintiffs assert claims under the First and Fourteenth Amendments, Title VII, the New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL"). These claims are properly brought in this Court, not limited to Article 78 proceedings. Defendants' motion to dismiss fails on multiple grounds and should be denied in its entirety. Plaintiffs plead viable claims, meet preconditions to suit, and are not barred by issue or claim preclusion. They have been severely harmed by Defendants ongoing discriminatory policies and deserve their day in court.

## STATEMENT OF FACTS

The comprehensive factual allegations supporting these claims are set forth in the Second Amended Complaint with its Exhibits and incorporated herein by reference. The key facts are summarized below.

**Background: The COVID-19 Vaccine Mandate:** On August 24, 2021, Defendants imposed a COVID-19 vaccine mandate requiring all DOE employees to show proof of vaccination by September 27, 2021. This mandate was imposed despite DOE having allowed unvaccinated employees to work in person with students throughout the entire prior 2020-2021 school year during the worst of the pandemic. SAC ¶ 52-57. Moreover, the mandate came after the CDC announced on national television that the vaccines could not stop transmission of Covid-19. ¶ 62.

Initially, Defendants informed employees that no religious or medical accommodations would be considered. SAC ¶ 65. However, following litigation and a court order, Defendants were forced to amend the mandate to allow for religious accommodations. SAC ¶ 69. The new Mandate stated: "[n]othing in this order shall be construed to prohibit any reasonable accommodation otherwise required by law." Eichenholtz testified that the Mandate allowed for in person or remote accommodation. ¶ 109.

**The Discriminatory "Stricken Standards":** In a parallel arbitration proceeding involving various unions, Arbitrator Martin A. Scheinman issued an award ordering both the DOE and the City to provide DOE employees with religious accommodations, providing them with the choice to use the Stricken Standards or any lawful statutory process. SAC ¶ 75.

The Stricken Standards contained facially discriminatory criteria that: favored Christian Scientists while excluding most other faiths; required membership in an "established" religious organization with longstanding documented opposition to vaccines; rejected beliefs from personal prayer or faith-based guidance; denied requests if a religious leader had publicly supported vaccines; required clergy verification and excluded organizations whose leaders had publicly supported vaccines. SAC ¶¶ 81-90.

Though the government is prohibited from making or enforcing a discriminatory policy, and the arbitration award allowed Defendants to choose a different policy, both Defendants chose the Stricken Standards policy to assess religious accommodation applications. SAC ¶ 90. City attorneys, acting under the City's direction, were instrumental in creating the standards that the Second Circuit would later strike down as unconstitutional. SAC ¶¶ 79-80. The Mayor bragged in a press release that the City was "100%" involved in setting the "ground rules" or discriminatory criteria. SAC ¶ 194. And he endorsed the policy limiting accommodation to just Christian

Scientists and Jehovah's Witnesses. ¶¶ 194-95.

## Systematic Discrimination in Implementation

**Phase 1: DOE's Blanket Denials.** Despite the arbitration award requiring individualized review, DOE denied 100% of religious accommodation applications through automated emails that made no reference to the submitted religious beliefs. SAC ¶¶ 92-100. The denials falsely claimed that the mandate did not allow for in-person accommodation and admitted to using the wrong legal standard, asserting that any accommodation would pose "an undue hardship (i.e., more than a minimal burden)" without any individualized analysis. Id. No human being individually reviewed the applications before issuing these blanket denials, and no cooperative dialogue was offered or conducted. Id.

**Phase 2: Discriminatory Arbitration Process.** Plaintiffs appealed and were subjected to review by arbitrators bound by the criteria in the Stricken Standards. For those who were allowed a hearing, DOE representatives engaged in what can only be described as "heresy inquisitions," openly arguing that entire religious groups should be categorically denied. All Catholics were deemed ineligible because "the Pope supports vaccination." All Jews were denied based on a Jerusalem Post article about a rabbi in Israel. Muslims, Hindus, Buddhists, and non-denominational Christians were similarly excluded based on statements from religious figures. SAC ¶¶ 139-161. These positions went beyond even the already discriminatory Stricken Standards and reflected Mayor de Blasio's public directive that religious accommodations would be limited to members of "a very few religions that have a long, long, long-standing history" of opposing vaccination. SAC ¶ 194-95. Discovery has revealed that City decision-makers provided DOE representatives and arbitrators with articles about these religious leaders and instructed them to categorically deny most faiths. ¶¶ 196-202. Most shockingly, the Commissioner of Health, who

issued the vaccine mandate, wrote a letter instructing reviewers to deny religious accommodation to employees with religious concerns about abortion. ¶ 203. The letter acknowledges that fetal cell lines were used in connection with all three vaccines. But it argues that religious objections should be rejected anyway because Commissioner Chokshi did not believe the concern merits protection, noting that the Pope and other religious leaders took the vaccine anyway. SAC ¶¶ 203-06.

**Differential Treatment and Unequal Standards.** Approximately 169 employees whose religious beliefs were deemed acceptable under the discriminatory scheme were granted accommodations, including classroom teachers. SAC ¶ 293. These employees continued to receive accommodations even after the Second Circuit struck down the policy, demonstrating that accommodation was feasible and that undue hardship was not an issue. SAC ¶ 294.

**The Second Circuit's Ruling and Failed Remediation.** In November 2021, the Second Circuit held in *Kane v. de Blasio* that the Stricken Standards process was likely unconstitutional because it was neither neutral nor generally applicable. 19 F.4th at 167-170. The Court particularly criticized Defendants' practice of denying applicants because religious leaders were vaccinated and their rejection of personally held beliefs. SAC ¶ 215. To avoid a class-wide judicial order, the City promised to provide "fresh consideration" through a new "Citywide Panel" for denied accommodation requests. SAC ¶¶ 222-224.

**The Citywide Panel's Continued Discrimination.** The Citywide Panel, designed and supervised the City's lead defense attorney, Eric Eichenholtz, failed to remediate the discrimination. Of 7,000 applicants denied under the Stricken Standards, the City only reviewed about 500 cases. SAC ¶ 227. Of these, they only granted one accommodation. ¶ 263.

The Panel continued to apply discriminatory criteria and was instructed by Eichenholtz to deny personally held and abortion related religious beliefs (¶¶ 235-71). But even if a person's

beliefs somehow qualified under this continued animus, the City also tacked on a blanket "undue hardship" alternative basis for denial on most applications. Paragraphs 282-392 of the SAC provide a detailed accounting of many of the ways that the City's undue hardship policy was deficient. As a few examples, the Citywide Panel: applied a more onerous undue hardship standard than the Stricken Standards appeals (which did not have an undue hardship defense); used the unlawful "de minimis" hardship test; failed to individually assess any of the undue hardship claims, simply assuming that any accommodation must be "more than a minimal burden" and ignored sworn affidavits from the nation's top public health experts showing that plaintiffs could be safely accommodated in person as the Covid-19 vaccine did not stop transmission. SAC ¶¶ 282-392. The City also stated "undue hardship" as a reason to deny dozens of remote employees, revealing a lack of good faith effort to try to accommodate employees, as required by law.

**Some Plaintiffs Never Received a Review.** Many Plaintiffs never received a Citywide Panel review, despite being promised they would. The rest were all denied, even though they could have been accommodated remotely or in person as set forth in detail in the general and individualized sections of the SAC.

**Continued Animus and Retaliation.** Rather than repudiating the unconstitutional Stricken Standards after the Second Circuit's rebuke, Defendants expanded their use to other City departments. SAC ¶¶ 272-81. In September 2022, after the CDC updated its website to unequivocally state that vaccinated and unvaccinated employees presented equal risk of transmission and should be treated the same in the workplace, Defendants sent out a letter offering to reinstate Plaintiffs, but only if they would violate their faith. They knew at the time that Plaintiffs needed accommodation, had no scientific or legal basis to deny it, and yet refused to provide it. This constitutes an independent failure to accommodate. A third failure occurred when the

7

mandate was lifted in February 2023, and DOE refused to rehire most Plaintiffs and attached "problem codes" to their employment files—codes typically reserved for employees who committed misconduct such as child abuse. SAC ¶¶ 465-71. These problem codes effectively blacklisting Plaintiffs from employment in education. SAC ¶¶ 465-87. Defendants also contested Plaintiffs' unemployment benefits using the same discriminatory arguments the Second Circuit had rejected, continuing to assert that employees' religious beliefs were invalid. *See, e.g.,* SAC ¶¶ 485-87, 601-03, 735-40.

**Individual Plaintiff Allegations.** The Second Amended Complaint contains detailed, individualized accounts for each of the thirty-one Plaintiffs, demonstrating their sincerely held religious beliefs and the specific harms they suffered. These accounts establish that Plaintiffs held bona fide religious objections grounded in long-standing religious practices, often supported by clergy letters, and that many could have been easily accommodated without undue hardship. Due to limited space, the Court is respectfully referred to the SAC, which provides extensive detail for each, explaining their religious beliefs (many are themselves pastors or faith leaders, many do not vaccinate their children due to their religious beliefs, and all have readily apparent sincerely held religious objections to vaccines) (SAC ¶¶ 489-1422). As detailed in the SAC, multiple plaintiffs already had remote jobs, and all of them could have been accommodated remotely or in person as their colleagues who were favored under the Stricken Standards were. The factual record demonstrates a clear pattern of religious discrimination that continued even after the Second Circuit's condemnation of Defendants' policies, warranting relief under all asserted claims.

## STANDARD OF REVIEW

On a Rule 12(b)(6) motion, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020); *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015). To survive,

a complaint need only "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard "does not require 'detailed factual allegations,'" but demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The assessment 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct. *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955; *see Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937." *Lynch,* 952 F.3d at 75. A complaint should not be dismissed simply because it appears recovery is remote or unlikely. *Twombly*, 550 U.S. at 556.

## ARGUMENT

### POINT I
### THE CITY IS A PROPER PARTY TO THIS ACTION

The City is a proper Defendant. Unlike *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 248 (E.D.N.Y. 2012) which addressed the City's respondeat superior liability for DOE employee torts, the City's liability stems from its own policies, customs, and direct actions as a joint principal with the DOE, satisfying requirements for municipal liability. *Monell v. Department of Social Services*, 436 U.S. 658, 691–94 (1978). Under *Monell*, a municipality is liable when its official "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," directly contributes to a constitutional violation. *Id*. at 694. A municipal policy need not be written or formally adopted to create liability; it may be inferred from widespread practice (*Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)) or from a single decision by a municipal policymaker with final authority. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

The Second Circuit already held that the City was liable in *Kane.* Here, the SAC confirms

the City is jointly liable for discrimination at every phase of the accommodation process:[1]

(1)    **City's Participation in Adopting the Stricken Standards**: The Stricken Standards named the City as a co-defendant and co-obligor to provide and implement a religious accommodation process and allow them to choose a lawful process or the Stricken Standards. The City chose the latter. City decision-makers drafted much of the discriminatory criteria. The Mayor officially endorsed the criteria, claiming that only Christian Scientists and Jehovah's witnesses had valid religious objections, and admitting that the City was "one hundred percent" involved in setting the narrow criteria. He also expressed pride in the fact that this narrow policy deterred employees from applying.  (SAC ¶¶ 182-206).

(2)    **City's Direction to Maximally Discriminate During Arbitration Appeals:** The appeals began the day after the Mayor's press conference cited above. Discovery shows the City sent arbitrators and DOE representatives articles and instruction to deny whole categories of religious applicants, including but not limited to all Catholics, Seventh Day Adventists, Eastern Orthodox and most other Christians, Jews, Muslims, Buddhists and others due to positions taken by their purported "leaders." Commissioner Chokshi also issued a letter instructing them to deny any religious objections involving abortion based on his interpretation of religious doctrine., a clear violation of the Establishment Clause. (SAC ¶¶ 182-206).

(3)    **City's Creation and Control of the Citywide Panel**: After the Second Circuit found the Stricken Standards unconstitutional, the City voluntarily agreed to remediate the discrimination and created and controlled the Citywide Panel, designed and supervised by City attorney Eric Eichenholtz. The City's assumption of responsibility for remediation makes it

---

[1] *Thorne-Long,* an unpublished lower court case, is inapposite, as that plaintiff provided only conclusory allegations of City involvement, whereas the SAC here details specific City actions meeting the plausibility standard under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

directly liable for the Panel's failure to provide lawful reviews, as it denied 499 out of 500 applicants without individualized assessments and continued to implement unlawful standards.

(4)    **Deliberate Constitutional Defiance**: Despite the Second Circuit's ruling in *Kane*, the City never repudiated the Stricken Standards and instead expanded their use to other City departments, demonstrating deliberate indifference to constitutional violations. The Panel also continued to use arguments deemed unconstitutional by the Second Circuit in challenging unemployment insurance years after the Second Circuit's rebuke. The City was on actual notice of the violations through the Kane complaint prior to any denials and the Second Circuit's ruling, yet it continued to enforce discriminatory policies and failed to provide lawful remediation. *See Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (deliberate indifference when policymakers choose to retain unconstitutional programs after notice).

The City cannot escape liability by pointing to DOE as the implementing agency when the City itself designed, endorsed, and controlled the discriminatory policies through its highest officials. Given the SAC's robust factual allegations demonstrating the City's direct involvement and control over the discriminatory policies and the Citywide Panel's failure to remediate, the City is a proper party, and Defendants' motion to dismiss it from the action must be denied.

## POINT II
## THE SAC PLEADS VIABLE FAILURE TO ACCOMMODATE CLAIMS

### A. Plaintiffs Plead All Elements of the Prima Facie Claims.

The SAC asserts prima facie failure to accommodate claims for each Plaintiff. Title VII, SHRL and CHRL each impose an affirmative obligation to make reasonable accommodations for employees' (or potential employees') religious beliefs and practices. 42 U.S.C §2000e(j); 20 C.F.R. §1605.2(b); N.Y. Executive Law § 296(10)(a); N.Y.C. Admin Code § 8-107(3)(a). To plead a prima facie case of religious discrimination under Title VII, employees must allege: "(1) [they]

held a bona fide religious belief conflicting with an employment requirement; (2) [they] informed [their] employers of this belief; and (3) [they were] disciplined for failure to comply with the conflicting employment requirement." *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006). The state and local statutory elements are substantially similar, though more broadly construed. *See Marte v. Montefiore Med. Ctr.*, No. 22-cv-03491, 2022 U.S. Dist. LEXIS 186884, at *19 (S.D.N.Y. Oct. 12, 2022). Defendants concede Plaintiffs meet elements 2 and 3 of the prima facie case requirement but argue that *no* Plaintiff alleged a sincerely held religious belief that can survive dismissal. [MOL at 30].

### 1. Each Plaintiff Asserts Bona Fide Religious Beliefs

Contrary to Defendants position, Plaintiffs met their burden of asserting sincerely held religious beliefs. As a threshold matter, they each asserted they have sincerely held religious beliefs, which is sufficient to survive dismissal.

The burden to establish a sincerely held religious belief "is not a heavy one." *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 482 (2d Cir. 1985*), aff'd and remanded*, 479 U.S. 60 (1986). The EEOC instructs that employers should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief. EEOC Compliance Manual on Religious Discrimination § 12-I(A)(3) (2021). The government cannot "sit in judgment on the verity of an adherent's religious beliefs." *NYFRL,* 125 F.4th at 332-33. Importantly, "[l]ocal boards and courts ... are not free to reject beliefs because they consider them 'incomprehensible." *United States v. Seegar*, 380 U.S. 163, 184–85 (1965). The government's sole permissible role is "to determine whether religious beliefs are 'sincerely held." *NYFRL,* 125 F.4th at 332-33. In *NYFRL,* the Court clarified "[i]n other words, the Citywide Panel could deny accommodations if it concluded a claimant was not personally devout in the belief underlying the objection, but it could

not deny accommodations because it cast judgment on the nature of the religious objection raised." The core purpose of any analysis under the light burden of element one is to "differentiate between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Gardner-Alfred v. Federal Reserve Bank of New York*, 143 F.4th 51, 63 (2d. Cir. 2025).

Plaintiffs easily meet this standard. For each Plaintiff, the SAC provides detailed, individualized accounts of sincerely held religious reasons for opposing the vaccine, grounded in long-standing religious practices, personal sacrifices, and consistent adherence to faith-based principles, often at great personal cost. *See,* Zapantis, SAC ¶¶ 492-505; Argyros, SAC ¶¶ 536-662; Baptiste, SAC ¶¶ 580-606; Burrell-Bartley, SAC ¶¶ 609-38; Bynoe, SAC ¶¶ 646-69; Calia, SAC ¶¶ 675-87; Carbone, SAC ¶¶ 698-738; Carter, SAC ¶¶ 745-79; Daly, SAC ¶¶ 789-814; Deegan, SAC ¶¶ 819-38; DiCapua, SAC ¶ 845-66; Erlenbach, SAC ¶¶ 889-904; Ficchi, SAC ¶¶ 911-28; Finlaw, SAC ¶¶ 940-60; Garrett, SAC ¶¶ 968-82; Skala Kiladitis, SAC ¶¶ 991-96; Lukacevic, SAC ¶¶ 1015-37; Medina, SAC ¶¶ 1050-72; Moas, SAC ¶¶ 1076-1107; Monzillo, SAC ¶¶ 1113-25; Napolitano, SAC ¶¶ 1136-50; Olivierre, SAC ¶¶ 116-73; Otto, SAC ¶¶ 1178-93; Pizza, SAC ¶¶ 1206-27; Raymond, SAC ¶¶ 1231-49; Rettino, SAC ¶¶ 1258-75; Rivicci, SAC ¶¶ 1283-95; Schmidt, SAC ¶¶ 1313-29; Scott, SAC ¶¶ 1334-56; Stamos, SAC ¶¶ 1357-75; Valera, SAC ¶¶ 1404-21. As a few examples:

- Many Plaintiffs demonstrated long-standing religious objections to vaccines, receiving religious exemptions for their children, and homeschooling them or moving when the religious exemption was repealed. *See, e.g.,* Plaintiffs Argyros; [SAC ¶¶ 543-44]; Baptiste [SAC ¶ 581]; Bynoe [¶ 649]; Carter [¶ 753]; Deegan [SAC ¶ 820]; Erlenbach [¶ 893]; Kiladitis [SAC ¶¶ 993-95]; Lukacevic [¶ 1033]; Napolitano [SAC ¶¶ 1137-38].

- Some Plaintiffs submitted letters from their religious leaders affirming the sincerity of their beliefs and confirming that their religious objections were sincere and in some cases that their religious communities shared their concerns. *See, e.g.,* Carter [SAC ¶ 759]; Schmidt [SAC ¶ 1315]; Moas [SAC ¶¶ 1077, 1103]; Burrell-Bartley [SAC ¶ 612]; Finlaw [SAC ¶ 948]; Napolitano [SAC ¶ 1139]; DiCapua [SAC ¶ 847].

- More than one Plaintiff is an ordained minister or faith leader, leading their own congregations. *See, e.g.,*: Carter [SAC ¶¶ 746-49]; Scott [SAC ¶ 1348]; Medina [SAC ¶¶ 1070-71]. Take for example Plaintiff Pastor Stephon Bynoe, who was ordained and started his own church after finding that Seventh Day Adventist practices of the church he belonged to were too lenient. [SAC ¶¶ 647-48]. As a faith leader, Pastor Bynoe wrote religious accommodation letters for two members of his congregation who received accommodations—at least one by the Defendants - yet when he applied for the identical accommodation for himself, using the same religious beliefs he had just successfully advocated for others, his request was denied without even a hearing. [SAC ¶¶ 650-52, 662, 171(c)]. This stark disparity reveals the arbitrary and discriminatory nature of Defendants' process.

Defendants fail to offer any explanation why "none of the Plaintiffs sufficiently pleaded that they had a bona fide religious belief or practice that conflicted with the vaccine mandate. [MOL 31]. They mention only three plaintiffs by name– Calia, Carbone, and Carter – and assert that they "simply stated they had sincere objections to the vaccine" without saying how it conflicts with their beliefs. Nothing could be farther from the truth.

Take Carter, for example. Carter is a Pastor at the Pentecostal Tabernacle Church in Staten Island, which he has attended faithfully since he was a child. SAC ¶¶ 745-749. "He does not drink alcohol, smoke cigarettes, or take any product that he believes will pollute God's temple. Due to

these same religious beliefs, Pastor Carter does not believe in vaccination." *Id.* at ¶¶ 750-51. "Due to their religious belief, the Carters do not vaccinate their four children." ¶ 753. With his lengthy, heartfelt letter seeking accommodation, Pastor Carter submitted a letter from the leader of his church affirming his deep sincerity and the fact that his religious beliefs preclude vaccination. ¶¶ 754-759. The head pastor's letter further affirmed that Pastor Carter's opposition to using products derived from aborted fetal cell lines is consistent with the Bible and teachings of their church. *Id.*

Plaintiffs Calia and Carbone also articulated sincere religious beliefs. The detailed factual allegations show they are each devout Christians with a long history of religious opposition to the use of products associated with abortion, among other well-documented religious concerns including clear guidance from prayer. Both worked remotely and could have easily been accommodated. Calia was given no explanation for her denial. Carbone was told that she was essentially heretical for holding a belief not shared by the Pope. SAC ¶¶ 716-719. The Citywide Panel affirmed the denial on the ground that her religious beliefs do not preclude vaccination, even though she explained that she does not even take Tylenol due to her strong religious opposition to abortion, based on rumors that it might be tainted as well. Defendants' conclusory blanket accusation that all Plaintiffs' religious beliefs are deficient, and their choice to highlight Plaintiffs like Carbone and Carter and Calia, who each articulated particularly strong religious objections, serves as further evidence of their continued callous religious discrimination and animus.

## B.  Defendants Are Not Entitled to the Undue Hardship Defense "as a Matter of Law"

"If employees establish a prima facie case of religious discrimination under Title VII, the burden then shifts to the employer to show it could not accommodate the employees' religious beliefs without undue hardship." *Knight*, 275 F.3d. Contrary to Defendants' assertion, the facts in this case do not justify dismissal based on undue hardship "as a matter of law."

The Second Circuit has long held that Defendants bear the burden on undue hardship which is an affirmative defense. See *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995). In *Chinchilla*, which Defendants heavily rely on, the district court rejected Defendants' similar arguments on "undue hardship as a matter of law" in another vaccine mandate accommodation claim against the City, stating: "The pleading requirements in the Federal Rules of Civil Procedure…do not compel a litigant to anticipate potential affirmative defenses…and to affirmatively plead facts in avoidance of such defenses." *Chinchilla v. New York City Police Dep't,* No. 23 CIV. 8986 (DEH), 2024 WL 3400526, at *10 (S.D.N.Y. July 12, 2024) (citing *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007). Defendants argument that this is one of the rare cases where they can prevail on undue hardship "as a matter of law" because the defense allegedly "appears on the face of the complaint." [MOL at 31, citing *D'Cunha v. Northwell Health Sys*., No. 23-476-cv, 2023 U.S. App. LEXIS 30612 (2d Cir. Nov. 17, 2023)] fundamentally misapplies the law and the facts.

### 1. Religious Accommodations Were Allowed and Granted Under the Mandate

First, *D'Cunha* is inapposite as it involved a healthcare setting where the vaccine mandate at issue did not allow for religious accommodation. By stark contrast, the Mandate here was amended to expressly allow for religious accommodation on its face, SAC ¶¶ 94-95, and the City and DOE were ordered by an arbitrator to provide religious accommodation. Eichenholtz admitted under oath that the Mandate expressly allowed for in person or remote accommodation. (SAC ¶ 109). In fact, DOE provided religious accommodation to "at least 169 persons, some of them teachers," (¶ 138). These accommodated workers remained accommodated while Plaintiffs were denied the same relief. In *Chinchilla*, Judge Ho rejected Defendants' similar undue hardship argument, holding that where, as here, the SAC has allegations that some employees were

accommodated, "this would tend to demonstrate the feasibility of offering this accommodation to Plaintiff" and thus precluded any finding of undue hardship as a matter of law. *Id*. at 10.

## 2. Lack of Evidentiary Support Precludes Dismissal as a Matter of Law.

Second, it is per se unlawful to find undue hardship as a matter of law under the CHRL. Under that liberal standard, "there is no accommodation (whether it be indefinite leave time or any other need []) that is categorically excluded from the universe of reasonable accommodation." *Phillips v. City of New York*, 66 A.D.3d 170, 182 (2009). In *Phillips,* the appellate court explained that the City made a legislative choice "to deem all accommodations reasonable except for those a defendant proves constitute an undue hardship" and that this precludes judgment on the pleadings, even in cases where the accommodation might appear extremely onerous. *Id*

Title VII and the SHRL also preclude assumptions about hardship absent proof and objective evidence. The bar is even higher after the Supreme Court's landmark unanimous decision in *Groff v. DeJoy*, 143 S. Ct. 2279 (2023) (overruling the "de minimis" hardship test applied by the City here). In *Groff,* the Court held that employers bear the burden of proving that no accommodation is possible without substantial hardship or expense in the context of their business, a highly fact specific inquiry that cannot be established as a matter of law. *Id.*[2] But even pre-*Groff*, the Second Circuit has held that undue hardship requires evidentiary support. In *Borkowski*, the Second Circuit held that having to hire a teacher's aid to accommodate an employee cannot be assumed to be a hardship. An employer's failure to assess "costs, budgets, organizational impact, and other relevant factors" precludes summary judgment in their favor. 63 F.3d at 142.

Here, like in *Borkowski*, classroom teachers accommodated under the Stricken Standards

---

[2] Shockingly, Defendants continue to claim that undue hardship only requires they show "de minimis" burden. (MOL at 31). This would be reversible error and triggers an inference that the City's undue hardship findings did not meet legal standards. Defendants were ordered to provide fresh review that complied with federal, state and local standards, and knew the latter require proof of a significant hardship or expense even before *Groff*.

were often provided with an aid that would stay in person while they taught remotely. Defendants fail to present objective evidence why they could do this for Plaintiffs as well. In fact, Eichenholtz admitted under oath that neither the City nor the DOE analyzed any of the statutory factors before denying applicants based on undue hardship (SAC ¶ 299-306) and "neither the City nor the DOE ever assessed any objective evidence to determine that employees could not safely be accommodated before issuing the undue hardship denials" (SAC ¶ 302). He further admitted that DOE never provided or reviewed information "as to the number of employees it could afford to employ without causing undue hardship" (SAC ¶ 311), and that the "inability to pay employees" who were not able to work in person "has not come up" (SAC ¶ 312).

Additionally, Defendants knew that Plaintiffs could have been safely accommodated in person. For example, early on, they were provided with affidavits from the nation's top public health experts, including Dr. Jay Bhattacharya (head of NIH) and Dr. Marty Makary (Commissioner of the FDA) explaining that DOE teachers could be safely accommodated in New York City. (*See, e.g.,* SAC ¶¶ 353-392). But they admit they disregarded this evidence and issued blanket denials based on speculative and unsupported assumptions. For example, under oath, "Mr. Eichenholtz admitted that neither he nor the panel ever relied on any evidence or data to conclude that unvaccinated employees might pose a substantial risk of significant harm if allowed to work in person unvaccinated" which is the statutory requirement for an undue hardship determination based on safety (¶ 306); he "further confirmed that the Citywide Panel did not assess any other required statutory factor on safety, including the duration of any risk, nature and severity of potential harm, likelihood of harm, or imminence of harm" (¶ 307) and he "was not aware of any direct threat analysis conducted for any employee" and "could not recall any panel member assessing whether Covid-19 vaccination could limit the spread of Covid-19" (SAC ¶ 304). These

18

admissions preclude finding undue hardship as a matter of law. *See, Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 287–89 (1987) (rejecting undue hardship defense where Defendants failed to assess or present objective evidence of the statutory factors).

### 3. Failure to Engage in Cooperative Dialogue Precludes Dismissal

Third, Defendants' failure to engage in cooperative dialogue prior to denial independently precludes dismissal as a matter of law. The Court of Appeals has unequivocally established that "the lack of a good faith interactive process forecloses summary judgment in favor of the employer." *Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 838 (2014).

Defendants assert that they did engage in cooperative dialogue. But this is a disputed fact that cannot be decided as a matter of law against plaintiffs at this stage. The CHRL mandates that "the determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question **may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue**." N.Y.C. Admin. Code § 8-107(28)(2) (emphasis added). This is a pre-denial requirement, meaning that the dialogue cannot take place after a denial has been issued or on appeal. Cooperative dialogue is well-defined in the statute and requires certain subjects to be interactively discussed prior to any denial, including good faith discussion of "the person's accommodation needs, potential accommodations, including alternatives to a requested accommodation." Plaintiffs allege none of these topics were discussed prior to denial or on appeal and that no dialogue took place whatsoever.

Defendants do not address *Jacobsen* but instead cite article 78 cases assessing the impact of legislative modifications made in 2018. In 2018, the City "legislatively modif[ied]" *Jacobsen* to go even further, creating a "nonwaivable, robust, and individualized" dialogue requirement that not only precludes summary judgment against an employee, as the *Jacobsen* holding requires, but

also entitles an employee to summary judgment against their employer solely on the basis of a failure to engage. Unlike in *Chinchilla,* and the other cases cited, Plaintiffs do not assert a standalone cooperative dialogue claim so the issue is not ripe for review. Whether or not standalone cooperative dialogue claims are viable, the *Jacobsen* rule that failure to engage in cooperative dialogue "forecloses summary judgment in favor of the employer" remains intact and dispositive: Defendants cannot obtain dismissal as a matter of law on undue hardship grounds when they admit to providing no individualized review or dialogue whatsoever prior to denying Plaintiffs' applications.

## POINT III
## PLAINTIFFS ARTICULATED FREE EXERCISE CLAIMS

Plaintiffs also assert viable Free Exercise claims. The SAC articulates detailed factual allegations showing that the original and remedial process were not neutral or generally applicable, and the Second Circuit has already held that Defendants' policies cannot survive strict scrutiny. There are a few different categories of claims, which will be addressed below.

First, Plaintiffs similarly situated to those accommodated in *Kane* and *NYFRL* should survive. In *NYFRL* and *Kane*, the Second Circuit acknowledged that the Stricken Standards policy and implementation violates the Free Exercise Clause because the original religious exemption policy was neither neutral nor generally applicable. *See, e.g., Kane,* 19 F.4th at 167 ("[w]e confirm the City's 'susp[icion]' that the [Stricken Standards] procedures likely violated the First Amendment.") In *NYFRL*, the Second Circuit confirmed that this holding applies to all employees who did not receive a Citywide Panel review. *NYFRL*, 121 F.4th at 464 (reversing dismissal of Solon's claims because the Citywide Panel never issued a decision, so "Solon's religious exemption request can only have been considered under the same framework that we held was likely unconstitutional in Kane"). Like Solon in *NYFRL*, some Plaintiffs in this action were promised a Citywide Panel

review to "fix" the acknowledged discrimination but never received a decision, rendering the process illusory and forcing faith-violating choices. See, e.g., SAC ¶¶ 626-628, 639 (Burrell-Bartley); ¶¶ 1124-1126 (Monzillo); ¶¶ 1219-1221, 1227 (Pizza).

In NYFRL, the Second Circuit also reinstated the claim of Heather Clark, who had a Citywide Panel review, establishing that free exercise claims are viable for both categories of employees. Many Plaintiffs here are similarly situated to Clarke. For example, like Clarke, many plaintiffs, like Clark, are not classroom teachers or worked remotely and are not covered by the City's undue hardship rationale. See, e.g., SAC ¶¶ 6, 562-563 (Assistant Principal Zapantis worked in administrative office without student contact), ¶¶ 633-34 (Burrell-Bartley was already working remotely when the Mandate went into effect); ¶¶ 642-660 (Pastor Stephon Bynoe was a UFT Teacher Center Coach/Specialist who taught professional development workshops to adult teachers virtually from an administrative building); ¶¶ 670-674 (school psychologist Conni Calia worked primarily on computers writing IEPs and holding meetings, and had been granted medical accommodation to work fully remotely the previous year); ¶¶ 697-710 (Community Associate Adriana Carbone worked in the Manhattan Borough Office coordinating with nonprofits and handling custodial payroll with no student contact); ¶¶ 910-919 (Assistant Principal Megan Ficchi supervised six schools with multiple locations, often without being physically present); ¶¶ 1334-1342 (secretary Damaris Scott worked in a non-student-facing position where all duties could be done remotely), ¶¶ 1176-1190 (school programmer Peter Otto designed the school's remote learning system and spent half his day on fully digital programming tasks); ¶¶ 1262-68 (Rettino was an ATR teacher not tied to a school). The sheer volume of Plaintiffs who worked remotely yet were denied based on "undue hardship" also leads to an inference of pretext in the undue hardship process. And many more were not told they were denied based on undue hardship, but rather

because of improper attacks on their beliefs, or based on no reasoning at all.

All the aforementioned Plaintiffs' free exercise claims must survive under *Kane* and *NYFRL*'s existing framework. But the additional facts present in this complaint should protect all Plaintiffs' Free Exercise Claims. Critically, the pleading deficiencies found in NYFRL, which prevented the remaining plaintiffs from receiving relief under the free exercise clause in that case, are not present in this far more robust operative complaint.

### A. The SAC Establishes that the Mandate Was Not Generally Applicable as Applied by Defendants.

Strict scrutiny must apply because the Mandate, as applied through the religious accommodation policies, was not generally applicable. The Supreme Court provides that if there is *any* mechanism for individualized accommodation, even if never utilized, the law is not generally applicable. *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522 (2021). Here, state law clearly articulates a mechanism for individualized exemption – individualized analysis is required under the SHRL and CHRL, and the Defendants' own policies also provided such a mechanism, resulting in the religious accommodation of 169 employees, many with student facing jobs.

The Second Circuit already held that the original accommodation process was not generally applicable, because the Stricken Standards allowed for "individualized government assessment of the reasons for the relevant conduct, the process was not generally applicable." *Kane*, 19 F.4th at 169, quoting *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 877 (1990). Multiple circuits followed *Kane* to hold that the existence of a religious accommodation process from a vaccine mandate defeats general applicability and requires strict scrutiny of denials. *Does 1-11 v. Board of Regents of the University of Colorado*, 100 F.4th 1251 (10th Cir. 2024); *Spivack v. City of Phiadelphia*, 109 F.4th 158 (3d Cir. 2023); *Dahl* v. *Board of Trs. of W. Mich.*

*Univ.*, 15 F.4th 728, 733 (6th Cir. 2021) (per curiam).

In the Second Circuit, the test hinges on whether the government has discretion. In *Kane,* the Court held that generally applicability was defeated under the Stricken Standards scheme because plaintiffs "offered evidence that the arbitrators reviewing their requests for religious accommodations had substantial discretion over whether to grant those requests." *Kane*, 19 F.4th at 169. The Citywide Panel process did not and could not fix the general applicability trigger. Eichenholtz admitted that the Citywide Panel exercised unfettered discretion in making its decisions (SAC ¶ 425) and spreadsheets showing the Citywide Panel votes showed that different panel members came to different discretionary conclusions for the same employees. Moreover, the Panel accommodated Castro, who worked in a school building with students, but denied others with less student contact on "undue hardship." The Second Circuit has repeatedly held that a mechanism for exemption from a law or policy is only generally applicable if it "affords no meaningful discretion to the State." *We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 76 F.4th 130, 151 (2d Cir. 2023). These facts fail that test.

General applicability is also defeated in other ways set forth in this SAC, which were not before the Court in *NYFRL*. The most glaring is that 169 employees remained accommodated while similarly situated Plaintiffs were denied. And the Citywide Panel's applied an unequal and much more onerous undue hardship burden on those who had already been discriminated against, which those accommodated under the original Stricken Standards were not subjected to. Moreover, the SAC shows the Mayor exercised unfettered discretion to make carve-outs to the City's mandates, including his issuance of EEO 62, which allowed exceptions for athletes and performers due to economic reasons. When the executive branch has discretion to make non-public health related carve outs from a public health law, the Second Circuit holds that strict scrutiny must apply to

23

those who seek religious protection to protect against the possibility that the government "devalues" religious needs for the same exemption by "judging them to be of lesser import than nonreligious reasons." *Agudath Israel of America v. Cuomo*, 983 F.3d 620, 632 (2d Cir. 2020) (citing cases). Here, that possibility is very real, given that the Commissioner who issued the DOE Mandate himself wrote a letter asserting that religious concerns about abortion are not important in his view of the religious doctrines.

The point is underscored by the fact that the Defendants allowed thousands of teachers to work in person who were not compliant with the Mandate, and even allowed thousands of teachers with active covid infections to teach in person, while excluding Plaintiffs. Moreover, as the Court in DiCapua highlighted, the Mandate was underinclusive. Over a million unvaccinated children and their parents were still allowed to remain in school buildings unvaccinated. Absurdly, after Ms. Kiladitis was denied accommodation and excluded from her job, she was elected PTA President of a DOE school. As such, she was allowed to and did participate in and organize many volunteer activities in DOE public school buildings each day, yet, Defendants claimed it was an undue hardship for her to continue to do her job for pay in school buildings. (SAC ¶¶ 1011-12).

**B.  The Religious Accommodation Policies Were Not Neutral on Facially or As Applied**

The SAC also shows lack of neutrality at every level of review. As the Supreme Court has explained, the "minimum requirement of neutrality is that a law not discriminate on its face." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). But neutrality is also defeated by even "subtle departures" revealed through "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question and the legislative or administrative history, including contemporaneous statements made by members of the decision-making body." *Id*. at 534.

24

In *Kane*, the Second Circuit held that the Stricken Standards were not neutral because they "presuppose[d] the illegitimacy of religious beliefs and practices." 19 F.4th at 168 (citing *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018)). The Court found the Stricken Standards policy lacked neutrality facially and as applied strongly warned the Defendants that "'[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" *Id*. at 169 (quoting *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989)).

On the limited facts before it on the preliminary injunction motion in *Kane*, where Plaintiffs bear the burden, the Court did not find enough evidence that the City participated in the Stricken Standards process to find that neutrality impacted the Mandate itself. *Id*. at 165. The sole allegation in that complaint involving the City was that the Mayor had stated that he believed only Christian Scientists and Jehovah's witnesses had valid religious objections. The Court afforded the City an inference not available in this motion that this was merely a personal opinion.

Nothing in *Kane* precludes a revisitation of that holding. As this court held in *Broecker v. New York City Department of Education,* "The law of the case doctrine holds that a court "may depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.' " *Broecker v. New York City Department of Education*, 2023 WL 2710245, at *8 (E.D.N.Y., 2023) (citing *Johnson v. Holder*, 564 F.3d 95, 99-100 (2d Cir. 2009). Here, with a more robust accounting of the comments in context, and extensive additional detail about the City's involvement (Point I), the Court is not bound by that holding in *Kane* and should examine all religious burdens under strict scrutiny to ensure that the City's decisions appropriately weighed the important religious interests at stake against real evidence.

25

In this case, the SAC reveals that the Mayor admitted in the same press conference that the City was "100%" involved in setting the "ground rules" that limited accommodation to Christian Scientists and Jehovah's Witnesses and he was pleased that this had led to many employees giving up on their applications. ¶¶ 194-195. These statements alone defeat neutrality. The City was legally responsible for choosing a religious accommodation policy and the highest decision maker endorsed the facially unconstitutional ones and admitted that this was an official decision. *Masterpiece Cakeshop*, 138 S. Ct. at 1729 (failure to disavow triggers strict scrutiny).

Furthermore, discovery has produced far more evidence of animus by the City. As one of many examples, the SAC alleges that the City circulated articles and directives during the Stricken Standards process directing DOE to deny Jews based on a Jerusalem Post article about a rabbi in Israel, Buddhists because the Dalai Lama is vaccinated, Muslims, Catholics and Seventh Day Adventists among others based on leaders' stances. Finally, the Commissioner's letter, which takes sides in a religious debate and directs decision makers to impose special disability on applicants with disfavored views on vaccines is insurmountable, as he issued the Mandate in the first place. This fact alone must trigger strict scrutiny of all religious decisions made under the Mandate. *Masterpiece Cakeshop*, 138 S.Ct. at 1729 (neutrality defeated where decision maker characterizes belief as "merely rhetorical – something insubstantial and even insincere.")

At bare minimum, the City's religious accommodation decisions must be strictly scrutinized, as the evidence shows that the Commissioner's letter was used both in the arbitration process and by the Citywide Panel as a basis to deny applications. SAC ¶¶ 164-165, 202-204, 240, 619-23, 804-07. The SAC plausibly alleges that this animus permeated the Citywide Panel's "remedial" reviews. For example: (1) Emails reveal that Eichenholtz instructed panelists to reject fetal cell line objections as "invalid," substituting judgment on religious merit. SAC ¶¶ 237-239;

(2) The Panel routinely deemed conscience-guided objections non-religious for allowing "pick and choose" adherence, ignoring tenets like Catholicism's emphasis on the Holy Spirit speaking through conscience. SAC ¶¶ 244, 247, 445; (3) The Law Department (which was in charge of reviews) continues to argue for denials based on Pope's stance, years after *Kane*. SAC ¶ 254; and (4) the City imposed a more onerous undue hardship standard on those seeking remedial review than those who had been unfairly preferred under the original Stricken Standards.

In sum, the detailed factual allegations in this case establish a lack of neutrality at every level of the review process, distinguishing this case from the purportedly conclusory allegations that doomed other plaintiffs in *NYFRL*. The combination of facial discrimination in the Stricken Standards, systematic City participation in discriminatory guidance, and pervasive animus in implementation satisfies the pleading standard and demonstrates that strict scrutiny must apply to all Plaintiffs' Free Exercise claims.

## POINT IV
## PLAINTIFFS ARTICULATED DISCRIMINATION CLAIMS

Whether analyzed under the Equal Protection Clause, Establishment Clause, or Statutory Standards, Plaintiffs similarly asserted more than enough facts to meet the minimal pleading standard on a discrimination claim. At the pleading stage, Plaintiffs need only establish facts that give rise to a minimal inference of discriminatory motivation to survive a motion to dismiss on the lower standards governing discrimination claims. *Littlejohn*, 795 F.3d 311 (2d Cir. 2015) (holding that "the allegations in the complaint need be sufficient only to give plausible support to a minimal inference of discriminatory motivation"). This "reduced prima facie burden" is appropriate because "the facts necessarily are within the defendant's knowledge" at this early stage. *Id*. at 310-13; see also *Vega*., 801 F.3d at 87 (confirming that "a plaintiff is not required to plead a prima facie case under McDonnell Douglas" to survive a motion to dismiss). Here, Plaintiffs have far exceeded this

minimal burden.

### A. Plaintiffs Assert Establishment Clause Claims

First, Plaintiffs plausibly allege allegations that violate the Establishment Clause. Government officials violate the Establishment Clauses when adopting express classifications that create denominational preferences. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). "This principle of denominational neutrality has been restated on many occasions… [S]tated unambiguously: The State may not adopt programs or practices which aid or oppose any religion. This prohibition is absolute." *Id.* (cleaned up).

It does not matter if the favoritism is based on "animus," ignorance or a design flaw. In *Larson*, the Supreme Court struck down a regulation requiring registration for religious organizations that solicited more than 50% of their funds from nonmembers, holding that it effectively distinguished between well-established churches and churches which are new and lacking constituency which "clearly granted denominational preferences." *Larson,* 456 U.S. at 228. This case is *Larson* on steroids. Here, the preference for "established" religious organizations is not just implicit, it was explicitly stated in the Stricken Standards as the criteria upon which accommodation rested (among other denominational preferences). And the facts show that the Citywide Panel continued to reject religious beliefs based on prayer rather than official doctrine.

Multiple other Establishment Clause violations have also been alleged. Commissioner Chokshi's letter, for example, is a clearcut example of the government favoring one religious position over another, and as discussed *supra*, the evidence showed reviewers were instructed to follow this advice and usually did. It is black letter law that the "government may not compel affirmation of religious belief, punish expression of religious doctrine it believes to be false,

impose special disabilities on basis of religious views or religious status, or lend its power to one or other side in controversies over religious authority or dogma." *Smith*, 494 U.S. 872 at 110.

Another Establishment Clause problem that the Second Circuit has not addressed yet arises from the unequal undue hardship standard used in the Stricken Standards appeals versus the Citywide Panel appeals. By applying a more difficult undue hardship barrier to Plaintiffs than to the Christian Scientists, Jehovah's Witnesses and others deemed to belong to the right religion under the Stricken Standards, the City treated different denominations differently and committed a per se violation of the Establishment Clause a second time over.

**B. Plaintiffs Assert Equal Protection Claims**

For similar reasons, Plaintiffs pleaded Equal Protection Claims. The Equal Protection Clause prohibits the government from classifying people based on suspect classes unless the classification satisfies strict scrutiny. *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 457-58 (1988). Religion is a suspect class. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam). When the government expressly classifies persons based on a suspect class, its action is automatically subject to strict scrutiny. As this Circuit recognizes, "[a] plaintiff in such a lawsuit need not make an extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny." *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.,* 438 F.3d 195, 204-05 (2d Cir. 2006 (citing cases). Use of such classifications demonstrates a discriminatory purpose as a matter of law, without regard to the decision-makers' animus or subjective intent. *Miller v. Johnson*, 515 U.S. 900, 904-05 (1995); *accord Hassan v. City of New York*, 804 F.3d. 277, 295 (3d Cir. 2015) ("Put another way, direct evidence of intent is 'supplied by the policy itself.'") (citation omitted).

Under Equal Protection and Establishment Clause analysis it matters not if the Government

could have denied any Plaintiff based on undue hardship or another reason. All that matters is that they were subjected to different barriers based on their disfavored religious beliefs. "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier" to state a claim. *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Rather, the injury in fact is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id*. On this precedent, Plaintiffs equal protection claims must survive, whether this Court finds an "undue hardship" defense reasonable or not.

### C. Plaintiffs Plead Statutory Discrimination Claims

For the same reasons set forth above, Plaintiffs have alleged statutory discrimination claims. As set forth above, pleading standards on any discrimination claim, even those without direct evidence of discrimination, are lenient, and it is well settled in this Circuit that at the motion-to-dismiss stage, the complaint benefits from a temporary presumption and must be viewed in light of the plaintiff's minimal burden to show discriminatory intent. *Littlejohn*, 795 F.3d 297.

Plaintiffs far surpass that minimal standard by offering multiple direct evidence claims. As discussed *supra,* a written policy making suspect classifications among different religions or religious beliefs constitutes direct evidence of discrimination regardless of intent. Chokshi's written letter, directing discrimination against abortion related concerns, and Eichenholtz' similar emails also directing denial of personally held beliefs also qualify as same.

In a direct evidence claim, the employer cannot "rebut" a claim by demonstrating the existence of a non-discriminatory reason for reaching the same result – rather, they are subject to summary

judgment unless they can present a valid affirmative defense. *TWA v. Thurston*, 469 U.S. 111, 121 (1985). None are available here, as religious discrimination is *per se* unconstitutional. *See generally* Melissa L. Saunders, *Equal Protection, Class Legislation, and Colorblindness*, 96 Mich. L. Rev. 245, 262 (1997); *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (overruling *Korematsu v. United States*, 323 U.S. 214 (1944)).

Under this standard, the Citywide Panel determinations are not relevant. Even if Defendants could prove undue hardship, this would not allow the Court to condone the original denials, which were issued under the Stricken Standards criteria and based on suspect classifications. And in any event, Plaintiffs pled enough facts to infer that these undue hardship denials might have been pretextual. This Circuit holds that courts cannot resolve the question of pretext against employees on summary judgment of a discrimination claim (so clearly cannot do so on a motion to dismiss). *Buon v. Spindler,* 65 F.4th 64 (2d Cir. 2023). And the well-pleaded allegations here more than state a claim of pretext. For example, the City incanted "undue hardship" to deny accommodations even of employees whose non-classroom jobs could have easily been done 100% remotely. Mr. Eichenholtz admitted that the Citywide Panel did not actually engage in any undue hardship analysis. And, Defendants have yet to provide a non-discriminatory reason why they could accommodate teachers and others accommodated under the Stricken Standards but not Plaintiffs. On these facts, Plaintiffs must prevail at this stage.

**D. Plaintiffs Plead Retaliation Claims**

Plaintiffs sufficiently alleged a prima facie retaliation claim under Title VII and related state laws. The SAC highlights specific retaliatory acts, including Defendants' attachment of "problem codes" to Plaintiffs' personnel and fingerprint records—codes typically reserved for serious offenses like child abuse (SAC ¶ 481). These codes blacklisted Plaintiffs from educational

employment, with multiple alleging job offers were rescinded post-security checks despite clean records (see, e.g., SAC ¶¶ ¶¶ 1380-1388). The DOE labeled affected employees as "ineligible due to problem code," requiring immediate removal from student contact pending review (SAC ¶¶ Id).

Defendants also imposed coercive waivers, punishing those challenging discriminatory denials by requiring them to forfeit legal rights or face termination "for cause," losing accrued benefits like paid time off and health insurance (SAC ¶¶ 453-57). Many Plaintiffs, including Judy Stamos, remain barred from DOE even as a new hire unless they waive their right to sue. Mayor Adams' public statement about not "rewarding" exemption seekers further suggests intent to deter protected activities like accommodation requests or lawsuits. These actions support an inference of retaliation. These actions lead to an inference that they were meant to deter employees from protected activity, like seeking accommodation or continuing lawsuits to preserve their rights.

**POINT V**
**PLAINTIFFS' CLAIMS ARE NOT LIMITED TO ARTICLE 78 PROCEEDINGS AND ARE NOT TIME-BARRED**

Defendants' argument that Plaintiffs' civil rights claims must be brought through Article 78 rather than plenary action is frivolous and unsupported. As the Second Circuit recently held in *Whitfield v. City of New York*, "it is the petitioner's choice whether to bring an Article 78 proceeding---with the attendant summary procedures, deferential review of agency action, and limited menu of relief---or a plenary action." 96 F.4th 504, 528-29 (2d Cir. 2024). In *Whitfield*, the Second Circuit held that so long as there are different damages or relief available, res judicata did not even bar a subsequent § 1983 claim after plaintiff brought an Article 78 claim on the same set of facts.

The Supreme Court has established federal courts' "virtually unflagging obligation" to exercise their jurisdiction. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Defendants' attempt to funnel federal and state civil rights claims into state

administrative proceedings against Plaintiffs' will violates this principle. Defendants' unsupported argument violates clear controlling precedent and would strip this Court of federal jurisdiction contrary to 28 U.S.C. §§ 1331 and 1343, undermine Congress's intent to provide federal forums for civil rights claims through 42 U.S.C. § 1983 and Title VII, and defeat this Court's supplemental jurisdiction over the CHRL and SHRL, which provide robust protection and remedies against employment discrimination not available in an article 78 proceeding.

Plaintiffs' claims and remedies cannot be adjudicated through Article 78 alone. Plaintiffs seek compensatory damages, pain and suffering damages, and injunctive relief—remedies extending well beyond Article 78's scope. The SHRL and CHRL specifically authorize compensatory and punitive damages unavailable in Article 78 proceedings, which focus on administrative reasonableness rather than the full remedial scope of civil rights statutes.

## POINT VI
## PLAINTIFF'S CLAIMS ARE NOT BARRED BY RES JUDICATA OR COLLATERAL ESTOPPEL

Defendants argue that the claims of Calia, Stamos, Daly and DiCapua are barred by prior article 78 litigation. This argument is legally and factually incorrect. As a threshold matter, Stamos' article 78 claim was voluntarily dismissed without prejudice (Chazin, Ex. E at 3), Calia was not part of the suit (Gibson, Ex. 2), and Daly's special proceeding was as a taxpayer seeking a "summary inquiry" that cannot yield any damages, only testimony and is irrelevant to her claims here (Chazin, Ex. F).

But even if they had received merits decisions on article 78 claims, they would not be precluded by res judicata. Defendants' own cases contradict their position. For example *Kern*, upon which Defendants rely, expressly stated that "an Article 78 proceeding does not preclude a subsequent § 1983 proceeding because damages sought pursuant to § 1983 typically are not

available in Article 78 proceedings." 857 F. App'x 691, 694 (2d Cir. 2021). Similarly, Title VII and statutory claims provide for categories of damages not available in an Article 78, such as attorneys' fees, compensatory damages not incidental to reinstatement, and pain and suffering.

Defendants' position is further defeated by their citation to *Razzano v. Remsenburg-Speonk Union Free Sch. Dist.*, 751 F. App'x 24, 27 (2d Cir. 2018), which they cite for the proposition that res judicata bars claims that "might properly have been litigated" in a prior proceeding. However, Defendants conveniently omit the court's further holding in that case that plenary discrimination claims cannot "properly have been litigated" in the limited context of a special proceeding (including under Article 78) and will not result in res judicata. *Id.* at 27. The Second Circuit has consistently recognized this as true. *See, e.g., Davidson v. Capuano*, 792 F. 2d 275, 278 (2d Cir. 1986) ("dismissal of Article 78 petition seeking reinstatement is "of course" without prejudice to the institution of any future actions"); *Whitfield*, 96 F.4th at 526 ("pure Article 78 proceeding does not bar future damages claims.")

To be sure, DiCapua also was a Plaintiff in and *Kane*, a plenary action raising addressing constitutional claims, which were dismissed, and then won relief in her state suit in *Dicapua* (Gibson Decl, Ex 1) (vacating the denial of DiCapua's religious accommodation request and holding the undue hardship defense was arbitrary and capricious as the City treated identically situated employees differently). After those decisions were each issued, DiCapua received her right to sue letter on her timely filed Title VII claim and joined this action within ninety days of receipt of same, though expressly clarifying that she only joins in the Title VII claim.

DiCapua is not barred from this claim because she could not add a Title VII claim to her prior suits, as they were resolved and before to her receipt of the Right to Sue letter. Had she asserted a Title VII claim earlier as a placeholder, it would have been dismissed for failure to

exhaust. *See, Syeed v. Bloomberg L.P.*, 568 F.Supp.3d 314, 321 (S.D.N.Y. 2021) (dismissing Title VII claims where plaintiff had not received a right-to-sue letter prior to initiating his lawsuit even though the letter was received after commencement and prior to the motion to dismiss).

Moreover, it is well-settled law that a claimant who wins partial relief in a state law employment discrimination claim is not barred by res judicata from filing a subsequent lawsuit for further damages under Title VII in federal court. *Nestor v. Pratt & Whitney*, 466 F.3d 65, 71–72 (2d. Cir. 2006). Indeed, in *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54 (1980), the Supreme Court held that a claimant may even bring a subsequent Title VII suit solely for attorneys' fees after winning in state court. Here, Plaintiff won relief in her state proceeding but still needs to be made whole for attorneys' fees and other damages not available to her in that forum. DiCapua's Title VII claim is thus properly before this Court.

Last, Defendants argue that Plaintiff Valera's claims are barred because he participated in *Broecker*, 2023 WL 2710245, at *14 in a group lawsuit challenging procedural due process. In *Broecker*, plaintiffs, including Valera, alleged that the DOE, union, and arbitrator lacked authority to impose the vaccine mandate without following statutory rules for tenured teacher discipline. While some facts overlap, most differ significantly. *Broecker* focused solely on due process, not religious discrimination, and its last operative complaint was filed before Valera's denial by the Citywide Panel. This lawsuit, based on distinct facts and a different legal issue, should not be precluded.

Defendants improperly conflate claim preclusion (res judicata) with issue preclusion (collateral estoppel). To invoke issue preclusion, they must establish: "(1) the issues in both proceedings are identical, (2) the issue was actually litigated and decided, (3) there was a full and fair opportunity to litigate, and (4) the issue was necessary to a valid final judgment." *Gunn v.*

*Beschler*, No. 22-971, 2023 U.S. App. LEXIS 8082, at *4 (2d Cir. Apr. 5, 2023). They fail this burden, offering no evidence of specific issues decided against any Plaintiff. The only relevant prior proceeding involves Plaintiff DiCapua, whose undue hardship claims were assessed differently: NYFRL found a rational basis for the Citywide Panel's hardship claim, while DiCapua deemed it irrational. These conflicting standards—rational basis versus Title VII's "substantial hardship or expense" test—prevent issue preclusion against DiCapua.

**POINT VII**
**STATE LAW CLAIMS AGAINST DOE**
**ARE NOT BARRED BY NOTICE OF CLAIM REQUIREMENTS**

Defendants' argument that Plaintiffs' state law claims against DOE should be dismissed for failure to timely file notices of claim fails for multiple reasons. As a threshold matter, this issue does not preclude relief on the state claims, since the City is jointly liable (Point I) and all parties agree that no notice of claim is required for human rights law claims against the City. Whether or not an order vacating the Citywide Panel's determination would result in reinstatement, the City can still financially compensate Plaintiffs. But Plaintiffs state law claims against the DOE should also proceed for the following reasons.

**A.  Plaintiffs' State Claims Fall Under State Law Exemptions.**

The New York State Education Law requires certain notices to be filed prior to filing suit against the NYC DOE. But there are exceptions. First, as this Court recognized in *Caputo v. Copiague Union Free Sch. Dist.*, 218 F. Supp. 3d 186 (E.D.N.Y. 2016), "a notice of claim for a NYSHRL claim against a school district or its personnel is not required."

Second, Plaintiffs' lawsuit also qualifies for the "public interest exception" to the notice of claim requirement, which distinguishes between claims brought to vindicate private rights and those brought to vindicate public rights. See *Union Free Sch. Dist. No. 6 v. N.Y. State Human Rights Appeal Bd.*, 35 N.Y.2d 371 (1974). According to the Court of Appeals, the public interest

36

exception is applied to actions like this one that are "brought to protect an important right, which seek relief for a similarly situated class of the public, and whose resolution would directly affect the rights of that class or group..." *Mills v. County of Monroe*, 59 N.Y.2d 307, 311 (1987). Plaintiffs offer no argument against this case law but simply state, without authority, that there "does not appear to be a 'public interest exception' to the NOC requirement, despite what Plaintiffs claim." (MOL at 25). The cases cited above bely this claim.

### B. Plaintiffs Met the Notice of Claim Requirements in Any Event

To the extent that Education Law § 3813(1) imposes a notice requirement for state law claims against the DOE, Plaintiffs met them, either literally or functionally. Defendants assert that "Plaintiffs, Carlia, Finlaw, Kiladitis, Carter and Argyros allege that they filed an NOC, but only Calia and Argyros filed NOCs." Defendants offer no proof that the other Plaintiffs did not file notices of claim, or that the "late" notice they attach for Argyros was the only one she filed (the SAC alleges this was her second one to document the problem codes). And disputed facts must be resolved in favor of the Plaintiffs at this stage. Moreover, Defendants list is incomplete. Other Plaintiffs also asserted that they timely filed notices. *See e.g.,* Garrett (¶ 985); Monzillo (¶¶ 1122-23) and still others allege that they provided functional notice. Defendants cite *Santiago,* a 2006 Southern District case to dispute whether functional notice suffices under the Education Law, but recent case law from the SDNY admits that "courts in this Circuit have begun to coalesce around the rule that an EEOC complaint can satisfy notice of claim requirements" so long as it places the school district on notice of the claims alleged and is served on the party required by section 3813 within the statutory time period. In the Eastern District, courts have consistently recognized functional filing, such as EEOC complaints. *Riccardo v. N.Y.C. Dep't of Educ.*, No. 16-CV-4891, 2016 WL 7106048, at *8 (S.D.N.Y. Dec. 2, 2016) (collecting cases). Multiple other types of filing

have also been recognized as fulfilling the functional notice standards. *See, e.g., Berkowitz v. E. Ramapo Sch. Dist,* 932 F. Supp.2d 513, 527 (S.D.N.Y. 2013) (group letter suffices); *Union Free Sch. Dist. No. 6,* 35 N.Y.3d at 380 (SHRL charge would suffice if public interest exception did not apply); *Mennella v. Union Free Sch. Dist,* 287 A.D.2d 636, 636-37 (2d Dep't 2001) (Petition to the Commissioner counts); *Deposit Cent. Sch. Dist. v. Pub. Emp. Rels. Bd,* 214 A.D.2d 288, 292 (3d Dep't 1995) (PERB complaint sufficed); *Spoleta Const. & Dev. Corp. v. Bd. of Educ.*, 221 A.D.2d 927, 928 (4th Dep't 1995) (unverified letter suffices).

**POINT VIII**
**PLAINTIFFS' TITLE VII CLAIMS ARE NOT BARRED BY FAILURE TO EXHAUST**

Plaintiffs meet the exhaustion requirements of Title VII and many of Defendants' arguments to the contrary are confusing. Defendants' assertion that Zapantis' Title VII claim was not filed until April 2023 and is thus untimely is invented out of whole cloth, with no factual support, even in the submissions provided by Defendant in support of the motion (MOL 27). The SAC does not provide a date but does assert that the filing was timely. (SAC ¶¶ 519-20). Indeed, it was timely filed in 2022, months before the deadline. (See Gibson Decl. Ex. 3). Defendants concede that the action was then commenced within ninety days of the Right to Sue Letter.

Defendants next assert that Zapantis was the only Plaintiff to file an EEOC complaint. This ignores the multiple paragraphs detailing DiCapua's EEOC claim, which was also timely filed and timely joined to this action within 90 days of receipt of her right to sue letter. *See, e.g.,* SAC ¶ 1490. (See Gibson Decl. Ex 4). The SAC also references hundreds of other EEOC complaints filed by non-plaintiff colleagues, alleging, as DiCapua and Zapantis' claims do, widespread religious discrimination and failure to accommodate pursuant to unlawful practices impacting the whole class. SAC ¶¶ 519-20, 1490-95 (listing names of other timely claimants that Plaintiffs also piggyback off of which similarly allege widespread religious discrimination in the implementation

of the Mandate at DOE).

Most confusingly, Defendants agree that there is a "single filing rule" that allows multiple plaintiffs to "piggyback" off of one or more claims even if they did not exhaust administrative remedies through their own EEOC complaints. The Second Circuit has held that "where one plaintiff has filed a timely EEOC complaint, other non-filing plaintiffs may join in the action if their individual claims arise out of similar discriminatory treatment in the same time frame." *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1058 (2d Cir. 1990). Here, all Plaintiffs' claims arise out of the same discriminatory religious accommodation policies applied by Defendants during the same time period. (¶¶ 519-20, 884-86, 1490-96, 1601). The SAC asserts that the EEOC filings of both Zapantis and DiCapua provided notice that the issues were class-wide, though this is not necessary under the Second Circuit's liberal standard, and Defendants and the EEOC were aware of the widespread nature of the discrimination through these complaints and the filing of hundreds of other complaints from similarly situated DOE employees. (¶¶ 519-20, 884-86, 1490-96, 1601). As an offer of proof, DiCapua's complaint is attached and incorporated by reference. (Gibson Aff. Ex. 4). Defendants offer no legal or factual analysis to explain why they think that the non-filing Plaintiffs cannot piggyback off these claims, which are comprehensively detailed and provide adequate notice that additional employees beyond the complainants were impacted. *Id.*

## POINT IX
## THE AMENDED COMPLAINT DOES NOT VIOLATE RULE 8

Defendants' claim that the SAC should be dismissed because it is too long should be rejected. The SAC, while long, complies with Rule 8. Given the complexity of this case—involving 31 plaintiffs, multiple defendants, *Monell* claims and a years-long pattern of alleged discriminatory conduct—the level of detail is proportionate and necessary to articulate each plaintiff's experience and the systemic violations alleged. Details are particularly important given

the Second Circuit's holding in *NYFRL* that the complaint was too conclusory to establish some of the key elements of the claims. This complaint fills in the detail the Court found lacking in that matter.

Defendants identify no basis to strike any of the Complaint. They only specifically take issue with "paragraphs '1514' through '1540.'" Asserting that these paragraphs address the "Stricken Standards" they state "these 'Stricken Standards' were, in fact, stricken in November 2021 and have not been in use for nearly three years. Continuing to harp on them in such long-winded fashion when the issue surrounding them has been resolved is inane and wasteful." This argument is insulting. The Second Circuit has already held that the denials were unconstitutional. But each of these Plaintiffs was unlawfully denied religious accommodation pursuant to these standards and yet their claims have certainly NOT been resolved.  They still have not been compensated or reinstated or made whole in any way. Defendants may understandably want to move on but these facts are central to most claims in the lawsuit and the discrimination that occurred cannot be swept under the rug.[3]

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion to dismiss, direct Defendants to file an answer, and issue whatever further, different or additional relief that the Court deems just.

Dated: Ithaca, New York                                    Respectfully Submitted,
        September 15, 2025

---

[3] Defendants' lengthy argument in the brief about whether the vaccine mandate is lawful is irrelevant to the claims in this case. This lawsuit does not challenge the mandate's legality but instead assert that Defendants engaged in religious discrimination, failed to accommodate, and retaliated against Plaintiffs in processing exemption requests and imposing adverse employment actions when implementing it. Defendants' reliance on cases like *Broecker v. N.Y.C. Dep't of Educ.*, 585 F. Supp. 3d 299 (E.D.N.Y. 2022), is a red herring, addressing a claim not raised here. The Court should disregard this argument as outside the scope of Plaintiffs' claims.

Gibson Law Firm, PLLC

By:   */s/ Sujata S. Gibson*
       Sujata S. Gibson
       120 E Buffalo Street, Suite 201
       Ithaca, NY 14850
       (607) 327-4125
       sujata@gibsonfirm.law

       *Attorneys for the Plaintiffs*